## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| SAN MIGUEL HOSPITAL CORPORATION, d/b/a ALTA VISTA REGIONAL HOSPITAL, on behalf of itself and all others similarly situated,<br><br>              Plaintiff<br><br>v.<br><br>RICHARD SACKLER, DAVID SACKLER, MORTIMER D.A. SACKLER, KATHE SACKLER, ILENE SACKLER LEFCOURT, THERESA SACKLER, GARRETT LYNAM AS EXECUTOR OF THE ESTATE OF JONATHAN SACKLER, RICHARD SACKLER AND DAVID SACKLER AS CO-EXECUTORS OF THE ESTATE OF BEVERLY SACKLER, and RICHARD SACKLER AND DAVID SACKLER AS CO-EXECUTORS OF THE ESTATE OF RAYMOND SACKLER.<br><br>              Defendants | Case No. 1:25-cv-1010<br><br><br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

175161075v2

# TABLE OF CONTENTS

I.      JURISDICTION AND VENUE ................................................................................. 1

II.     NATURE OF THE CASE .......................................................................................... 3

III.    PARTIES .................................................................................................................... 7

    A.    Plaintiff .............................................................................................................. 7

    B.    Defendants ......................................................................................................... 7

    C.    Co-Conspirators .............................................................................................. 11

        1.    Manufacturing Co-Conspirators ........................................................ 11

        2.    Distributor Co-Conspirators ............................................................... 13

IV.     DEFENDANTS, BY AND THROUGH PURDUE, SET THE NATIONAL
    OPIOID CRISIS IN MOTION ............................................................................... 15

    A.    The Sackler Defendants Exerted Significant Control Over Purdue's
        Marketing Activities of OxyContin ................................................................ 18

V.      DEFENDANTS AND THEIR CO-CONSPIRATORS CREATED
    ILLEGITIMATE DEMAND FOR OPIOIDS. ......................................................... 26

    A.    The Nature of Defendants' and their Co-Conspirators' Deceptive Conduct ............ 26

        1.    Falsehoods about the risks and benefits of prescription opioids. .................. 26

        2.    Methods Utilized by Defendants and their Co-Conspirators' to
            publicize these falsehoods and convince prescribers, legislators, and
            the public of their truth. .................................................................... 27

        3.    Effects of Defendants' and their Co-Conspirators' Deceptive
            Conduct caused excessive opioid use. ............................................... 28

    B.    Chronology of Specific Deceptive Acts of Defendants and their Co-
        Conspirators. ................................................................................................... 34

VI.     DEFENDANTS UNLAWFULLY INFLATED THE SUPPLY OF OPIOIDS. ................. 60

    A.    Defendants Failed to Ensure That Purdue Met Its Legal Obligations to
        Maintain Effective Controls against Diversion And Took Steps to
        Circumvent Safeguards ................................................................................... 60

    B.    Distributors Deliberately Filled Orders for Large Volumes of Opioids ..................... 64

    C.    The Nature of the Distributor Co-Conspirators' Wrongful Conduct in the
        Distribution of Opioids ................................................................................... 66

VII.    INDICIA OF CONSPIRACY AMONG THE DEFENDANTS AND THEIR CO-
    CONSPIRATORS. .................................................................................................. 68

    A.    The Distributor Co-Conspirators marketed the Manufacturing Co-
        Conspirators' opioids ...................................................................................... 68

        1.    Walgreens ............................................................................................ 69

|  |  | 2. | CVS | 71 |
|  |  | 3. | Walmart | 72 |
|  |  | 4. | Kroger | 73 |
|  |  | 5. | Marketing Participation by Other Distributors | 73 |
|  | B. | | Collaboration Through Front Groups and Trade Groups | 75 |
|  |  | 1. | Pain Care Forum | 76 |
|  |  | 2. | Healthcare Distribution Alliance | 80 |
|  |  | 3. | National Association of Chain Drug Stores | 85 |
|  |  | 4. | Joint Funding of KOLs and Front Groups | 89 |
|  | C. | | Other Collaboration | 90 |
| VIII. | | | THE OPIOID PROMOTION ENTERPRISE HARMED PLAINTIFF AND OTHER HOSPITALS. | 98 |
| IX. | | | TOLLING | 103 |
| X. | | | CLASS ALLEGATIONS | 103 |
| XI. | | | CAUSE OF ACTION | 106 |
|  |  | 1. | Structure of the Opioid Promotion Enterprise | 106 |
|  |  | 2. | The Common Purpose and Scheme of the Opioid Promotion Enterprise | 108 |
|  |  | 3. | Pattern of Racketeering Activity | 109 |
|  |  | 4. | Conspiracy | 116 |
|  |  | 5. | Consequences | 116 |
| XII. | | | PRAYER FOR RELIEF | 116 |
| XIII. | | | JURY DEMAND | 117 |

# COMPLAINT

## I.    JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as Plaintiff's cause of action arises under the laws of the United States, specifically the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–1968.

2.      This is a civil action under RICO, 18 U.S.C. § 1964, against the estates of and other living individual members of the Sackler family for their leading roles in (a) knowingly, intentionally, willfully, recklessly, and/or negligently foisting, failing to prevent, and contributing to the opioid crisis that continues to destroy families and negatively impact the health and safety of the U.S. public, and (b) engaging in an unlawful enterprise to fraudulently transfer billions of dollars generated by Purdue from the opioid crisis to themselves.

3.      This Court has subject matter jurisdiction under section 1332(a), because: (a) Plaintiff is a citizen of the State of New Mexico; (b) Defendants are all individuals or entities that are not citizens of New Mexico; (c) there is therefore complete diversity between the parties, and (d) the amount in controversy exceeds $75,000 exclusive of interest and costs. 28 U.S.C. § 1332(a).

4.      This Court also has subject matter jurisdiction under section 1332(d), because: (a) the amount in controversy exceeds $5,000,000; and (b) "any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A).

5.      This Court has personal jurisdiction over Defendants because at all relevant times Defendants engaged in substantial business activities in New Mexico and purposefully directed their actions towards New Mexico and have the requisite minimum contacts with New Mexico necessary to constitutionally permit this Court to exercise jurisdiction.

6.      Alternatively, this Court has personal jurisdiction over all Defendants pursuant to 18 U.S.C. § 1965(a)–(b), (d).

7.    The ends of justice require the application of RICO's nationwide service of process provisions to any Defendants over whom this Court would otherwise lack personal jurisdiction. 18 U.S.C. § 1965(b). Defendants' racketeering conduct took place throughout the United States, including substantial conduct within New Mexico, and their conduct injured Plaintiff in the State of New Mexico. Others similarly situated to Plaintiff have also been injured by Defendants' racketeering conduct in New Mexico and across the country. Holding Defendants to account in this district, then, is only proper. Doing so will also ensure Plaintiff will not be required to litigate its claims beyond its home district in various courts across the United States. Congress expressly provided nationwide service of process as a basis for personal jurisdiction in RICO actions. Exercising personal jurisdiction over all Defendants in this case pursuant to RICO's nationwide service of process provisions thus serves and advances Congress's policy goals.

8.    New Mexico is a fair, reasonable, and not unduly inconvenient forum such that the Fifth Amendment's due process requirements are satisfied. Defendants' actions have injured Plaintiff and countless others in New Mexico and beyond; the document discovery in this case will be almost exclusively electronic, rendering any geographic distance between the document repositories and this Court immaterial; Defendants have access to sophisticated legal counsel who can readily litigate in any U.S. jurisdiction; and judicial economy is best served by adjudicating Plaintiff's claims against all Defendants in a single court. Accordingly, this Court may exercise personal jurisdiction over all Defendants pursuant to RICO's nationwide service of process provisions.

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Plaintiff was injured in this district and because Defendants actions directly led to the marketing, sale, distribution, and/or dispensing of prescription opioids in this district.

10.    Alternatively, venue is proper in this Court pursuant to RICO's nationwide service of process provisions. 18 U.S.C. §§ 1965(a)–(b), (d).

II.     **NATURE OF THE CASE**

11.     As a closely held corporation, Purdue Pharma L.P. ("Purdue") was owned and heavily controlled by the Sackler family. In fact, eight members of the Sackler family held a majority of the seats on Purdue's Board of Directors until 2018.

12.     For purposes of clarity, references to Purdue include Purdue Pharma L.P.; The Purdue Frederick Company; Purdue Pharma Inc.; Purdue Pharma L.P.; the Purdue Frederick Company; Purdue Pharmaceutical Products L.P.; Purdue Products L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, Rhodes Technologies Inc., and Avrio Health Limited Partnership, and further includes any other entities or any other entities owned or controlled, in whole or in part, directly or indirectly, by or on behalf of the Sackler family, including Purdue Pharma L.P., Purdue Pharma Inc., Purdue Transdermal Technologies L.P., Purdue Pharma Manufacturing L.P., Purdue Pharmaceuticals L.P., Imbrium Therapeutics L.P., Adlon Therapeutics L.P., Greenfield BioVentures L.P., Seven Seas Hill Corp., Ophir Green Corp., Purdue Pharma of Puerto Rico, Avrio Health L.P., Purdue Pharmaceutical Products L.P., Purdue Neuroscience Company, Nayatt Cove Lifescience Inc., Button Land L.P., Rhodes Associates L.P. (N/A), Paul Land Inc., Quidnick Land L.P., Rhodes Pharmaceuticals L.P., Rhodes Technologies, UDF L.P., SVC Pharma L.P. and SVC Pharma Inc.

13.     By controlling Purdue with an iron fist, the Sacklers' enterprise is responsible for much death and devastation. Through the Sacklers' direction, Purdue's sales of OxyContin, concerted efforts to push aggressive and deceptive marketing of opioid products, failure to take steps required by law to address diversion of its products, and other breaches of duty, set the opioid epidemic ablaze and stoked it for decades.

14.     Under the Sacklers' watchful eye, Purdue launched OxyContin in 1996. The purpose of the Sacklers' enterprise was to have Purdue spread the lie far and wide that its opioids were specially formulated to be safe, not addictive, and appropriate for a far wider range of patients and pain

symptoms than previously understood across the medical establishment. As part of the Sackler's aggressive campaign, Purdue (a) improperly paid doctors to promote its products; (b) targeted doctors who had well documented histories of prescribing high levels of opioids; (c) secretly sponsored astroturf and front groups, such as Partners Against Pain, that would falsely portray opioids as safe; and (d) advocated for prescribing higher doses of opioids and for longer periods of time.

15.    In 1996, Richard Sackler – while serving as keynote speaker at Purdue's 1996 national sales meeting – gleefully proclaimed that: "the launch of OxyContin Tablets will be followed by a blizzard of prescriptions that will bury the competition. The prescription blizzard will be so deep, dense and white that you will never see their white flag." Sackler also told all the sales representatives and staff that Purdue "had the most powerful selling package insert in the category and in the industry." He further told the Purdue field force that the Purdue team working on the Package Insert (of which he was a part) made the label "a more potent selling instrument." Richard Sackler would become Purdue's President three years later.

16.    The Sacklers' enterprise succeeded beyond their wildest dreams and led to a massive wave of medically unnecessary opioid prescriptions and widespread abuse and diversion.

17.    Purdue has twice voluntarily acknowledged that its opioid marketing and sales practices – which were directed and dominated by the Sacklers – constituted federal crimes:

  a. In May 2007, Purdue confessed that, from the time of Oxycontin's launch in 1996, it falsely marketed the drug as non-addictive and pled guilty to misbranding and related crimes for which it paid a record $600 million penalty.

  b. In 2020, Purdue admitted to criminal misconduct by acknowledging that it conspired with others to aid and abet the dispensing of opioids without a legitimate medical purpose and outside the usual course of professional practice in violation of federal law. For these crimes, Purdue agreed a criminal fine of $3.544 billion, plus entry of a forfeiture judgment in the amount of $2 billion, plus allowance of a $2.8 billion claim in the chapter 11 proceedings in the Southern District of New York to resolve civil liability asserted by the U.S. Department of Justice ("DOJ"). Purdue also specifically admitted that this opioid-related criminal misconduct dated back at least to May 2007 continued into 2017. For approximately 70 years, Purdue – founded as the Purdue

Frederick Company ("Purdue Frederick") – has been beneficially owned and managed by the Sackler family.

18.     The descendants of Mortimer D. Sackler and Raymond Sackler, respectively, own the company through a web of family trusts. The two branches generally sort themselves into "Side A" (the "Mortimer side") and "Side B" (the "Raymond side"). Side A and Side B share ownership of Purdue to this day, and at all relevant times completely dominated and controlled Purdue. While only the Sackler Defendants are named Defendants in this matter, the challenged conduct includes any conduct taken by any Sackler Defendant in any capacity, including, without limitation, in his or her capacity as a trustee of any trusts that own or control any interest in Purdue on behalf of any members of the Sackler family or any trusts for the benefit of any members of the Sackler family that have received any value from Purdue and includes any conduct by other current and former trustees of such trusts.

19.     The Sacklers exercised such tight control over Purdue that a leading expert on corporate law concluded that "there is little to distinguish the control the Sacklers exercised over Purdue from the control that the godfather held over his Mafia family."

20.     From the start, the Sacklers continually pressured Purdue's sales force to drive-up OxyContin sales. The Sacklers not only closely tracked sales and marketing data, but continually demanded that management increase sales targets, tagged along on sales calls to doctors' offices, directly engaged with and gave orders to junior marketing personnel over management's objections, and contravened or countermanded executives' directives.

21.     The Sacklers insisted that Purdue aggressively market OxyContin, including by targeting so-called "high value" prescribers that would prescribe more OxyContin prescriptions than other prescribers. This strategy made OxyContin ubiquitous, made Purdue tens of billions of dollars in sales, and transformed the Sacklers into multi-billionaires.

22.     While the Sacklers were aware of OxyContin's addictive nature and potential for abuse and diversion, they sought to promote the impression among health care providers that it was non-addictive and to encourage providers to write OxyContin prescriptions that they otherwise would not have written.

23.     In 2006, Purdue estimated that as much as 18.1%—or $1.8 billion—of OxyContin sales revenue between 1996 and 2005 were "attributable to OxyContin abuse" and as much as 25% of all OxyContin kilograms were being abused. A McKinsey report provided to Purdue concluded that, in 2007, approximately 38% of OxyContin users were dependent and/or abused the drug.

24.     Against this backdrop, the Sackler Defendants pressured the company to seek "pediatric indications on oxycontin tablets." When asked whether promoting the use of opioids by children was "desirable, appropriate or feasible," Richard Sackler said that OxyContin consumption by children was a "critically important piece of business."

25.     The Sacklers lacked sympathy for the victims of Purdue's OxyContin blitzkrieg. Rather, the Sacklers chose to pursue a strategy of blaming OxyContin abusers for falling into the Sacklers' trap. For example, in 2001, Richard Sackler wrote in an email that "we have to hammer on the abusers in every way possible. They are the culprits and the problem. They are the reckless criminals."

26.     While seeking to "turbocharge" OxyContin sales, the Sacklers failed to ensure Purdue's compliance with its anti-diversion duties under the Controlled Substances Act (the "CSA") and corresponding Drug Enforcement Administration ("DEA") regulations. Under these laws and regulations, Purdue was required to maintain effective controls against opioid diversion, including by maintaining a suspicious order monitoring ("SOM") system and an Abuse and Diversion Detection Program (the "ADD Program"). Purdue, however, failed to maintain effective diversion programs.

27.    Rather, Purdue, directed by the Sacklers, specifically targeted prescribers whose prescribing practices were aberrant in contravention of its own written policies.

28.    During this period, the Sacklers also systematically moved assets out of Purdue and into their own pockets. Shortly after the guilty plea in 2007, the Sacklers panicked and asked each other, "We're rich? For how long? Until which suits get through to the family?" Shortly thereafter, a close family advisor advised the Sacklers to "take defensive measures" against Purdue's "uncapped liablities," including by sending assets overseas to deprive litigants of a "deep pocket."

29.    While OxyContin was the most recognizable brand name in Purdue's stable of opioids, other opioid-related products that Purdue offered include but are not limited to MS Contin, Hysingla, Butrans, Dilaudid, Targiniq, Palladone, and Ryzolt, as well as generic versions of these drugs. Plaintiffs' use of the term "opioid" herein includes each of these drugs.

## III.    PARTIES

### A.    Plaintiff

30.    Plaintiff San Miguel Hospital Corporation d/b/a Alta Vista Regional Hospital, is a corporation chartered in the State of New Mexico, domiciled and doing business at 104 Legion Drive, Las Vegas, New Mexico 87701.

### B.    Defendants

31.    Defendant Theresa E. Sackler ("Theresa Sackler") is Mortimer Sackler Sr.'s widow and was his third wife. She was a member of the Board from 1993 through 2018, a member of the Board of MNP Consulting Limited ("MNP") from its formation until February 19, 2019, and a member of the board (the "MNC Board") of MN Consulting LLC ("MNC") from January 17, 2019 until April 15, 2019. MNC replaced the role previously occupied by MNP in connection with management of the global Sackler enterprise. She also served as a director for at least five IACs, including but not limited to Napp Pharmaceutical Group Limited and Napp Pharmaceutical Holdings Ltd. Upon information

and belief, she currently resides in the United Kingdom and resided in New York, at least part-time, through 2019.

32.    Defendant Kathe A. Sackler ("Kathe Sackler") is Mortimer Sackler Sr.'s daughter from his first wife, Muriel. Kathe Sackler was a member of the Board from 1990 through 2018 and a member of the MNP Board from its formation until February 5, 2019. She also served as a director for at least five IACs, including but not limited to Napp Pharmaceutical Group Limited and Napp Pharmaceutical Holdings Ltd. She graduated from the New York University School of Medicine and is trained in medicine. She resides in Connecticut.

33.    Defendant Mortimer D.A. Sackler ("Mortimer Sackler Jr.") is the son of Mortimer Sackler Sr. from Mortimer Sackler Sr.'s second wife, Gertraud Wimmer. Mortimer Sackler Jr. was a member of the Board from 1993 through 2019, a member of the MNP Board from its formation until April 1, 2019, and a member of the MNC Board from January 17, 2019 to, upon information and belief, the present. Mortimer Sackler Jr. also served as a director for at least five IACs, including but not limited to Napp Pharmaceutical Group Limited and Napp Pharmaceutical Holdings Ltd. Upon information and belief, he resides in Switzerland and maintains a business office in New York.

34.    Defendant Ilene Sackler Lefcourt ("Ilene Sackler") is another daughter of Mortimer Sackler Sr. from his first wife, Muriel. Ilene Sackler was a member of the Board between 1990 and 2018 and a member of the MNP Board from its formation until September 18, 2018. Ilene Sackler served as a director for at least four IACs, including but not limited to Napp Pharmaceutical Group Limited and Napp Pharmaceutical Holdings Ltd. She resides in New York.

35.    Defendant Estate of Raymond Sackler; Raymond R. Sackler ("Raymond Sackler"), the patriarch of "Side B" of the Sackler family, died on July 17, 2017. Defendants Richard Sackler ("Richard Sackler") and David A. Sackler ("David Sackler") are named as defendants both in their individual capacities, as noted *infra*, and in their capacities as executors of the Estate of Raymond

Sackler, which is an estate consisting of all interests and assets owned by Raymond Sackler as of his death. Raymond Sackler was a physician and, as alleged above, acquired Purdue Frederick with his brothers Mortimer Sackler Sr. and Arthur in 1952. Raymond Sackler served on the Board (beginning October 2, 1990, including as co-Chairman until 2007) and on the MNP Board from its formation until his death in 2017. Raymond Sackler also served as a director for a number of IACs, including but not limited to Napp Pharmaceutical Group Limited. He was co-CEO of PPI at the time of OxyContin's launch in 1996 and held that position until 2003. He helped devise Purdue's business plan to preserve profit streams for the Sacklers, was involved in various operational details of Purdue's business, helped develop abuse-deterrent OxyContin formulations, consulted on high-level strategic decisions, and influenced various initiatives and programs and Purdue's support for various third parties that promoted Purdue's interests. Raymond Sackler, his descendants, their spouses, and their affiliates are sometimes referred to by the Sacklers, and in this Complaint, as the "Side B Sacklers."

36.     Estate of Beverly Sackler. Beverly Sackler ("Beverly Sackler"), Raymond Sackler's widow, died on October 14, 2019. Defendants Richard Sackler and David A. Sackler ("David Sackler") are named as defendants both in their individual capacities, as noted infra, and in their capacities as executors of the Estate of Beverly Sackler, which is an estate consisting of all interests and assets owned by Beverly Sackler as of her death. In life, Beverly Sackler was deeply involved in the Debtors and the Sacklers' worldwide enterprise. Beverly Sackler was a member of the Board from January 15, 1993 until October 17, 2017, and a member of the MNP Board from 1996 until October 17, 2017. Beverly Sackler also served as a director for at least three IACs, including but not limited to Napp Pharmaceutical Group Limited and Napp Pharmaceutical Holdings Ltd. Until her death in 2019, she resided in Connecticut. Upon information and belief, the Estate of Beverly Sackler that was not devised under the terms of her will is now property of the Beverly Sackler Revocable Trust.

37.     Defendant Richard Sackler is the son of Raymond Sackler and Beverly Sackler. He became a member of the Board in 1990 and its co-chair in 2003, which position he retained until he left the Board in 2018. Richard Sackler also served on the MNP Board from its formation until October 1, 2018. He also was PPLP's head of research and development from at least 1990 through 1999, its president from 1999 through 2003, and served in other executive roles throughout the business. Richard Sackler also served as a director for at least five IACs, including but not limited to Napp Pharmaceutical Group Limited and Napp Pharmaceutical Holdings Ltd. He currently holds active licenses to practice medicine in New York and Connecticut. He resides in Florida.

38.     Defendant David Sackler is the son of Richard Sackler and the grandson of Raymond Sackler. David Sackler was a member of the Board from 2012 through 2018, a member of the MNP Board from July 19, 2012 until April 1, 2019, and a member of the MNC Board from January 2019 to, upon information and belief, the present. David Sackler also served as a director for at least four IACs, including but not limited to Napp Pharmaceutical Group Limited and Napp Pharmaceutical Holdings Ltd. Upon information and belief, he resides in New York.

39.     Estate of Jonathan D. Sackler ("Jonathan Sackler"), another son of Raymond Sackler and Beverly Sackler, and brother to Richard Sackler, died on June 30, 2020. Defendant Garrett Lynam is the executor of the Estate of Jonathan D. Sackler, which is an estate consisting of all interests and assets owned by Jonathan Sackler as of his death. Jonathan Sackler was a member of the Board from 1990 through 2018 and a member of the MNP Board from its formation until September 20, 2018. Jonathan Sackler also served as director for at least six IACs, including but not limited to Napp Pharmaceutical Group Limited and Napp Pharmaceutical Holdings Ltd. He resided in Connecticut.

40.     Defendants Theresa Sackler, Kathe Sackler, Mortimer Sackler Jr., Ilene Sackler, Richard Sackler and David Sackler as Co-Executors of the Estate of Raymond Sackler, Richard Sackler and David Sackler as Co-Executors of the Estate of Beverly Sackler, Richard Sackler, David Sackler,

and Garrett Lynam as Executor of the Estate of Jonathan Sackler are collectively referred to as the "Sacklers" and/or the "Sackler Defendants."

### C.    Co-Conspirators

#### 1.    Manufacturing Co-Conspirators

41.    Indivior, Inc. f/k/a Reckitt Benckiser Pharmaceuticals, Inc. ("Indivior") is a Delaware corporation with its principal place of business in Richmond, Virginia.

42.    Hikma Pharmaceuticals USA Inc. f/k/a West-Ward Pharmaceuticals Corp. ("Hikma") is a wholly-owned subsidiary of Hikma Pharmaceuticals plc. Hikma Pharmaceuticals USA Inc. is a Delaware corporation with its principal place of business in Berkeley Heights, New Jersey.

43.    Grünenthal GmbH is a German company with its principal place of business in Aachen, Germany. It concentrates on manufacturing, marketing, and selling prescription pain medications, including opioids.

44.    Abbott Laboratories, Inc. is a subsidiary of Abbott Laboratories. Abbott Laboratories and Abbott Laboratories, Inc. are referred to collectively as "Abbott." In 2002, Abbott acquired the pharmaceutical assets of BASF SE, which included Knoll Pharmaceuticals (Knoll Pharmaceuticals and its successor entities are referred to as "Knoll"). AbbVie, Inc. ("AbbVie"), is a Delaware corporation with its principal place of business in North Chicago, Illinois.

45.    Watson Laboratories, Inc. ("Watson") is a Nevada corporation with its principal place of business in Corona, California. Actavis Pharma, Inc. (f/k/a Watson Pharma Inc.) ("Actavis Pharma") is a Delaware corporation with its principal place of business in New Jersey. Actavis LLC (f/k/a Actavis Inc.) ("Actavis LLC") is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey. Watson, Actavis Pharma, and Actavis LLC are collectively referred to as "Actavis."

46.    Allergan plc is an Irish public limited company with its principal place of business in Dublin, Ireland.  Allergan Finance, LLC is a Nevada limited liability company headquartered in Madison, New Jersey. Allergan Finance, LLC is a wholly owned subsidiary of Allergan plc. Allergan Sales, LLC is incorporated in Delaware and headquartered in Irvine, California. Allergan USA, Inc. is incorporated in Delaware and headquartered in Madison, New Jersey. Allergan USA, Inc. is a wholly owned subsidiary of Allergan plc. Allergan plc; Allergan Finance, LLC; Allergan Sales, LLC; and Allergan USA, Inc. are collectively referred to as "Allergan."

47.    Endo Pharmaceuticals Inc. is a wholly owned subsidiary of Endo Health Solutions, Inc. (collectively,  "Endo").  Endo manufactured, promoted, advertised, distributed, and sold branded—Percocet  (oxycodone/paracetamol),  Opana  (oxymorphone),  and  Percodan (oxycodone/aspirin)—and generic opioids.

48.    Johnson & Johnson ("J&J") is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly owned subsidiary of J&J. Janssen Pharmaceuticals, Inc. was formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which was formerly known as Janssen Pharmaceutica, Inc.

49.    Mallinckrodt LLC, Mallinckrodt plc, and SpecGx LLC (collectively, "Mallinckrodt") manufactured, promoted, advertised, distributed, and sold branded and generic opioids. Mallinckrodt manufactures four branded opioids: Exalgo (hydromorphone), Roxicodone (oxycodone), Xartemis XR (oxycodone/acetaminophen), and Methadose (methadone). Mallinckrodt is also one of the largest manufacturers of generic opioids.

50.    Purdue manufactured, promoted, advertised, distributed, and sold branded opioids, including opioids OxyContin (oxycodone), MS Contin (morphine), Butrans (buprenorphine), Hysingla ER (hydrocodone), Dilaudid (hydromorphone), Dilaudid-HP (hydromorphone), Targiniq

ER (oxycodone/naloxone), Palladone (hydromorphone), Ryzoltand (tramadol), as well as generic versions of these drugs.

51. Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is an Israeli company with its principal place of business in Petach Tikva, Israel. Teva Pharmaceuticals USA, Inc. ("Teva USA") is a Delaware corporation with its principal place of business in Pennsylvania and is a wholly owned subsidiary of Teva Ltd. Defendant Cephalon, Inc. ("Cephalon") is a Delaware corporation with its principal place of business in Frazer, Pennsylvania. In October 2011, Teva Ltd., acquired Cephalon, which became a wholly owned subsidiary of Teva Ltd. Teva Ltd., Teva USA, and Cephalon are collectively known as "Teva."

52. Although not named as defendants because they are seeking reorganization under Chapter 11 of the Bankruptcy Code, and/or because Plaintiff has agreed to terms of settlement with them, these persons participated with Defendants along with others as part of the Opioid Promotion Enterprise, and, although not presently named as defendants in this action, are included as participants in any conduct alleged of the "Manufacturing Co-Conspirators" as a collective entity. Specific opioids manufactured by the Manufacturing Co-Conspirators are described in this Complaint as examples only.

### 2. Distributor Co-Conspirators

53. Henry Schein, Inc. ("Schein") is a Delaware corporation with its principal place of business in Melville, New York.

54. Walgreen Co. is an Illinois corporation with its principal place of business in Illinois. Walgreen Eastern Co., Inc. ("WEC") is a New York corporation with its principal place of business in Illinois. Walgreen Co. and WEC are collectively referred to herein as "Walgreens."

55. CVS Pharmacy, Inc. is a Rhode Island corporation with its principal place of business in Rhode Island. Defendant CVS Rx Services, Inc. is a New York corporation with its principal place

of business in Chemung, New York. CVS Orlando FL Distribution, L.L.C. is a Florida limited liability company. CVS Pharmacy, Inc., CVS Rx Services, Inc., CVS Orlando FL Distribution, L.L.C., are collectively referred to as "CVS."

56.    The Kroger Co. is an Ohio corporation with its principal place of business in Cincinnati, Ohio. Defendant Kroger Limited Partnership I is an Ohio limited partnership. Kroger Limited Partnership II is an Ohio limited partnership. The Kroger Co., Kroger Limited Partnership I, and Kroger Limited Partnership II are collectively referred to as "Kroger."

57.    Walmart Inc. f/k/a Wal-Mart Stores, Inc., ("Walmart") is a Delaware corporation with its principal place of business in Arkansas.

58.    Albertsons Companies, Inc. (f/k/a Albertsons LLC) is a Delaware corporation with its principal place of business is Boise, Idaho. Defendant Albertson's LLC is a Delaware limited liability company with its principal place of business in Boise, Idaho. Albertson's LLC is a wholly owned subsidiary of Albertsons Companies, Inc. Safeway, Inc. is a Delaware corporation with its principal place of business in Pleasanton, California. Safeway, Inc. is a wholly owned subsidiary of Albertsons Companies, Inc. Albertsons Companies, Inc., Albertson's LLC, and Safeway, Inc. are collectively known as "Albertsons."

59.    Giant Eagle, Inc. ("Giant Eagle") is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania. Defendant HBC Service Company ("HBC") is an operating division of Giant Eagle. Giant Eagle, Inc. and HBC Service Company are collectively referred to as "Giant Eagle."

60.    Publix Super Markets, Inc. ("Publix") is a Florida corporation with its principal place of business in Lakeland, Florida.

61.    AmerisourceBergen Drug Corporation ("ABDC") is a Delaware corporation with its principal place of business in Chesterbrook, Pennsylvania. As of August 30, 2023, ABDC and affiliated

14

companies have been rebranded as Cencora. ABDC distributed and promoted prescription opioids throughout the United States and in New Mexico, including through its subsidiary, Xcenda L.L.C. ("Xcenda"), a Florida limited liability company.

62.    Anda, Inc. ("Anda") is a Florida corporation with its principal place of business in Weston, Florida. In October 2016, Teva Ltd. acquired Anda from Allergan plc.

63.    Cardinal Health, Inc. ("Cardinal") is an Ohio corporation with its principal place of business in Dublin, Ohio.

64.    H.D. Smith, LLC (f/k/a H.D. Smith Wholesale Drug Co.) ("H.D. Smith") distributed prescription opioids throughout the United States and in New Mexico. H.D. Smith LLC's sole member is H.D. Smith Holdings, LLC, whose sole member is H.D. Smith Holding Company, a Delaware corporation with its principal place of business in Illinois. In January 2018, ABDC acquired H.D. Smith.

65.    McKesson Corporation ("McKesson") is a Delaware corporation with its principal place of business in Irving, Texas.

66.    ABDC, Anda, Cardinal, H.D. Smith, Schein, McKesson, Walgreens, CVS, Kroger, Albertsons, Publix, Giant Eagle, and Walmart, although not presently named as Defendants, are collectively referred to herein as the "Distributor Co-Conspirators." Walgreens, CVS, Kroger, Albertsons, Publix, Giant Eagle, and Walmart are collectively referred to herein as the "National Retail Pharmacies."

## IV.    DEFENDANTS, BY AND THROUGH PURDUE, SET THE NATIONAL OPIOID CRISIS IN MOTION

67.    Defendants personally pocketed more than four billion dollars from the opioid epidemic. They are the sole owners and beneficiaries of Purdue. They control Purdue and occupied the majority of Purdue Pharma Inc.'s board seats from its inception in 1990 until 2018. Defendants were not idle owners who quietly sat by, but were active participants who helped direct the actions of

Purdue, including its marketing and sales force, and build it into a highly profitable pharmaceutical powerhouse. Defendants were directly involved in developing, directing, and voting on Board matters that facilitated Purdue's deceptive practices that helped create the opioid epidemic that has ravished the nation in the past few decades.

68.    The Sacklers purchased Purdue Frederick in 1952. Purdue was not initially engaged in the sale of opioids. Purdue has, at all times, been owned, directed, and controlled by members of the Sackler family. Throughout the period relevant to this Complaint, the two sides of the Sackler family—Mortimer D. Sackler and his descendants (*i.e.*, Side A) and Raymond Sackler and his descendants (*i.e.*, Side B)—shared equal ownership of the company and equal rights to control the decisions of the company.[1]

69.    From 1990 until January 16, 2019, members of the Sackler family served on the Board, which controlled and directed the business activities of all of Purdue. Throughout that time, the Sacklers were either the sole directors or the majority of directors on the Board.

70.    The various Sackler Defendants served on the Board for the following periods of time:

| Sackler Defendant | Total Years Served as Purdue Director (rounded to nearest year) | Years |
|---|---|---|
| *Side A* | | |
| Theresa Sackler | 26 years | 1993–2018 |
| Kathe Sackler | 28 years | 1990–2018 |
| Mortimer Sackler Sr. | 19 years | 1990–2010 |
| Ilene Sackler | 28 years | 1990–2018 |
| *Side B* | | |

---

[1] Three brothers, Arthur, Mortimer Sackler Sr., and Raymond Sackler, purchased the company together. Arthur died in 1987. Soon after his death, and before the launch of OxyContin, Arthur's estate sold his one-third interest in Purdue to Mortimer Sackler Sr. and Raymond Sackler. Since that time, ownership of Purdue has been split equally between the two brothers and their respective families.

| Sackler Defendant | Total Years Served as Purdue Director (rounded to nearest year) | Years |
|---|---|---|
| Raymond Sackler | 27 years | 1990–2017 |
| Beverly Sackler | 25 years | 1993–2017 |
| Richard Sackler | 28 years | 1990–2018 |
| David Sackler | 6 years | 2012–2018 |
| Jonathan Sackler | 28 years | 1990–2018 |
| Mortimer Sackler Jr. | 26 years | 1993–2019 |

71.    The following Sackler Defendants also held various Board positions:

    a.    Richard Sackler was Co-Chairman of the Board from March 6, 2003 through June 30, 2007; and

    b.    Raymond Sackler was Co-Chairman of the Board from January 1, 2004 through June 30, 2007, and Co-Chairman of Purdue Frederick from March 6, 2003 through December 31, 2003.

72.    In addition to their board positions, some of the Sackler Defendants also held executive positions at Purdue for several years:

    a.    Richard Sackler was President of PPI from January 1, 2002, through March 5, 2003, and he described himself in a resume as COO from January 1, 1986, to December 1999;

    b.    Mortimer Sackler Jr. was Vice President of PPI from January 1, 2002 through April 23, 2003;

    c.    Raymond Sackler was President and Co-CEO of PPI from January 1, 2002 through March 5, 2003;

    d.    Kathe Sackler was Senior Vice President from January 1, 2002 through June 30, 2007; and

    e.    Ilene Sackler was a Vice President from January 1, 2002 through December 31, 2002. Even when they dropped these nominal officer titles, the change was entirely superficial.

73.    Only after Purdue pled guilty to federal crimes and settled various investigations by state governments concerning its marketing and sale of opioids in 2007, the Sacklers began to add a

17

small number of non-Sackler members to the Board to create the appearance of some independent oversight.

74.    Just as the Sacklers maintained total control over the Board, the Sacklers also handpicked Purdue's chief executives based on their perceived readiness to prioritize loyalty to the Sackler family over loyalty to Purdue.

75.    The Sackler Defendants routinely injected themselves into typical management functions and made improper demands on corporate executives.

76.    The Sackler Defendants' practices were so outside of the norms, in 2017, management identified the fact that "the Board of Directors serve[s] as the 'de facto' CEO" as one of the most pressing issues facing the company. Likewise, McKinsey & Company ("McKinsey") similarly observed that "the Board gets involved in too many decisions that it shouldn't." McKinsey further found that the Sacklers "viewed all employees like the guys who 'trim the hedges' – employees should do exactly what's asked of them and not say too much."

77.    The Sacklers themselves acknowledged that they blurred the roles between management and the Board.

78.    In March 2007, Jonathan Sackler admonished Richard Sackler about Richard's systematic practice of assigning projects directly to Purdue employees without consulting their supervisors was improper.

79.    While the Sackler Defendants eventually dropped their formal executive titles, they never stopped functioning as executives and micromanaging Purdue.

### A.    The Sackler Defendants Exerted Significant Control Over Purdue's Marketing Activities of OxyContin.

80.    Each Sackler Defendant took part in tightly controlling Purdue's OxyContin campaign. In 1999, for example, Richard Sackler wrote in an email, "You won't believe how

committed I am to make [sic] OxyContin a huge success. It is almost that I dedicated my live [sic] to it."

81.    Richard Sackler and Mortimer Sackler Jr. both closely watched sales forecasts prepared by Purdue personnel and made their own demands to push OxyContin sales:

a.    For example, on March 8, 2008, Russell Gasdia, Purdue's head of sales, informed then-CEO Stewart of a conversation he had with Richard Sackler regarding Purdue's sales forecast, writing, "John, I know it is tricky, but Dr. Richard has to back off somewhat. He is pulling people in all directions, creating a lot of extra work and increasing pressure and stress. I will draft a response but he is not realistic in his expectations and it is very difficult to get him to understand."

b.    Either the message did not make it to Richard, or he disregarded it. The following day, on March 9, 2008, Richard engaged with Purdue's sales team in painstaking detail in an effort to prove that the team's sales forecast was too low. Richard instructed the team to revise their spreadsheets, remarking, after the changes, that "this looks very different and much more encouraging, doesn't it?" and expressing his "excite[ment] to dig into the data." After removing Richard from the chain, one of the marketing managers advised his subordinates on how to "defend[] the forecast" if "you wind up talking to Dr. Richard today without me." But Richard preferred his own views to that of his marketing team. In a report to the Board the following day, Richard wrote that after a deep dive into "the preliminary sales forecast for 2008," he could "happily report that the 2008 forecast and sales plan [prepared by management] is almost certainly overly conservative, by which I mean it significantly understates what we may reasonably expect to be achieved in 2008." Richard concluded by recommending that the Board "have Mortimer Jr. and I work with John Stewart to re-forecast the year and also the 5 year plan for OxyContin tablets," and to create "a new and higher sales plan." In January 2010, numerous members of Purdue's marketing team lamented receiving "more data requests from Dr. Richard . . . that will take a lot of time and not add much value," complaining that "we're getting carried away with weekly data," and querying, "[w]hat questions are we trying to answer?" Gasdia forwarded the complaints to Stewart asking for his "help with this? It seems like every week we get one off requests from Dr. Richard and now even Dr Raymond for reports tailored to their needs, which take time and effort away from other priorities. We are not even sure of the value provided once complete." After Stewart provided some advice on how to handle the Sacklers' requests, he added, "You are not alone in receiving requests for extraordinary analyses and reports." In February 2011, after Gasdia provided information to the Board regarding sales of Butrans (another opioid) compared to forecasts at Richard's request, Richard responded, "I had hoped for better results." A couple weeks later, Richard Sackler asked members of management, "What do I have to do to get a weekly report on Butrans sales without having to ask for

it?" The following week, after Gasdia provided the weekly sales report that Richard requested, Richard asked Gasdia individually, "What else more can we do to energize the sales and grow at a faster rate?" Less than a week later, in response to another weekly sales report regarding Butrans sales, Richard inquired with Gasdia about the performance of a specific salesperson located in Palm Beach. In June 2011, Richard even joined sales representatives on physician sales calls in order to help the Sackler Defendants "get a sense of" what "impacts prescribing behavior" and gain "a more detailed analysis of 'where' the prescription uptake is great, and where it is poor," including "which district, which region, which types of prescribers, which types of practices etc." affected prescribing behavior—even though in private, Purdue management was wary of the "potential compliance risk" that this posed. As discussed below, Purdue's policy of targeting abnormally high-volume OxyContin prescribers for intensive marketing—enthusiastically endorsed by the Sackler Defendants—is at the heart of the criminal conduct to which Purdue confessed, and is closely related to the Sackler civil settlement they reached with the DOJ in 2020.

c.      In February 2012, Mortimer Sackler Jr. intervened on the timing of Purdue's annual sales meeting, arguing that Purdue should "not plan the national sales meeting" after "the winter break as it extends the period of time since the doctor[s] last saw our rep." As a result, Mortimer Sackler Jr. was accused by lower-level sales managers of "micromanagement beyond belief." In March 2012, after Richard was provided with a report regarding sales of Butrans, Richard remarked, "This is bad," and asked a marketing executive to make edits to the report. Gasdia forwarded the email to Stewart, writing, "This is taking a lot of David's energy, almost every day. . . . It isn't constructive to spend too much time on this as opposed to expending energy within my department of identifying the problem, developing the solutions and gaining implementation. Anything you can do to reduce the direct contact of Richard into the organization is appreciated." In 2013, Baker reported that during "a recent conversation with Dr. Richard, he outlined what he would tell [incoming CEO] Mark [Timney] he had to do to do [sic] with the US business in the short run," despite Baker imploring Richard "to leave the new executive to consider and make recommendations to the board without prior direction."

d.      In June 2014, after Richard posed questions to then-CEO Timney and Saeed Motahari, a new sales executive, aimed at boosting sales of Butrans, Timney cautioned that it was "a little early" to be pushing Motahari since he was "only 2 weeks into the role." Seemingly disregarding Timney's words of caution, Richard responded, "I'm looking for the difficult task of changing the trajectory very significantly. What can be done that gives a relaunch a chance?" In 2015, MNP's Governance Committee actually drafted a resolution in an attempt to curb the Sackler's meddling. This effort met some resistance and the Governance Committee was unable adopt the measure.

82.     Purdue is a privately owned company, which develops and manufactures prescription opioid drugs and other medications. Its main product is the prescription opioid OxyContin, a powerful, highly addictive pain reliever. Purdue introduced OxyContin to the market in 1996. Opioids are a class of drugs that are primarily used for pain relief, and include prescription drugs like morphine and codeine, as well as illicit drugs like heroin. In the past, prescription opioids were used for short-term, acute, or cancer-related pain, and for patients near the end of life. Historically, they were not used to treat chronic, non-cancer pain because of their highly addictive nature. That all changed after Purdue brought OxyContin to market.

83.     In 1994, Purdue applied to the FDA for approval of its controlled-release oxycodone based Schedule II opioid, OxyContin. Through market research, Purdue tested the receptivity of doctors to OxyContin for non-cancer pain. The company learned that physicians were concerned about the safety and risks of OxyContin because of its addictive and abuse potential. Purdue also learned that physicians wanted a long-lasting pain reliever that was less addictive and less subject to abuse and diversion than existing drugs. The company used this information to portray OxyContin as the safe and effective, long-lasting pain reliever physicians wanted.

84.     Still, Defendants, by and through Purdue, began an aggressive deceptive marketing campaign in 1996 that would completely change how physicians viewed the safety profile of opioids for chronic non-cancer pain.

85.     Defendants knew that expanding the potential patient pool for OxyContin meant higher cash flows for Purdue and, in turn, more money for the Sackler family. Even though oxycodone is substantially more powerful than morphine (the active ingredient in MS Contin), the Defendants sought to ensure that OxyContin would not be limited like MS Contin to treating cancer and end-of-life pain. To that end, Defendants caused Purdue to engage in an unlawful marketing campaign designed to mislead medical professionals and patients. Among other things, Purdue hired an army of

sales representatives to make the false claim that OxyContin could be prescribed safely in high doses for a broad variety of pain ailments, could improve patients' quality of life, could provide 12 continuous hours of pain relief, and had a lower addiction risk than other opioids. These sales representatives made hundreds of thousands of calls to prescribers annually.

86.    Defendant Richard Sackler, in particular, drove Purdue's deceptive marketing practices. He was a hands-on executive who was well aware of the dangerous messages Purdue was communicating about OxyContin. Richard Sackler was so involved, even as a Board member, that Purdue employees repeatedly, over the years, expressed frustration with his micromanagement.

87.    As early as February 1997, Purdue and certain of the Defendants knew that oxycodone containing drugs like OxyContin were among the most abused opioids in the United States. Defendants were well aware of the abuse and diversion of OxyContin taking place across the country because they kept apprised of stories related to OxyContin through daily news alerts, the vast majority of which involved reports of abuse, diversion, and opioid-induced deaths and overdoses. This was in addition to reports and complaints of abuse and diversion that the company directly received.

88.    Additionally, Defendants had knowledge of abuse and diversion through various communications and events. In a February 1997 email, Defendants were told that "oxycodone containing products are still among the most abused in the U.S." OxyContin creator Dr. Robert Kaiko further noted in the email that included Richard Sackler, Kathe Sackler, Jonathan Sackler and other Purdue executives and Board members that a number of patients in the company's research program "were suspect in terms of their drug accountability."

89.    Despite this knowledge, Purdue and the Sackler Defendants maintained close ties to current and former FDA employees as it navigated the regulatory waters surrounding production, marketing, and distribution of opioids. For example, Purdue hired Dr. Curtis Wright in October 1998 upon his retirement a year earlier from the FDA. Dr. Wright was the FDA Medical Officer tasked

with reviewing the OxyContin applications submitted by Purdue to the FDA. As part of his review of OxyContin, Dr. Wright was the FDA Medical Officer tasked with reviewing the OxyContin applications submitted by Purdue to the FDA. As part of his review of OxyContin, Dr. Wright concluded that OxyContin was "as good as current therapy, but has not been shown to have a significant advantage beyond reduction in frequency of dosing." Based on this, Dr. Wright found claims that OxyContin was less likely to produce addiction were unsupportable. In his workup, however, Dr. Wright also included two key and misleading statements that because the foundations of Purdue's aggressive marketing campaigns surrounding its opioids. Specifically, these statements were (a) "delayed absorption. As provided by OxyContin tablets, is believed to reduce the abuse liability of a drug"; and (2) "When the patient no longer requires therapy with OxyContin tablets. Patients receiving doses of 20-60 mg/day can usually have the therapy stopped abruptly without incident." There is evidence to suggest that Purdue was directly involved and had a hand in drafting Dr. Wright's approval submission. In March 1995, nine months before OxyContin was approved, a Purdue employee advised a Purdue executive that Dr. Wright "has confirmed that we will receive an APPROVAL letter for OxyContin (NDA 20-553) by the end of December 1995."

90.    By March 2000, Purdue was aware of specific reports of abuse and diversion involving OxyContin occurring in communities across the United States. The media were reporting that people were crushing OxyContin tables and snorting the powder or dissolving the powder in water and injecting the solution in order to attain a rush or high. Indeed, in a 2001 letter sent to healthcare providers, Purdue acknowledged "the diversion and abuse of OxyContin Tablets and other analgesics in some regions of the country."

91.    In 2001, Key Opinion Leader (KOL) Dr. Kathleen Foley emailed Richard Sackler in response to negative press surrounding Purdue and OxyContin. Dr. Foley recommended "bringing together all of the members of the pharmaceutical industry, who have analgesic drugs out there and

try to come together as a sort of cohesive voice recognizing that your particular drug has been recently identified in the newspapers as a drug issue. I think that there is a tightrope that you need to walk, because you are a drug company and it would be much better if the advocacy came from outside of the drug company and even better without much in the way of support from you. So along those lines, the kinds of things that I am thinking of is that maybe we should call a meeting, bring together representatives from all of the companies, ideally high level representatives, like presidents or major leaders and strategize about the way to play the media issues." Richard Sackler heeded Dr. Foley's advice.

92.     Indeed, Richard Sackler was acutely aware that in order to continue profiting from opioids and protecting their interests, the industry would need to come together. In an April 2001 email, Richard Sackler wrote to Paul Goldenheim "[o]ur goal is to bind these organizations more closely to us than heretofore, but also to align them with our expanding mission and to see that the fate of our product(s) are inextricably bound up with the trajectory of the pain movement."

93.     Purdue and the Defendants exercised significant direct control over the non-profit American Pain Foundation, an organization that depended entirely on incoming grants from (and was controlled by) pharmaceutical companies such as Purdue. The American Pain Foundation assisted with the design and promotion of the website for Partners Against Pain, which reached nearly 39 million people "with key messages about pain and overcoming barriers to treatment through print, television, radio, and online placements as a part of Purdue's local market media outreach grant."

94.     Additionally, the American Pain Foundation established the Pain Care Forum in 2004 to "promote and support taking collaborative action regarding federal pain policy issues." Despite this admirable aim, the Pain Care Forum actually frustrated legislative, regulatory, and educational measures aimed at mitigating the opioid crisis.

95.    Purdue and the Defendants also exercised control over the American Academy of Pain Medicine and the American Society, which Purdue paid millions of dollars to help fund. Each of these entities worked on behalf of Purdue to increase opioid prescribing.

96.    Purdue also implemented a savings card program where sales representatives provided HCP's with savings cards to defray the costs of Purdue opioid prescriptions. Under the program, physicians gave savings cards to their patients to save their patients money on prescriptions for Purdue products, including OxyContin. The savings card program was a key component of Purdue's strategy for keeping patients hooked on OxyContin longer. And Purdue's internal analyses consistently showed (1) that patients who redeemed savings cards remained on OxyContin longer and (2) patient use of savings cards led more and more physicians to prescribing OxyContin.

97.    Increased usage of opioid savings cards resulted in greater profits for Defendants. Purdue's sales representatives urged prescribers in states that banned the use of savings cards to instruct their patients to redeem them out-of-state. Defendants played key roles in overseeing, approving, monitoring, and implementing the savings card initiative and were aware that that Purdue aggressively encouraged prescribers to use opioid savings cards through direct mail and email, sales visits, and other promotional efforts.

98.    As a result of Purdue's multi-pronged approach, OxyContin generated $3.5 billion in revenue for Purdue and the Defendants between 1996 to 2001 and almost immediately accounted for 90% of the company's sales.

99.    This uncontrolled growth, spurred on by Purdue's illegal marketing practices, directed by Defendants, led to a flood of medically inappropriate and unnecessary prescriptions, which then caused significant overdose deaths and addiction in others.

100.    Defendants, by and through Purdue, brought together several key players in the pharmaceutical industry (the aforementioned "Co-Conspirators") and formed the Opioid Promotion Enterprise, whose actions gave way to the devastating opioid epidemic in the United States.

## V.    DEFENDANTS AND THEIR CO-CONSPIRATORS CREATED ILLEGITIMATE DEMAND FOR OPIOIDS.

101.    Defendants were aware that opioids pose significant risks and that the long-term safety and efficacy of opioids for chronic pain has never been established in medical literature. Nevertheless, in a deliberate plot to counter legitimate fears, Defendants intentionally and unlawfully engaged in a misinformation campaign about the risks and effects of opioid use.

102.    The consensus in the medical community—prior to Defendants' concerted campaign of deception—was that opioids were not safe for long-term use or for the treatment of chronic pain. Opioids were reserved for specialized uses, such as treatment of cancer pain or palliative care at the end of life. But Defendants realized that they could profit if they could convince providers to prescribe opioids for common ailments.

103.    Once a greater number of patients with chronic, noncancer pain were receiving opioid "therapy," best practices had to evolve to treat the consequences: titration to higher doses for patients presenting with the industry-promoted concept of "pseudoaddiction" as well as higher doses and longer use of opioids when patients presented with withdrawal-like symptoms.

104.    The concept of blaming the patient for drug-seeking behavior took root. Patients moved to illicit heroin and other drugs to address their withdrawal cravings after states and regulatory authorities took steps to reduce opioid prescriptions and prosecute doctors running pill mills.

### A.    The Nature of Defendants' and their Co-Conspirators' Deceptive Conduct

#### 1.    Falsehoods about the risks and benefits of prescription opioids.

105.    Defendants and their Co-Conspirators intentionally and unlawfully engaged in a misinformation campaign to convince prescribers, legislators, and the public that opioids are

appropriate—and even necessary—to treat chronic pain. The falsehoods spread by Defendants and their Co-Conspirators can be summarized as follows: (1) The risk of addiction to opioids is low, (2) It is easy to identify people at high risk for addiction, (3) Signs of addictive behavior are "pseudoaddiction" requiring more opioids, (4) Addicted patients are "untrustworthy" "abusers," (5) Opioid withdrawal can be avoided by tapering; (6) Opioid doses can be increased without limit or increased risk, (7) Long-term opioid use improves functioning, (8) Opioids are safer than other pain medications, (9) Ostensibly "abuse-deterrent" formulations are safer, (10) Short-acting opioids should be used to treat chronic, noncancer "breakthrough" pain, and (11) Despite heightened risk factors, the elderly and veterans can safely use opioids.

106.    Each of these misrepresentations regarding the use of opioids to treat chronic pain was either not supported by or was contrary to the scientific evidence. Through these and other misrepresentations, Defendants and their Co-Conspirators misinformed and continue to misinform the medical community and the public about the risks of opioid use.

### 2.    Methods Utilized by Defendants and their Co-Conspirators' to publicize these falsehoods and convince prescribers, legislators, and the public of their truth.

107.    Defendants used multiple, mutually reinforcing channels to spread their deceptive claims, including: (1) direct, targeted communications with prescribers by sales representatives or "detailers";[2] (2) Front Groups with the appearance of independence from the Manufacturing Defendants, including the American Pain foundation ("APF"), The American Academy of Pain

---

[2] The Manufacturing Co-Conspirators' sales representatives aggressively pushed doctors to prescribe stronger doses of opioids. One common technique was to visit doctors regularly, gradually, and dangerously raising their comfort level with prescribing ever-higher doses of opioids. For example, one Purdue sales representative wrote about how his regional manager would drill the sales team on their upselling tactics. It went something like this. "Doctor, what is the highest dose of OxyContin you have ever prescribed?" "20mg Q12h." "Doctor, if the patient tells you their pain score is still high you can increase the dose 100% to 40mg Q12h, will you do that?" "Okay." "Doctor, what if that patient then came back and said their pain score was still high, did you know that you could increase the OxyContin dose to 80mg Q12h, would you do that?" "I don't know, maybe." "Doctor, but you do agree that you would at least Rx the 40mg dose, right?" "Yes." The next week the representative would see that same doctor and go through the same discussion with the goal of selling higher and higher doses of OxyContin.

Medicine ("AAPM")[3] and the American Pain Society ("APS"),[4] The Pain and Policy Study Group ("PPSG") at the University of Wisconsin; the Alliance for Patient Access ("AfPA"), American Geriatrics Society ("AGS"), the American Chronic Pain Association ("ACPA") , the C.A.R.E.S. (Collaborating and Acting Responsibly to Ensure Safety) Alliance (created by Mallinckrodt in 2010) (3) independent organizations (including the Federation of State Medical Boards ("FSMB") and  The Joint Commission f/k/a the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO" prior to 2007 and "Joint Commission" thereafter)) that were captured by Defendants; (4) Key Opinion Leaders ("KOLs"), that is, doctors paid by the Manufacturing Co-Conspirators to promote their pro-opioid message; (5) mechanisms of disseminating their misleading messages through reputable organizations; (6) continuing medical education (or "CME") programs controlled and/or funded by the Manufacturing Co-Conspirators; (7) branded advertising; (8) unbranded advertising; (9) publications; and (10) speakers' bureaus and programs.

### 3. Effects of Defendants' and their Co-Conspirators' Deceptive Conduct caused excessive opioid use.

108.    Pharmaceutical marketing and promotion is effective at changing the habits of prescribers and consumers.[5] Pharmaceutical manufacturers would be very unlikely to spend the large sums that they do on marketing were it not effective. The promotional activities described above thus drove an increase in opioid prescriptions.

---

[3] Through 2019, AAPM received lavish funding totaling nearly $10 million from opioid manufacturers. Purdue paid $2,798,769; J&J paid $570,174; Janssen paid $562,674; Insys paid $52,725; and Teva and Cephalon contributed over $1 million. In 2011 alone, AAPM received $1.3 million from pharmaceutical companies.

[4] As to APS, Purdue paid $3,418,210; J&J paid $1,793,906; Endo paid $5,208,065; and Janssen paid $60,000. Altogether, opioid manufacturers contributed over $12 million through 2019.Sen. Chuck Grassley & Sen. Ron Wyden, Senate Fin. Comm., *Findings from the Investigation of Opioid Manufacturers' Financial Relationships with Patient Advocacy Groups and Other Tax-Exempt Entities* 19–37 (Dec. 16, 2020) (hereinafter *December 2020 Senate Bipartisan Opioids Report*).

[5] *See, e.g.*, *How Drug Marketing May Influence Prescriptions*, Nat'l Inst. of Health (May 23, 2017), https://www.nih.gov/news-events/nih-research-matters/how-drug-marketing-may-influence-prescriptions; *Spending on Consumer Advertising for Top-Selling Prescription Drugs in U.S. Favors Those with Low Added Benefit*, Johns Hopkins Bloomberg Sch. of Pub. Health (Feb. 7, 2023), https://publichealth.jhu.edu/2023/spending-on-consumer-advertising-for-top-selling-prescription-drugs-in-us-favors-those-with-low-added-benefit.

109.    Indeed, KOL Dr. Portenoy, who was a paid speaker or advisor to companies including Cephalon, Endo, Janssen, and Purdue, has acknowledged that promotion directed at prescribers under the guise of education was designed to and, in fact, did influence prescribers' decisions. He has likewise admitted that the Manufacturing Co-Conspirators' use of his work (and similar work by others) was one of the contributing factors to the opioid crisis.

110.    These promotional activities included those of Front Groups that were funded and directed by the Manufacturing Co-Conspirators. A U.S. Senate report found that the financial contributions from opioid manufacturers and the resulting activities of the Front Groups "suggests, at the very least, a direct link between corporate donations and the advancement of opioids-friendly messaging."[6]

111.    Because marketing opioids to doctors was effective at making chronic opioid therapy a commonplace and often first-line treatment, opioid prescription rates have increased. While previously a small minority of opioid sales, today between 80 and 90% of opioids (measured by weight) are used for chronic pain.

112.    The increasing number of opioid prescriptions has led to increased rates of opioid misuse because there is a "parallel relationship between the availability of prescription opioid analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and associated adverse outcomes."[7] The opioid epidemic is thus "directly related to the increasingly widespread misuse of powerful opioid pain medications."[8]

113.    The increasing number of opioid prescriptions has led to increased numbers of patients who, even if they are not misusing prescription opioids, have nevertheless become

---

[6] *Fueling an Epidemic Part Two, supra.*
[7] Richard C. Dart, et al., *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 New Eng. J. Med. 241 (2015), https://www.nejm.org/doi/pdf/10.1056/NEJMsa1406143.
[8] *See* Robert M. Califf, et al., *A Proactive Response to Prescription Opioid Abuse*, 374 N. Engl. J. Med. 1480 (2016), https://www.nejm.org/doi/full/10.1056/NEJMsr1601307.

physiologically and/or psychologically dependent on them.[9] Such patients are more difficult, time-consuming, and resource-intensive to treat for any medical condition (not just those related to substance use) with which they present. This difference is caused by the patients' opioid use.

114.    The increase in prescriptions (driven by aggressive marketing) leads to increased rates of overdose. In a 2016 report, the CDC explained, "Opioid pain reliever prescribing has quadrupled since 1999 and has increased in parallel with [opioid] overdoses." Patients receiving opioid prescriptions for chronic pain account for most overdoses. For these reasons, the CDC concluded that efforts to rein in the prescribing of opioids for chronic pain are critical "to revers[ing] the epidemic of opioid drug overdose deaths and prevent[ing] opioid-related morbidity."[10]

115.    The progression from prescription opioids to the use of illicit drugs, particularly heroin (and, more recently, fentanyl), is well documented.[11]

116.    In a November 2019 study by the National Bureau of Economic Research, researchers from the University of Pennsylvania, the University of Notre Dame, and the Rand Corporation examined how the marketing of OxyContin at its introduction in 1996 affected the opioid crisis. At that time, certain states' regulations made the drug easier to prescribe, and Purdue concentrated its marketing efforts in those states.

117.    The study found that in states where Purdue focused its initial misleading marketing messages, OxyContin distribution was nearly twice as high as in similarly situated states with more stringent prescription requirements in which Purdue did not market aggressively.[12]

---

[9] *See* Emily O. Dumas & Gary M. Pollack, *Opioid Tolerance Development: A Pharmacokinetic/Pharmacodynamic Perspective*, 10 The AAPS Journal 537 (2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2628209/pdf/12248_2008_Article_9056.pdf ("Long-term use of opioids can be problematic due to the rapid development of profound tolerance to the analgesic effects . . . .").

[10] Rose A. Rudd, et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, 643 Morbidity & Mortality Wkly. Rep. 1378 (2016), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm.

[11] Theodore J. Cicero, et al., *The Changing Face of Heroin Use in The United States: A Retrospective Analysis of The Past 50 Years*, 71 J. Am. Med. Ass'n Psychiatry 821 (2014), https://jamanetwork.com/journals/jamapsychiatry/fullarticle/1874575.

[12] Abby E. Albert, et al. "Origins of the Opioid Crisis and Its Enduring Impacts," NBER Working Papers 26500, Nat'l Bureau of Econ. Research (2019), https://www.nber.org/system/files/working_papers/w26500/w26500.pdf.

118.    The authors found that by 2000 the false marketing campaign had led to OxyContin sales 2.5 times higher in the targeted states than in the non-targeted states. Hence, the authors concluded that Purdue's false marketing had a direct effect on sales of OxyContin.[13]

119.    The authors also studied misuse and overdose death trends over time. When looking at overdose deaths, the authors found low overdose death rates across the non-targeted states and much higher rates in the states where Purdue had concentrated its false marketing.

120.    Based on their careful analysis, the authors concluded that the differences were attributable to Purdue's marketing.[14]

121.    Although this study used the natural experiment created by Purdue's decision to avoid marketing OxyContin in certain states, its conclusion applies to opioid marketing more broadly because the study demonstrates a quantifiable effect of the intensity of opioid marketing on adverse outcomes (e.g., overdose rates).

122.    Put more simply, it is inconceivable from a business perspective that the Manufacturing Co-Conspirators would have spent billions of dollars marketing their drugs (which they did) if they did not receive a return on their investment in the form of higher sales. From this, one can only conclude that Manufacturing Co-Conspirators' marketing caused more opioids to be prescribed, which led to increased rates of opioid dependence (of which overdose is merely an extreme manifestation).

123.    The vector between Manufacturing Co-Conspirators' marketing and increased prescriptions is the reliance of doctors upon the false and/or misleading statements found made in Manufacturing Co-Conspirators' promotions. Reliance is the necessary connection between the two observed states of (a) increased marketing and (b) increased prescriptions because a prescription can

---

[13] *Id.* at 20.
[14] *Id.* at 37 (emphasis added).

only be written by a healthcare provider. Therefore, the causal relationship established by the studies discussed above necessarily implies reliance by prescribers.

124.    Opioid prescriptions in the United States are still far too high. Opioid prescriptions (in total dosage units) are much higher than they were before the Manufacturing Co-Conspirators' marketing blitz began:[15]



125.    In fact, MMEs per capita prescribed in 2020 in the United States were 334 per person -- more three times as high as they were in 1992 (106 per person).[16] Prescribing practices have improved from the peak of prescription rates in or around 2011 (well over 700 MME per person), but they have a long way to go to return to the baseline levels existing before Manufacturing Co-Conspirators changed the national narrative on opioid prescribing.

126.    Opioid prescription rates in the United States are still considerably higher than those in other developed countries. In fact, "[t]he amount of prescription opioids dispensed per million

---

[15]  Congressional Budget Office, "The Opioid Crisis and Recent Federal Policy Responses" (Sept. 2022),https://www.cbo.gov/publication/58532

[16]  Johanna Catherine Maclean, et al., "The Opioid Crisis, Health, Healthcare, and Crime: a Review of Quasi-Experimental Economic Studies," National Bureau of Economic Research (Apr. 2022), https://www.nber.org/system/files/working_papers/w29983/w29983.pdf

people per day in the United States is approximately four times the median for member countries of the Organization for Economic Co-operation and Development."[17]



Source: American Institute of Chemical Engineers (2022).[18]

127.    While most deaths are now attributed to fentanyl and other synthetics (primarily distributed illegally), many of the persons using these products got their start, and developed their dependency, with prescription opioids.

---

[17]  Congressional Budget Office, "The Opioid Crisis and Recent Federal Policy Responses" (Sept. 2022),https://www.cbo.gov/publication/58532
[18]  Benjamin Haslund-Gourley, et al., "Responding to the Opioid Epidemic," American Institute of Chemical Engineers (Sept. 2022), https://www.aiche.org/resources/publications/cep/2022/september/responding-opioid-epidemic

B.    **Chronology of Specific Deceptive Acts of Defendants and their Co-Conspirators.**

128.    Each action described in this subsection is alleged to be a predicate act of Wire Fraud and/or Mail Fraud, as each action (a) involved the use of interstate wires and/or mail, and (b) served to advance the purposes of the Opioid Promotion Enterprise (as defined below).

129.    In 1997, AAPM and APS jointly issued a consensus statement, *The Use of Opioids for the Treatment of Chronic Pain*, which endorsed opioids to treat chronic pain and claimed that the risk of addiction to opioids was low.[19]

130.    The "1998 *Model Guidelines for the Use of Controlled Substances for the Treatment of Pain*," which emphasized the use of opioids for the treatment of pain and trivialized the risk of addiction and was issued by the official-sounding, but in fact mere enterprise member populated trade organization, the Federation of State Medical Boards.

131.    Much of the early work in changing the approach to pain management was made possible through grants by the Robert Wood Johnson Foundation ("RWJF"), which funded initiatives to expand the use of prescription opioids to treat both end-of-life and cancer pain as well as chronic, nonmalignant pain. A primary grantee was the University of Wisconsin Pain & Policy Study Group ("UW-PPSG") that initially promoted opioid use for end-of-life and cancer care before expanding its advocacy to the use of opioids for other chronic conditions.

132.    In the late 1990s and early 2000s, Defendants and the Manufacturing Co-Conspirators set their sights on three targets to change prescribing practices and the culture surrounding pain treatment: (1) the Joint Commission of the Accreditation of Healthcare Organizations ("JCAHO"), which established standards that hospitals had to follow to remain accredited; (2) the Federation of State Medical Boards ("FSMB"), which established model standards for doctor discipline; and (3) the

---

[19] Am. Acad. of Pain Med. & Am. Pain Soc'y, *The Use of Opioids for the Treatment of Chronic Pain* (1997).

Veterans Administration ("VA"), which directly ran a great number of hospitals and clinics. The goal was to convince these organizations to issue treatment guidelines encouraging the regular evaluation of pain and its treatment with prescription opioids.  Defendants were successful. The VA and FSMB guidelines supporting the assessment of pain and its treatment via prescription opioids were issued in 1998. JCAHO and the opioid industry (through another front group, the National Pharmaceutical Council) issued joint guidelines in 1999. The changes in these guidelines were so significant from the then-current best practices that hospitals were given two years—until 2001—to implement them.

133.    In the interval before the JCAHO guidelines went into effect, UW-PPSG (funded by the RWJF and the drug industry) led a media campaign directed at doctors, hospitals, and patients to persuade them to adopt these novel practices.

134.    The 1998 FSMB guidelines spurred prescriptions by removing the threat of discipline for doctors who prescribed opioids in violation of what had been accepted best practices prior to the Defendants' and Manufacturing Co-Conspirators' intervention. Reasonable physicians could conclude that failing to prescribe opioids would expose them to discipline.

135.    Purdue-financed KOL Dawn Marcus, in a 2000 article in the publication American Family Physician, falsely asserted "While studies report drug abuse/dependence/addiction is 3 to 19 percent of chronic pain patients, true addiction (psychologic dependency) is uncommon with the use of long-acting opioids for chronic pain."

136.    By Janssen's 2001 patient booklet for its opioid product Duragesic which misleadingly stated, "Addiction is relatively rare when patients take opioids appropriately."

137.    In 2003, APF participated in a luncheon with Cephalon, Purdue, and other pharmaceutical companies, the purpose of which, according to Cephalon's Scott Melville (who was coordinating with Purdue's Burt Rosen), was to "build a formal or informal coalition on these issues" related to pain.

138.    Later that year, 2003, APF held a "Corporate Roundtable" attended by Cephalon, Janssen, and Purdue. The notes from this roundtable reflect discussions of "how to exploit decade of pain," "collaboration," "collaboration w/focus," "collab – need to coalesce a key msg," "time is now to define roles of orgs what can we each do," "industry = problem solvers," and "APF has staff – take leadership."

139.    Enterprise mouthpieces funded by Endo released *A Clinical Guide to Opioid Analgesia*, written by Drs. Perry Fine and Russell Portenoy (2004) and the Endo-supported *A Clinical Guide to Opioid Analgesia*, which downplayed risks such as respiratory depression and addiction. This publication also promoted the myth that "long-term opioid therapy of an older population with no history of substance abuse is rarely associated with de novo development of abuse or addiction."[20]

140.    Cephalon supported another APF publication called *Target Chronic Pain Notebook* (2004-08)[21] This publication was cited in later KOL materials, such as "Consensus Panel Recommendations" regarding breakthrough pain (which were themselves based on a meeting that was also supported by Cephalon), which promoted the idea of using immediate-release opioids to treat "breakthrough" pain in patients without cancer.

141.    CMEs directly supported by Endo included Opioid Analgesia: Practical Treatment of the Patient with Chronic Pain,[22] and Advances in Opioid Analgesia:  Maximizing Benefit While Minimizing Risk.[23]  The programs promoted the use of opioids for pain from osteoarthritis, neuropathy, and back pain. Endo listed "[d]ifferentiation among states of physical dependence,

---

[20] Perry G. Fine & Russell K. Portenoy, *A Clinical Guide to Opioid Analgesia* 20, 34 (2004).

[21]    Am. Pain Found., *Target Chronic Pain Notebook* (rev. ed. Mar. 2008), https://nebula.wsimg.com/392ead060392f7d4fe593c5417233921?AccessKeyId=BFACF0D24D833A99FAF8&disposition=0&alloworigin=1.

[22] McCarber, *supra*.

[23] Cole, *supra*.

tolerance, pseudoaddiction, and addiction" as an element to be considered when awarding grants to CME providers.[24]

142.    J&J also established the National Pain Education Council to develop and promote continuing medical education programs and materials to educate physicians on the treatment of chronic pain with opioids. After a bench trial, an Oklahoma court found that CME materials sponsored by the NPEC "disseminated false and misleading statements regarding opioids and pain management."[25]

143.    FSMB's 2007 publication, *Responsible Opioid Prescribing*, was backed largely by Manufacturing Co-Conspirators, including Purdue, Endo, Cephalon, and Abbott. This publication was also supported by APF and AAPM; Dr. Fishman wrote the text[26] and Dr. Fine served on the Board of Advisors.[27] *Responsible Opioid Prescribing* made claims similar to those in the 1998 Guidelines. This publication inaccurately claimed that "[m]ultiple clinical studies" showed that opioids improved daily function, psychological health, and overall quality of life for those suffering from chronic pain.[28] The FSMB website described *Responsible Opioid Prescribing* as the "leading continuing medical education (CME) activity for prescribers of opioid medications."[29] Endo sales representatives distributed copies of *Responsible Opioid Prescribing* with a special introductory letter from Dr. Fishman. Evidencing its influence, 163,131 copies of *Responsible Opioid Prescribing* were distributed by state medical boards.[30]

---

[24] *Opana REMS, supra.*

[25] While this decision was overturned by the Oklahoma Supreme Court, that court overturned the ruling on purely legal grounds and did not challenge this factual conclusion by the trial court.

[26] In the same year as this publication appeared, Dr. Fishman received funding from Abbott.

[27]    *Project    Sponsors,*    Fed'n    St.    Med.    Bds., https://web.archive.org/web/20071112193505/http://www.fsmb.org/RE/PAIN/projectsponsors.html (last accessed July 13, 2021 as of Nov. 12, 2007).

[28] Scott M. Fishman, *Responsible Opioid Prescribing: A Physician's Guide* (2007) (hereinafter, *Responsible Opioid Prescribing*).

[29]    *Responsible    Opioid    Prescribing:    A    Clinician's    Guide,*    Fed'n    St.    Med.    Bds., https://web.archive.org/web/20130115014329/http://www.fsmb.org/book/ (last accessed July 13, 2021 as of Jan. 15, 2013).

[30]    Email    from    Dr.    Scott    Fishman    to    Charles    Ornstein    (Dec.    15,    2011),

Copies were also given away for free by Mallinckrodt's C.A.R.E.S. Alliance.[31] A 2012 update to *Responsible Opioid Prescribing* still assured physicians that "[o]pioid therapy to relieve pain and improve function is legitimate

144.    By the statements that, in a 2007 plea deal, Purdue admitted its "supervisors and employees, with the intent to defraud or mislead, [had] marketed and promoted OxyContin as less addictive, less subject to abuse and diversion, and less likely to cause tolerance and withdrawal than other pain medications." Nonetheless, Purdue continued in this course of conduct long after the 2007 plea deal.

145.    APF published a guide sponsored by Cephalon and Purdue, *Treatment Options: A Guide for People Living with Pain*, and distributed 17,200 copies of this guide in 2007 alone. This guide contains multiple misrepresentations regarding opioid use, including that opioids are an appropriate first-line therapy for chronic pain.[32] *Treatment Options* also represented the risk of death as a reason to avoid NSAIDs and warned that risks of NSAIDs increase if "taken for more than a period of months," with no corresponding warning about opioids. Under a heading asking "[s]hould I take these pain medicines?", the publication claimed that "NSAIDs can cause life-threatening side effects in some persons" and that "[t]here are 10,000 to 20,000 deaths each year because of the side effects of this class of medicines,"[33] when the actual figure is closer to 3,200.[34] In contrast, *Treatment Options* posed no such question about the appropriateness of opioids. Rather, the publication stated that opioids

---

https://assets.documentcloud.org/documents/279033/fishman-responses-to-propublica.pdf.

[31] *C.A.R.E.S. Alliance Tools*, *supra*, at 8.

[32]    Am.    Pain    Found.,    *Treatment    Options:    A    Guide    for    People    Living    with    Pain*, https://web.archive.org/web/20220812235117/https://ce4less.com/Tests/Materials/E019Materials.pdf    (last    visited Aug. 25, 2023 as of Aug. 12, 2022) (hereinafter *Treatment Options*).
[33] *Id.*

[34] Robert E. Tarone, et al., *Nonselective Nonaspirin Nonsteroidal Anti-Inflammatory Drugs and Gastrointestinal Bleeding: Relative and Absolute Risk Estimates from Recent Epidemiologic Studies*, 11 Am. J. Therapeutics 17 (2004), https://pubmed.ncbi.nlm.nih.gov/14704592/.

could be "increased over time" and that there was "no ceiling dose as there is with the NSAIDs."[35] This comparison is deceptive because opioids also pose severe and life-threatening effects, particularly at higher doses, and more people die each year from opioid use than from NSAID use.

146.    The APF's *A Reporter's Guide: Covering Pain and Its Management* and *Treatment Options: A Guide for People Living with Pain* (2008), one of many publications characterizing espousing the concept of pseudoaddiction, claimed that "the potential for addiction is low for the vast majority of patients using opioids for the long-term management of chronic pain."

147.    *Finding Relief: Pain Management for Older Adults*, a 2009 publication from the AAPM asserting downplaying the addictive qualities and risks of opioid use as against NSAIDs.

148.    More false information regarding the concept of "pseudoaddiction" as fabricated and disseminated by enterprise mouthpieces funded by Endo in *The Truth About Pain Management*, Am. Acad. Pain Med. (May 17, 2008)

149.    In April 2007, Endo sponsored an article aimed at prescribers, which emphasized the risks of NSAIDs as an alternative to opioids. The article included a case study that focused on the danger of extended use of NSAIDs. The article did not provide the same detail concerning the serious side effects associated with opioids.[36]

150.    Cardinal's October 2, 2008, statement that it would "maintain a compliance program designed to detect and prevent diversion of controlled substances as required by the CSA and applicable DEA regulations," was proven false when Cardinal later admitted it had failed to maintain effective controls against diversion as required by it 2008 Settlement Agreement with the DEA, and had failed to conduct meaningful due diligence and thus failed to detect and report suspicious orders.

---

[35] *Treatment Options*, *supra*.

[36] Charles E. Argoff, *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*, Pain Med. News (Apr. 2007), https://www.painmedicinenews.com/download/BtoB_Opana_WM.pdf.

151.    Walmart in a January 9, 2009, statement by spokeswoman Daphne Moore commented that the $637,000 fine Walmart paid for violating drug record-keeping regulations was limited to discrepancies between records and inventory involving a small number of pharmacies in Texas, implying no such failures existed at its other locations.

152.    Walgreens, in its April 7, 2011, Settlement Agreement with the DEA regarding allegations of non-compliance with the Controlled Substance Act, stated that it would "maintain a compliance program to detect and prevent diversion of controlled substances." The false nature of the statement is shown by an audit by Anda which showed lack of controls at Walgreens, its internal communications discussing noncompliance, its admissions concerning the failures of its SOM system and the September 13, 2012, Immediate Suspension Order and Order to Show Cause issued by the DEA for Walgreens's Jupiter distribution center finding it had failed to comply with the regulations that it had pledged to uphold 17 months earlier.

153.    Purdue hired APF to provide consulting services on its marketing initiatives. A "Master Consulting Services" Agreement executed on September 14, 2011, gave Purdue substantial rights to control APF's work related to a specific promotional project. The agreement also gave Purdue—but not APF—the right to end the project (and, thus, APF's funding) for any reason.

154.    APF developed the National Initiative on Pain Control (the "NIPC") (started in 2003 but continuing at least through 2012), which ran a facially unaffiliated website, *painknowledge.org*. NIPC promoted itself as an education initiative led by its expert leadership team, including purported experts in the pain management field. NIPC published unaccredited[37] prescriber education programs, including a series of "dinner dialogues." But it was Endo that substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing the programs' content; and distributing NIPC

---

[37] Accredited programs are reviewed by a third party and must meet certain requirements of independence from pharmaceutical companies.

materials. Endo's control of NIPC was such that Endo listed it as one of its "professional education initiative[s]" in a plan submitted to the FDA. Yet, Endo's involvement in NIPC was nowhere disclosed on the website pages describing NIPC or on *painknowledge.org*. Endo estimated it would reach 60,000 prescribers through NIPC.[38]  This website proclaimed that "[p]eople who take opioids as prescribed usually do not become addicted" and that opioid dosages should be raised until "you are on the right dose of medication for your pain," without addressing the dangers that high doses of opioids present to patients. The website listed certain adverse effects of opioids but omitted the severe adverse effects of hyperalgesia, immune system and hormone dysfunction, cognitive impairment, tolerance, dependence, addiction, and death. *Painknowledge.org* represented that, with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse."[39] The grant request that Endo approved for this project specifically indicated NIPC's intent to make claims of functional improvement.  *Pain: Opioid Facts*, a brochure available on *Painknowledge.org*, stated that "people who have no history of drug abuse, including tobacco, and use their opioid medication as directed will probably not become addicted."[40]

155.    By the false claims and misrepresentations in the 2012 book *Defeat Chronic Pain Now!* from the Mallinckrodt-created "C.A.R.E.S. Alliance" including that "Only rarely does opioid medication cause a true addiction when prescribed appropriately to a chronic pain patient who does not have a prior history of addiction," that "It is currently recommended that every chronic pain

---

[38] Endo Pharmaceuticals, *Risk Minimization Action Plan for OPANA ER (Oxymorphone Hydrochloride) Extended-Release Tablets* (June 2007) (hereinafter, *Opana REMS*).

[39]        *Pain:        Opioid        Therapy*,        painknowledge.org, https://web.archive.org/web/20101007083722/http://painknowledge.org/patiented/pdf/B697_%20Patient%20Hand out_FINAL.pdf (last accessed July 13, 2021 as of Jan. 19, 2012).

[40]        *Pain:        Opioid        Facts*,        painknowledge.org, https://web.archive.org/web/20120112051109/http://www.painknowledge.org/patiented/pdf/Patient%20Education %20b380_b385%20%20pf%20opiod.pdf (last accessed July 14, 2021 as of Jan. 19, 2012).

patient suffering from moderate to severe pain be viewed as a potential candidate for opioid therapy," "When chronic pain patients take opioids to treat their pain, they rarely develop a true addiction and drug craving," and "Only a minority of chronic pain patients who are taking long-term opioids develop tolerance."

156.    In published reports by researchers from ABDC's subsidiary Xcenda in both 2013 and 2017 which downplayed the dangers and pushed the use of opioids to promote the goal of the enterprise and increase the use of prescription opioids.

157.    Endo utilized APF to spread its message by supporting the publication of *Reading This Could Help Ease Your Pain: Pain Action Guide* (2000), which included misrepresentations such as "Pain medications rarely cause addiction. . . . Unless you have a history of substance abuse, there is little risk of addiction when these medications are properly prescribed by a doctor and taken as directed."[41]

158.    Purdue and Defendants sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which taught that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation," but did not disclose the significant hardships that often accompany cessation of use. This publication also claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients. But the article cited as support stated the contrary, noting the absence of long-term studies and concluding, "For functional outcomes, the other analgesics were significantly more effective than were opioids."

159.    Janssen detailers took advantage of Ultram's unscheduled status to leave free samples with doctors to encourage the patients to begin to use (and continue to use the drug). There were numerous reports of physicians developing OUD from the use of these free samples. During their

---

[41] Am. Pain Found., *Reading This Could Help Ease Your Pain: Pain Action Guide* (2000).

presentations to doctors, Janssen's detailers frequently touted Ultram's supposed low or nonexistent potential for abuse and inaccurately compared its risks to those of NSAIDs.

160.    Janssen employed sales representatives to promote its opioids in New Mexico and beyond, including Erik Zimmer and Danny Montford. Sales representatives like them deliberately targeted doctors to promote the use of Nucynta. These doctors included Dr. Jain, whose medical license was suspended in 2012 and who in 2014 was indicted for unlawfully dispensing controlled substances.[42] The sales representative assigned to Dr. Jain was given the highest target goal of new prescriptions of Nucynta to be written by Dr. Jain in the upcoming quarter.

161.    Janssen co-sponsored a 2008 APF publication that sought to normalize opioid treatment for the elderly.[43]

162.    As part of its 2008 settlement with the DEA, McKesson claimed to have "taken steps to prevent such conduct from occurring in the future"[44] As stated on McKesson's website:

> McKesson is committed to maintaining – and continuously enhancing – strong programs designed to detect and prevent opioid diversion within the pharmaceutical supply chain. In addition to reporting controlled substances transactions to DEA on a regular basis, we have invested significant amounts of time and financial resources into our Controlled Substance Monitoring Program (CSMP).[45]

This statement misleadingly implies that McKesson has not had deficient suspicious order monitoring programs.

163.    A 2011 non-credit educational program sponsored by Endo, *Persistent Pain in the Older Adult*, misleadingly claimed that withdrawal symptoms, which make it difficult for patients to stop using opioids, could be avoided by simply tapering a patient's opioid dose over ten days and that

---

[42] *Pawankumar Jain Pleads Guilty to Unlawfully Dispensing Prescription Painkillers and Health Care Fraud*, U.S. Dep't of Justice (Feb. 11, 2016), https://www.justice.gov/usao-nm/pr/pawankumar-jain-pleads-guilty-unlawfully-dispensing-prescription-painkillers-and-health.

[43] Am. Pain Found., *Special Considerations: Pain in Specific Populations* (Nov. 2008).

[44] McKesson 2008 Settlement, *supra*.

[45] *McKesson's Controlled Substance Monitoring Program*, McKesson, https://www.mckesson.com/About-McKesson/Fighting-Opioid-Abuse/Controlled-Substance-Monitoring-Program/ (last visited Aug. 24, 2023).

chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning."

164.    Former Purdue sales representative Steven May explained that he and his coworkers were trained to "refocus" doctors on "legitimate" pain patients and to represent that "legitimate" patients would not become addicted. In addition, they were trained to say that 12-hour dosing made the extended-release opioids less "habit-forming" than painkillers that need to be taken every four hours.[46]

165.    In December 2011, John Stewart, Purdue's CEO from 2007 to 2013, gave a speech titled *Providing Relief, Preventing Abuse*, which deceptively blamed addiction, overdose, and death on "abuse."

166.    J&J actively promoted tramadol as safer than other opioids. When evidence began to mount of significant problems with addiction and substance misuse related to tramadol, Janssen worked actively to prevent it from being added to the list of controlled substances. It was finally scheduled in 2014. Shortly after the drug was approved, problems with abuse and dependence began increasing rapidly. Instead of alerting the FDA of the need to schedule tramadol, J&J and Janssen, in the early 2000s, formed a "Independent Steering Committee" ("ISC") associated with the so-called Scientific Advisory Board of the RADARS System (formed by Purdue and discussed elsewhere) in order to lobby regulators against scheduling the drug. The ISC was ostensibly formed to monitor abuse of tramadol. But the real objective of the ISC was to placate the FDA into approving tramadol as a Schedule IV drug (rather than a Schedule II controlled substance).

167.    In April 2007, Endo sponsored an article aimed at prescribers, which emphasized the risks of NSAIDs as an alternative to opioids. The article included a case study that focused on the

---

[46] David Remnick, *How OxyContin Was Sold to the Masses* (Steven May interview with Patrick Radden Keefe), New Yorker (Oct. 27, 2017), https://www.newyorker.com/podcast/the-new-yorker-radio-hour/how-oxycontin-was-sold-to-the-masses.

danger of extended use of NSAIDs. The article did not provide the same detail concerning the serious side effects associated with opioids.[47]

168.    The AAPM offered a CME on *The Truth About Pain Management* in conjunction with a 2007 annual meeting where the chief lecturer had financial ties to Cephalon and Purdue.[48]

169.    NIPC's published "Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia" (2009), sponsored by Endo[49]

170.    AAPM and APS issued their own guidelines in 2009 (the "2009 Guidelines") with Defendants' assistance, prompting, involvement, and funding. The 2009 Guidelines recommended the use of opioids to treat chronic pain and the use of screening tools to identify patients at a purportedly high risk of addiction. The panel made these recommendations even though *none* of its recommendations were "supported by high quality evidence," and only four of its 25 recommendations were supported "by even moderate quality evidence."[50] 14 of the 21 panel members, including KOLs Drs. Fine and Portenoy, received support from the Manufacturing Co-Conspirators: six from Purdue, eight from Teva, nine from Janssen, and nine from Endo.[51] The Manufacturing Co-Conspirators widely cited and promoted the 2009 Guidelines without disclosing the lack of supporting evidence, the Manufacturing Co-Conspirators' involvement, or their financial backing of the guidelines' authors. For example, a 2009 speaker presentation prepared by Endo, *The Role of Opana ER in the Management of Moderate to Severe Chronic Pain*, used the 2009 Guidelines while omitting their

---

[47] Charles E. Argoff, *Case Challenges in Pain Management: Opioid Therapy for Chronic Pain*, Pain Med. News (Apr. 2007), https://www.painmedicinenews.com/download/BtoB_Opana_WM.pdf.

[48] *The Truth*, *supra*.

[49] Perry Fine, Nat'l Inst. on Pain Control, *Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia* (2009).

[50] Roger Chou, et al., Am. Pain Soc'y & Am. Acad. of Pain Med. Opioids Guidelines Panel, *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Noncancer Pain*, 10 J. Pain 113 (2009), https://www.jpain.org/action/showPdf?pii=S1526-5900%2808%2900831-6.

[51] *Id.*

disclaimer about the lack of evidence for recommending the use of opioids for chronic pain. Cephalon promoted the 2009 Guidelines for the use of opioids for noncancer patients.

171.    In 2009, the APF published *Exit Wounds: A Survival Guide to Pain Management for Veterans and their Families*; this publication was sponsored by Purdue, among others.[52] *Exit Wounds* described opioids as the "gold standard" of pain medications, as "often underused," and as drugs that can "increase [your] level of functioning." The publication further stated, "[l]ong experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications." *Exit Wounds* did not address the significant dangers of taking benzodiazepines with opioids. The book encouraged veterans that they "may need to push" doctors "hard" to get their preferred pain treatment. The publication further suggested that patients should plan for a "recurrence of pain" by "having a supply of a pain medication on hand."[53] Janssen and Purdue both paid for APF to distribute *Exit Wounds*.

172.    APF was often called upon to provide "patient representatives" for the Manufacturing Co-Conspirators' promotional activities, including for Janssen's *Let's Talk Pain* (at least through 2012). Janssen funded, edited, participated in the development of, and controlled the content of misleading materials published by front groups, including the unbranded APF initiative "Let's Talk Pain." The "Let's Talk Pain" website included misinformation about opioids, such as that "the stigma of drug addiction and abuse" associated with the use of opioids stemmed from a "lack of understanding addiction." The website also featured a video interview, edited by Janssen personnel, which claimed that opioids were what allowed a patient to "continue to function," falsely implying that her experience would be representative.[54] This website was accessible online until at least 2012.

---

[52] Derek McGinnis, *Exit Wounds: A Survival Guide to Pain Management for Veterans and Their Families* (2009).

[53] *Id.*

[54] *The Let's Talk Pain Show*, Let's Talk Pain, https://web.archive.org/web/20120324220752/http://www.letstalkpain.org/talkshow/ (last accessed July 13, 2021 as of Mar. 24, 2012).

173.    When accused (in 2012) of failing to monitor the distribution of hydrocodone and physicians prescribing excessive amounts, Abbott deliberately downplayed its role in driving the demand for hydrocodone by highlighting only the market share of its branded drugs. "Abbott's Vicodin brand accounts for less than 1 percent of all prescriptions filled for hydrocodone with acetaminophen products."[55] This statement misrepresented the role of Abbott's marketing in driving demand for hydrocodone products, even those that were generic.

174.    Grünenthal played a key role in this process. It developed INTAC technology, which made pills manufactured using the technology more difficult to crush and therefore, ostensibly, more difficult to abuse by insufflating the resulting powder. At the time of the technology's announcement, Grünenthal asserted that Intac would "foil[] the key step in most forms of opioid abuse,"[56] a misleading statement that ignores the fact that the vast majority of opioid misuse occurs by oral ingestion, something that INTACT does nothing to address. Grünenthal also asserted that "tablets produced by the INTAC process form a gel in aqueous solutions that cannot be readily injected," a statement that subsequent events would prove to be tragically incorrect.[57]

175.    Purdue licensed the technology to produce an ADF version of OxyContin in 2010.

176.    Endo licensed this technology for the 2012 reformulation of Opana ER, which had originally been released without INTAC in 2006. This reformulation was a ploy designed to allow Endo to claim that the newly available generic versions of Opana without INTAC were unsafe because they could be more readily abused and to market the reformulated Opana ER as "abuse deterrent."

---

[55] Frank Eltman, *Victim's Kin in NY Pharmacy Killing Announce Suit*, San Diego Union-Tribune (Feb. 9. 2012, 3:38 AM), https://www.sandiegouniontribune.com/sdut-victims-kin-in-ny-pharmacy-killing-announce-suit-2012feb09-story.html.

[56] Press Release, Grunenthal Group, INTAC – Grunenthal Group Presents Data Demonstrating the Strength of Its Tamper Resistant Technology at the American Association of Pharmaceutical Science Annual Meeting and Exposition (Oct. 16, 2012), https://www.prnewswire.com/news-releases/intac---grunenthal-group-presents-data-demonstrating-the-strength-of-its-tamper-resistant-technology-at-the-american-association-of-pharmaceutical-science-annual-meeting-and-exposition-174383771.html.

[57] *Id.*

What actually happened is that the FDA refused to allow Endo to claim that the reformulation was "abuse deterrent," Endo released the reformulated drug anyway, there was a "significant shift in the route of abuse [of Opana] from nasal to injection," sharing of needles led to outbreaks of HIV and hepatitis C, and the FDA ultimately had to request that Opana be removed from the market.[58] Meanwhile, Grünenthal continued to insist in face of the contrary evidence that "the properties of Intac add significant[ly] to prescription drugs."[59]

177.    Indivior promoted the film version of Suboxone to physicians, pharmacists, Medicaid administrators, and others across the country as less divertible, less abusable, and safer around children, families, and communities than other buprenorphine drugs, even though such claims have never been established.[60]  Indivior attempted to monopolize the opioid market and suppress generic competition to Suboxone. Indivior announced a "discontinuance" of its tablet form of Suboxone based on its supposed concern that its Suboxone tablets were particularly susceptible to diversion and abuse, despite Indivior executives' knowledge that "the primary reason for the discontinuance was to delay the Food and Drug Administration's approval of generic Suboxone-equivalent drugs."[61] Indivior also cooperated with Walmart, Walgreens, and CVS to increase Suboxone film opioid prescription rates. Indivior successfully convinced Walmart to change its internal insurance plan to discontinue coverage for tablets and instead cover Indivior's Suboxone film product. Indivior also worked to strategically structure its agreements with CVS Caremark to disadvantage generic competition to the benefit of its Subutex and Suboxone film products without being subject to legal scrutiny. Finally,

---

[58] Press Release, Food & Drug Admin., FDA Requests Removal of Opana ER for Risks Related to Abuse (June 8, 2017), https://www.fda.gov/news-events/press-announcements/fda-requests-removal-opana-er-risks-related-abuse.

[59] Michael Gibney, *Grunenthal Insists Crush-Proof Tablet Works After Endo Pulls Opana sNDA*, Fierce Pharma (Aug. 30, 2016), https://www.fiercepharma.com/drug-delivery/grunenthal-insists-crush-proof-tablet-works-after-endo-pulls-opana-snda.

[60] Press Release, Dep't of Just., Indivior Inc. Indicted for Fraudulently Marketing Prescription Opioid (Apr. 9, 2019), https://www.justice.gov/opa/pr/indivior-inc-indicted-fraudulently-marketing-prescription-opioid (last visited Feb. 27, 2024).

[61] *Id.*

Indivior established a nationwide Walgreens education program through which it coordinated Walgreens pharmacist education sessions and placed educational blurbs in newsletters distributed to Walgreens pharmacists. Indivior also targeted state Medicaid programs with its false and misleading Suboxone film promotions. Indivior government relations employees met with state legislators and Medicaid representatives, who they fed lies about Suboxone film' safety. In some cases, Indivior also offered "supplemental rebates to states to bring [] products into price parity." Indivior combined efforts with Purdue on its state government affairs projects and lobbying efforts. Indivior's marketing and promotion schemes were highly successful. Indivior converted thousands of patients with OUD over to its Suboxone film opioids and "caus[ed] state Medicaid programs to expand and maintain coverage of Suboxone Film at substantial cost to the government."[62] Indivior received billions of dollars in profits from its scheme.[63]

178.    In connection with a 2013 DEA settlement, Walgreens publicly stated that it would maintain a compliance program to detect and monitor diversion, including training its pharmacists on red flags for diversion, but it has failed to implement a program to adequately do so.[64] Walgreens continues to maintain that it "has taken a number of actions over many years to respond to the opioid crisis . . . including . . . [d]eploying technology to help pharmacists ensure they are dispensing prescriptions written for a legitimate medical purpose,"[65] while ignoring the existence of corporate policies that actively encouraged dispensing controlled substances.

---

[62] Press Release, Dep't of Just., Indivior Inc. Indicted for Fraudulently Marketing Prescription Opioid (Apr. 9, 2019), https://www.justice.gov/opa/pr/indivior-inc-indicted-fraudulently-marketing-prescription-opioid (last visited Feb. 27, 2024).

[63] *Id.*

[64] Settlement & Memo. of Agreement (June 10, 2013).

[65] *Walgreens Announces Agreement in Principle for Multi-State Opioid Settlement Framework*, Walgreens (Nov. 2, 2022), https://news.walgreens.com/press-center/news/walgreens-announces-agreement-in-principle-for-multi-state-opioid-settlement-framework.htm.

179.    In 2014 alone, the Manufacturing Co-Conspirators spent $166 million to detail branded opioids to doctors. This amount is twice as much as the Manufacturing Co-Conspirators spent on detailing in 2000. The amount included $108 million spent by Purdue, $34 million by Janssen, $13 million by Teva, and $10 million by Endo. These companies would not have spent so lavishly had detailing not been effective at increasing the prescribing rates.

180.    Through nationwide advertising, Walmart presented a public image of the safety and excellence of all the pharmacists the company hired. For example, in 2014,  in a recruitment video for pharmacists on Walmart's YouTube channel, the company shows Walmart pharmacists speaking about working at the company: "the safety and the excellence we carry to our patients is phenomenal," adding that "the culture that our company has [is] respect for the individual, service, and excellence, and, of course, we always have integrity." The commercial also states that Walmart's pharmacists "strive for excellence" and are "passionate about providing quality healthcare."[66]

181.    AbbVie reiterated a similar self-serving misrepresentation in 2014: "AbbVie provides funding to numerous anti drug abuse organizations. Additionally, AbbVie advocates for responsible prescribing by healthcare professionals and appropriate use of Vicodin by legitimate patients through various educational efforts."[67]

182.    In March 2016, the Centers for Disease Control issued its new opioid guidelines (the "2016 Guidelines") urging doctors to limit prescriptions and, when possible, opt for non-opioid alternatives. For the first time, a respected agency was saying that the risks of painkillers greatly outweighed the benefits for the vast majority of chronic pain patients" "If benefits do not outweigh harms of continued opioid therapy, clinicians should optimize other therapies and work with patients

---

[66]    Walmart, *Your Career as a Walmart Pharmacist*, YouTube (Sept. 25, 2014), https://www.youtube.com/watch?v=9VD12JXOzfs.

[67]    *Heroin: From Prescription to Addiction (Part 14)*, CBS News (June 27, 2014, 4:05 PM), https://www.cbsnews.com/amp/boston/news/heroin-from-prescription-to-addiction-part-14/.

to taper opioids to lower dosages or to taper and discontinue opioids." There was immediate pushback to the 2016 Guidelines by members of the Opioid Promotion Enterprise, and the vigorous debate continues to this day. Many of the pro-opioid advocates affiliated with the Defendants' enterprise spread false depictions of the 2016 Guidelines, such as portraying them as opposing mandatory limitations, when the truth is they are merely guidelines for best practices. The pro-opioid groups also maintain a narrative that the 2016 Guidelines imposed mandatory dosage reductions (or "forced tapering") of all patients presently receiving opioid prescriptions, which is also a complete falsehood. No one engaged in the national dialogue on opioids favors such a measure. They argue that opioid prescribing is no longer an issue since most deaths are now among patients taking illegally manufactured and distributed products, but they ignore the hard fact that deaths from legal prescription opioids have merely leveled off and have *never* declined, as well as the fact that prescription opioids have similar effects as their illegally-manufactured counterparts and can serve as a gateway drug. Dr. Stefan G. Kertesz, an internist in Birmingham, Alabama, and associate professor at the University of Alabama, was one of the two "experts" (along with Dr. Daniel Alford, of the School of Medicine at Boston University) on a "[a] multidisciplinary expert panel" formed by the AAPM, a notorious Front Group, to meet and "review the influence of the core recommendations of the guideline on pain management practices, principally regarding the estimated 5 to 8 million Americans with chronic pain currently on opioids."[68]

183. McKesson publicly claims that its "customized analytics solutions track pharmaceutical product storage, handling and dispensing in real time at every step of the supply chain process," creating the impression that McKesson uses this tracking to help prevent diversion.

---

[68] Kroenke K, Alford DP, Argoff C, Canlas B, Covington E, Frank JW, Haake KJ, Hanling S, Hooten WM, Kertesz SG, Kravitz RL, Krebs EE, Stanos SP, Sullivan M. Challenges with Implementing the Centers for Disease Control and Prevention Opioid Guideline: A Consensus Panel Report. Pain Med. 2019 Apr 1;20(4):724-735, 725. doi: 10.1093/pm/pny307. Erratum in: Pain Med. 2022 Aug 31;23(9):1636. PMID: 30690556.

McKesson has also publicly stated in 2016 that it has a "best-in-class controlled substance monitoring program to help identify suspicious orders" and that it is "deeply passionate about curbing the opioid epidemic in our country."[69]

184.    Cardinal, at least as of 2017, touted its anti-diversion practices and purported anti-diversion monitoring programs and publicly stated in settlements that it would take reasonable measures to prevent diversion. Cardinal had stated that its "sophisticated, state-of-the-art anti-diversion program includes advanced analytics, technology and on-the-ground deployment of investigators to evaluate pharmacies, scrutinize customers and orders, as well as identify, block and report orders of prescription-controlled substances that do not meet our strict anti-diversion criteria."[70] Along the same lines, Cardinal claims to "maintain a sophisticated, state-of-the-art program to identify, block and report to regulators those orders of prescription-controlled medications that do not meet [its] strict criteria."[71] A Cardinal executive claimed that Cardinal uses "advanced analytics" to monitor its supply chain. Cardinal assured the public it was being "as effective and efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal activity."[72] Given the sales volumes and the company's history of violations, either this executive was wrong, or, if Cardinal had such a system, it ignored the results. Cardinal continues to make misleading statements regarding its history of compliance with its obligations to detect and prevent diversion:

> In addition to the new requirements of the injunctive relief terms of the national agreement discussed above, we have maintained a controlled substance monitoring program for many years to help us combat the diversion of controlled substances for improper use. Our controlled substance monitoring program includes a state-of-the-

---

[69] Scott Higham, et al., *Drug Industry Hired Dozens of Officials from DEA as the Agency Tried to Curb Opioid Abuse*, Wash. Post (Dec. 22, 2016), https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html

[70] *Cardinal Health Statement on Multi-State Inquiry by Attorneys General*, Cardinal Health (Sept. 18, 2017), https://newsroom.cardinalhealth.com/2017-09-18-Cardinal-Health-Statement-On-Multi-State-Inquiry-By-Attorneys-General.

[71] *Issues that Matter: How State Attorneys General Are Tackling the Opioid Crisis*, CBS News (Oct. 18, 2017), https://www.cbsnews.com/news/pennsylvania-attorney-general-josh-shapiro-issues-that-matter/.

[72] Lenny Bernstein, et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: 'No One Was Doing Their Job'* (Oct. 22, 2016), https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html.

art, constantly adaptive, rigorous system supported by program specialists who monitor and investigate suspicious orders using advanced analytics and other tools. We operate a strict and uncompromising system to spot, stop, and report to regulators suspicious orders of prescription controlled substances, including opioids. As threats evolve, we are constantly adapting our system to prevent the diversion and misuse of medications. We operate in good faith and our goal is to get it right. Through our program to date, Cardinal Health representatives have conducted hundreds of thousands of site inspections of our pharmacy customers nationwide and thousands of pharmacies have been identified that do not meet our standards, and we refuse to do business with them.[73]

This statement misleadingly implies that Cardinal has always complied with its CSA obligations, despite multiple enforcement actions demonstrating that Cardinal has not.

185.    In 2018, Albertsons claimed: "Our pharmacy teams are on the front lines in combatting the opioid epidemic."[74] This statement ignores Albertsons's role in fueling the very epidemic it claimed to be combatting.

186.    Cardinal claims, as of 2021, "We challenge ourselves to best utilize our assets, expertise and influence to make our communities stronger and our world more sustainable, while governing our activities as a good corporate citizen in compliance with all regulatory requirements and with a belief that doing 'the right thing' serves everyone."[75] Cardinal likewise claims to "lead [its] industry in anti-diversion strategies to help prevent opioids from being diverted for misuse or abuse."

187.    In March of 2019, Kertesz was a lead author (along with four other physicians, including Alford) on a letter calling on the CDC to reiterate that its 2016 Guidelines were recommendations and were not binding. Kertesz and his allies have raised their concerns in both popular and academic publications as well as at various medical conferences. For instance, he co-

---

[73] *Addressing the Opioid Crisis: Board Engagement and Governance*, Cardinal Health, https://www.cardinalhealth.com/en/about-us/environmental-social-governance/policies-and-principles/board-engagement-and-governance.html (last visited Aug. 18, 2023).

[74] *Albertsons Is Latest Grocer to Fight Opioid Crisis*, Progressive Grocer (June 27, 2018), https://progressivegrocer.com/albertsons-latest-grocer-fight-opioid-crisis.

[75] *Corporate Citizenship*, Cardinal Health, https://www.cardinalhealth.com/en/about-us/corporate-citizenship.html (as of July 19, 2021).

authored an article published by STAT entitled "Strict limits on opioid prescribing risk the 'inhumane treatment' of pain patients."[76]

188.    The Washington Legal Foundation, a pharma-aligned group, opposed the 2016 Guidelines, saying the lack of disclosure was a "clear violation" of federal law. The Academy of Integrative Pain Management ("AIPM") (formerly the AAPM) went so far as to ask congressional leaders to investigate how the CDC had developed the guidelines and a House committee asked the CDC to turn over documents about its advisors.

189.    Many KOLs presently and formerly associated with industry-supported front groups were outspoken against the 2016 Guidelines. Some had managed to participate in federally-created advisory panels on pain management, such as the Interagency Pain Research Coordinating Committee (the "IPPCC") a 19-member panel coordinating pain research that had been created by the NIH in 2010. Industry-aligned participants included Richard Payne, a former APF board member, who questioned whether the experts advising the CDC had "conflicts of interests in terms of biases, intellectual conflicts that needed to be disclosed." They also included Myra Christopher, whose organization received funding from opioid drugmakers. In fact, her position was established through a $1.5 million gift from Purdue. Drs. Payne and Christopher had, at the height of opioid promotion in 2006, drafted a report on "Pain in America" touting the industry narrative. Long-time pharma industry KOL Scott Fishman is presently on the IPPCC.

190.    In 2016, after the adoption of the 2016 Guidelines, the industry (including Endo and the HDA) spent heavily lobbying for the legislation to create the Pain Management Best Practices Inter-Agency Task Force, a task force to review and update best practices on pain management and painkiller prescribing. Many of the task force members had ties to the opioid industry. For example,

---

[76] Kertesz, SG and Gordon, AJ. "Strict limits on opioid prescribing risk the 'inhumane treatment' of pain patients." STAT. Feb. 24, 2017. https://www.statnews.com/2017/02/24/opioids-prescribing-limits-pain-patients/. Last viewed Sept. 23, 2022.

Dr. Rollin Gallagher had not only consulted for Purdue, Endo and Janssen in the early 2000s, but was then editor-in-chief of *Pain Medicine*, the AAPM's flagship publication; the AAPM received nearly $1.2 million from the five largest opioid manufacturers between 2012 and 2017. Dr. Jianguo Cheng, recent past president of AAPM, received a $24,600 consulting fee from Purdue in 2017, Purdue's 8th largest stand-alone payment that year. Cindy Steinberg is the policy director for the US Pain Foundation, which received $3 million from the five biggest opioid manufacturers from 2012 to 2017. Task force chair, Dr. Vanila Singh, had, in the past year, spoken at conferences for the AAPM and the American Academy of Integrative Pain Management, a recently shuttered organization that had likewise received millions; her husband received nearly $67,000 from Covidien in 2014; and her 2017 financial disclosure showed she owned between $15,000 and $50,000 in J&J stock.

191.    Many Front Groups historically funded by the Opioid Promotion Enterprise participants remain quite active in advocating against more restrictive prescribing practices. This includes the U.S. Pain Foundation ("USPF") and the American Chronic Pain Association, both funded by Janssen, Purdue and others. The USPF's President could be seen at what was ostensibly a "pro-patient" rally at Brandeis University in Waltham, Massachusetts on October 25, 2023, seeking the termination of Andrew Kolodny, a professor and longtime advocate for more restrictive opioid prescribing practices. The Denver-based RADARS program created by Purdue back in 2001 also remains very active in pro-opioid advocacy and continues to argue against stricter limitations on prescription opioids before multiple legislatures and federal agencies.

192.    The pro-opioid advocacy movement has had some successes, such as the CDC's decision in 2022 to modify the 2016 Guidelines so as to clarify that they did not impose maximum daily dose of 90 MMEs (an extraordinarily high daily dosage). To be clear, the 2016 Guidelines never set a hard ceiling at 90 MME daily, although they were often falsely portrayed as doing so.

193.    At a May 8, 2018, hearing before the House Energy and Commerce subcommittee, H.D. Smith refused to take any responsibility for the massive amount of opioids it shipped to New Mexico, the state which, at the time, had the highest overdose rate in the United States. At the time, J. Christopher Smith, former President and CEO, stated, "H.D. Smith conducted itself responsibly and discharged its obligations."[77]

194.    Kroger claimed in April 2018 that it has a "comprehensive commitment to help the communities Kroger calls home combat the nationwide opioid epidemic."[78] Kroger has done this even as it faced enforcement actions from the DEA for not combatting the epidemic.

195.    On August 30, 2019, Allergan claimed in a press release that "it recognizes the seriousness of the opioid abuse problem. Allergan has a history of supporting – and continues to support – the safe, responsible use of prescription medications."[79]

196.    In August 2019, J&J stated to *Time* magazine that it did not cause the opioid crisis because its products "accounted for less than one percent of the total opioid prescriptions in Oklahoma as well as the United States."

197.    In October 2019, Schein claimed that it "look[ed] forward to playing a constructive role in helping to advance solutions that put an end to opioid addiction."[80] This statement ignored and minimized Schein's conduct in creating that addiction in the first place.

198.    ABDC has taken the public position, as of 2019, that it is "work[ing] diligently to combat diversion and [is] working closely with regulatory agencies and other partners in

---

[77] *Combatting the Opioid Epidemic, supra.*

[78] *The Kroger Co. and Cardinal Health to Co-Host Drug Take-Back Events Across 26 States on April 28*, Cardinal Health (Apr. 23, 2018), https://newsroom.cardinalhealth.com/company-news?item=123161.

[79] *Allergan Announces Settlement with Two Ohio Plaintiffs in Federal Opioid Litigation*, AbbVie (Aug. 30, 2019), https://news.abbvie.com/news/press-releases/news-type/corporate-news/allergan-announces-settlement-with-two-ohio-plaintiffs-in-federal-opioid-litigation.htm.

[80] *Henry Schein to Be Dismissed From Summit County Opioid Litigation*, Henry Schein (Oct. 21, 2019), https://investor.henryschein.com/news-releases/news-release-details/henry-schein-be-dismissed-summit-county-opioid-litigation.

pharmaceutical and healthcare delivery to help find solutions that will support appropriate access while limiting misuse of controlled substances." A company spokesperson also provided assurance that "[a]t [ABDC], we are committed to the safe and efficient delivery of controlled substances to meet the medical needs of patients."[81]

199.    Walmart, in a 2019 press release, promised that within the next sixty days, Walmart would restrict initial acute opioid prescriptions to no more than a seven-day supply and that in January 2020, it would begin to require e-prescriptions for controlled substances to protect public safety while it was in fact acting to advance the goal of the enterprise by fraudulently representing its current practices of CSA compliance. [82]

200.    In 2021, Giant Eagle denied that it had contributed to the opioid crisis despite the obvious fact that there could be no opioid crisis at all if pills were not distributed and dispensed: "While Giant Eagle denies that it was a cause of the opioid crisis, it recognizes the severity of the crisis, its impact on the public and the hard work of the public officials working to address the harms."[83]

201.    CVS CEO Larry Merlo in 2022 described his company as "America's front door to health care with a presence in nearly 10,000 communities across the country," which allowed it to "see firsthand the impact of the alarming and rapidly growing epidemic of opioid addiction and misuse."[84] According to its website:

---

[81]    *Records Show Rural New Mexico Flooded with Painkillers*, Ins. J. (June 6, 2016), https://www.insurancejournal.com/magazines/mag-features/2016/06/06/410426.htm#.

[82]    The falsity of the statements is demonstrated by the multiple later charges Walmart settled regarding such failures, that Walmart's internal procedures incentivized and pressured its pharmacists to avoid and ignore procedures required to comply with its duty to prevent excess use and diversion of prescription opioids, and the multiple settlements with the DEA which Walmart entered in to for violations of the CSA, and a November 23, 2021 jury verdict finding Walmart had failed to act in accordance with its public statements.

[83]    Nate Richmond, *Pharmacy Chain Operator Giant Eagle Settles Ohio Opioid Lawsuits Mid-Trial*, Reuters (Oct. 29, 2021), https://www.reuters.com/business/healthcare-pharmaceuticals/pharmacy-chain-operator-giant-eagle-settles-ohio-opioid-lawsuits-mid-trial-2021-10-29/.

[84]    *See, e.g.,* David Salazar, *CVS Health Unveils New PBM, Pharmacy Efforts to Curb Opioid Abuse,* (Sept. 21, 2017),

> CVS Health® has made a commitment to help address the misuse of prescription opioids by designing programs and collaborating with community leaders, policymakers, law enforcement, health care professionals and others to increase community-based educational programs related to opioid misuse, create safe prescription drug disposal sites, expand access to life-saving antidotes and advocate for targeted and effective policies, locally and nationally.[85]

CVS's statement fails to mention CVS's own role in promoting and enabling the widespread use of prescription opioids.

202.    In April 2022, a J&J representative made a public statement that "[t]he company's actions related to the marketing and promotion of important opioid prescription medications were appropriate and responsible."[86] These statements misrepresent J&J's marketing strategies, particularly the company's work to change the standard of care surrounding opioid use generally.

203.    On November 22, 2022, Allergan claimed that its "promotion and marketing of opioid medications were responsible and appropriate."[87] These statements misleadingly state that Allergan's marketing was not intended to illegitimately increase sales of dangerous opioids while ignoring or minimizing their risks.

204.    Walmart's website states, as of 2023, "Our pharmacists are trained to check for indicators of potential concern before filling each prescription,"[88] a statement that ignores Walmart's repeated efforts to impede its own pharmacists' ability to do so.

---

https://drugstorenews.com/pharmacy/cvs-health-unveils-new-pbm-pharmacy-efforts-curb-opioid-abuse.

[85] *Our Opioid Response*, CVS, https://www.cvshealth.com/impact/healthy-community/our-opioid-response.html (last visited Aug. 23, 2022).

[86] Leah Willingham, *Johnson & Johnson Subsidiary Settles New Mexico Opioid Lawsuit for $99 Million*, PBS (Apr. 18, 2022, 3:58 PM), https://www.pbs.org/newshour/health/johnson-johnson-subsidiary-settles-west-virginia-opioid-lawsuit-for-99-million.

[87] *Statement on Allergan Nationwide Settlement to Resolve Opioid-Related Claims*, AbbVie (Nov. 22, 2022), https://news.abbvie.com/news/media-statements/statement-on-allergan-nationwide-settlement-to-resolve-opioid-related-claims.htm.

[88] *Stewardship*, Walmart, https://corporate.walmart.com/stewardship (last visited Aug. 18, 2023)

205.    On February 21, 2024, Hikma claimed in a press release that "Hikma has been working with communities across the US for more than 20 years to provide medicines that help people recover from opioid use disorder."[89] The statement misleadingly omits Hikma's role in creating more individuals with OUD in the first place via the misconduct alleged elsewhere in this complaint.

206.    ABDC still misleadingly claims on its website and in other public statements that it has an effective diversion control team and protocol and that its sophisticated "diversion control program" provides daily reports to regulators about the quantity, type, and receiving pharmacy of every order of controlled substances it distributes.[90] ABDC continues to maintain that it "takes its legal obligations seriously. We have designed and operate a system to disclose customers' suspicious orders of controlled substances to the Drug Enforcement Administration."[91] This statement misleadingly implies that ABDC has always complied with its CSA obligations.

207.    In 2024, Publix attempted to deflect attention from its own wrongful dispensing and distribution practices by promoting a "Lock Your Meds" campaign to encourage adults with prescription opioids to lock them up so that they are not taken by children.[92] While commendable, this does nothing to address the primary cause of opioid dependency, which is individuals taking drugs that they received from pharmacies such as Publix.

---

[89] *Hikma Hosts White House Drug Policy Direction Dr. Rahul Gupta at its Columbus, Ohio Manufacturing Facility*, Fin. Times (Feb. 21, 2024), https://markets.ft.com/data/announce/detail?dockey=600-202402211320PR_NEWS_USPRX____NY42100-1.

[90] *Safe and Secure Distribution of Controlled Substances*, AmerisourceBergen (Sept. 2019), https://www.amerisourcebergen.com/-/media/assets/amerisourcebergen/fighting-the-opioid-epidemic/abc_opioidreport_sept2019.pdf; Letter from Amanda B. Robinson, Morgan Lewis & Bockius, to Sen. Claire McCaskill (July 3, 2018), https://www.hsgac.senate.gov/imo/media/doc/AmerisourceBergen%20Response%20Ltr%20to%20McCaskill%20re%20Opioids%20Report.pdf.

[91] AmerisourceBergen, *Safe and Secure Distribution of Controlled Substances* (Feb. 2022), https://www.amerisourcebergen.com/-/media/assets/amerisourcebergen/fighting-the-opioid-epidemic/ab_safesecuredistroreport_sept2019.pdf.

[92] *Lock Your Meds Campaign: Publix Partnership Unveils a Safer Tomorrow*, Informed Families Catalyst (jan 29, 2024), https://www.informedfamilies.org/catalyst/publixpartnership2024.

208.    The false narrative conspiracy never ended. None of the Co-Conspirators, even those entering multi-billion dollar settlements with states and municipalities, have ever renounced the narrative they created, and which persists, nor have they taken any steps to affirmatively distance themselves from the conspiracy behind this narrative.

## VI.    DEFENDANTS UNLAWFULLY INFLATED THE SUPPLY OF OPIOIDS.

### A.    Defendants Failed to Ensure That Purdue Met Its Legal Obligations to Maintain Effective Controls against Diversion And Took Steps to Circumvent Safeguards.

209.    As it directed Purdue's fraudulent marketing campaign, Purdue's Board, *i.e.* the Defendants, failed to ensure that Purdue met its legal obligation to prevent the diversion of its opioid products into illegal drug markets. As a result, from the introduction of OxyContin to the present day, including the period beginning immediately after the Pre-2008 DOJ/State Resolutions, millions of OxyContin pills have been diverted into illegal channels where they fueled a crisis of abuse of, and addiction to, illegally dispensed opioids, compounding the crisis of abuse and addiction in patients using legally dispensed opioids.

210.    With the Sackler-dominated Board at the helm, Purdue violated its duties under the CSA and corresponding DEA regulations—as Purdue has since expressly admitted. These duties required Purdue to maintain effective controls against the diversion of its opioid products into illegal drug markets, including by maintaining a SOM system able to (i) identify wholesaler and pharmacy orders that indicated a risk of diversion due to some irregularity in size, frequency, or pattern—so-called "suspicious orders"—and (ii) report suspicious orders to the DEA when they were identified. Purdue failed to maintain such controls—and, indeed, actually encouraged suspicious orders in order to increase sales of its opioid products.

211.    Although Purdue maintained certain System Order Monitoring (SOM) systems and an Abuse and Diversion Detection (ADD) Program for the purpose of providing Purdue the ability to

identify prescribers engaged in abuse and diversion, these programs utterly failed to prevent diversion of Purdue's opioid products and fell far short of Purdue's legal obligations. Among other shortcomings, Purdue's SOM systems suffered from fatal design flaws—which Purdue and the Board were aware of—that prevented the company from adequately identifying and reporting suspicious orders. In addition, Purdue's Order Monitoring System Committee—which was nominally responsible for Purdue's SOM operations for more than eight years between March 2009 and September 2017—failed to report numerous suspicious orders to the DEA despite clear evidence of diversion.

212.    The ADD Program failed to report countless diversion-prone prescribers to authorities and, in many cases, the company permitted and even encouraged sales representatives to continue promoting opioid products to these prescribers. Under the ADD Program, Purdue personnel were required to report health care providers engaged in suspicious activity, including an "atypical pattern of prescribing." Purdue was to consider whether such HCPs should be placed on a do not call list, the so called Region Zero, and report "red flags" to the DEA as potential evidence of diversion in violation of the Controlled Substances Act. But Purdue, under the close watch and guidance of the Sackler's, did just the opposite. Purdue deliberately identified those providers who proscribed vastly more OxyContin and required Purdue's sales for to focus and target on these overprescribing physicians to increase its own sales. For these and many other reasons discussed below, Purdue knowingly failed to comply with its duties under the CSA and corresponding DEA regulations. Despite the critical importance of its compliance obligations, the Board failed to monitor, or even inquire into, Purdue's SOM measures or the ADD Program appropriately, let alone take reasonable steps to ensure they were being implemented effectively. As a result, Purdue faced staggering liability in the form of civil penalties, fines, and tort liabilities.

213.    Moreover, to circumvent safeguards against the dispensation of suspicious prescriptions, the Sackler directors caused Purdue to enter into distribution agreements with specialty pharmacies to fill oxycontin prescriptions that traditional pharmacies had rejected.

214.    In its *Identifying Granular Growth Opportunities for OxyContin: First Board Update*, McKinsey informed the Board of Purdue, *i.e.* the Sacklers, that part of the reason for declining OxyContin sales was that "both pharmacies and distributors" were "under intense scrutiny and direct risk," causing a "clear disruption impacting patients." In particular, McKinsey noted a "range of obstacles" to patients' access to OxyContin, including "entire pharmacies being shut off by distributors, pharmacies themselves imposing tablet limits, decreases in channel inventory leading to greater stockouts, and pharmacies choosing to not stock OxyContin." To address this issue, McKinsey proposed creating an "alternative model for how patients receive OxyContin" that would "bypass retail, likely through a third party vendor who would provide [ ] direct distribution to patients."

215.    In response, in August 2013, Mortimer Sackler Jr. emailed Baker and then-CEO John Stewart soliciting ideas for a new distribution system "to help relieve this problem of product access" and asking whether they were pursuing the strategy proposed by McKinsey "or an alternate." Mortimer Sackler Jr. shared his own vision for a new distribution system in which Purdue "would directly ship" patients OxyContin prescriptions "after using an independent service to verify the legitimacy of their prescriptions." Stewart responded that Purdue was "considering/evaluating many options," including "shipping directly to pharmacies who can't get supply from their regular wholesalers" and finding a way "to provide guidance to patients who call [Purdue] with respect to their personal problem in filling a prescription." To this, Mortimer Sackler Jr. responded, copying additional members of Purdue's management **and** the entire Board of MNP Consulting Limited ("MNP") (the entity that controlled global Sackler enterprise), "I do think there may be an opportunity

here for us to set up a complimentary [sic] business to handle this for Purdue as well as other controlled drug manufacturers."

216.    Responding to Mortimer Sackler Jr., Richard Sackler claimed to have had the same idea and expressed it to Stewart. In turn, Stewart confirmed Mortimer Sackler Jr.'s interest in exploring an "alternative distribution process for all or essentially all opioid formulations" that would "supply pharmacies, clinics and perhaps also patients (eg mail order)," and possibly even hospitals. Mortimer Sackler Jr. responded, "To be clear, I was thinking about selling to pharmacies," and noted his belief that "McKinsey was talking about our fulfilling [prescriptions] to the consumer."

217.    Not long after these exchanges—and as explained in an update about the implementation of a program called "Evolve to Excellence" prepared by members of Purdue's management—Purdue proceeded to develop "multiple tactics to address [distribution] issues," including "alternative [supply] channels." By October 2013, Purdue approached at least six potential partners for its alternative distribution strategies, but all of them rejected Purdue's offer because they were "not comfortable with mail fulfillment" and were concerned with the "risk associated with dispensing OxyContin" under Purdue's proposed distribution models. Despite these setbacks, Purdue continued to explore alternative distribution strategies and, in October 2013, members of Purdue's management updated the Board on the status of these strategies: "What is Purdue Considering? Includes exploring opportunity to distribute directly; exploring existing channels (Specialty pharmacies, independent pharmacy networks)."

218.    Purdue eventually realized its goal of establishing "alternative distribution" channels. In 2015, Purdue entered into distribution agreements with three specialty pharmacies, which proceeded to fill numerous prescriptions that (1) had been rejected by traditional retail pharmacies based on indications of diversion; (2) were for uses that were unsafe, ineffective, and medically unnecessary; and (3) were often diverted into illegal drug markets. Indeed, the findings of Purdue's

own ADD Program show that many of these prescriptions were medically unnecessary. In particular, the specialty pharmacies filled Medicare prescriptions for Purdue opioids written by approximately 100 prescribers, **nearly one-fourth of whom were referred to the ADD Program on suspicion of diverting opioids into illegal markets**. Between 2015 and 2018, Purdue paid these specialty pharmacies more than $100,000 in kickbacks to fill prescriptions that other traditional pharmacies had rejected.

219.     When prescribers and patients experienced difficulty filling prescriptions for Purdue's opioid products, including OxyContin, Purdue's sales representatives and employees in its Medical Affairs department referred them to the specialty pharmacies with which Purdue had contracted.

**B.     Distributors Deliberately Filled Orders for Large Volumes of Opioids**

220.     The Distributor Co-Conspirators filled orders for the pharmacies dispensing extraordinarily large volumes of opioids. ARCOS data shows shipments to top dispensing pharmacies between 2006 and 2019:

- Prime Therapeutics (Albuquerque): ABDC, Anda, Cardinal, McKesson, H.D. Smith, Teva

- Menaul Compounding Pharmacy (Albuquerque): ADBC, Anda, Cardinal

- Highland Pharmacy (Albuquerque): ABDC, Anda, Cardinal, McKesson

- Walgreens (Las Cruces – E. Lohman Ave.): Anda, Cardinal, Walgreens

- Lovelace Outpatient Pharmacy (Albuquerque): Anda, Cardinal, McKesson

- Del Norte Pharmacy (Santa Fe): ABDC, Anda,

- Walgreens (Albuquerque – Montgomery Blvd.): ABDC, Anda, Cardinal, McKesson, Walgreens

- Walgreens (Almogordo): ABDC, Anda, Cardinal, Walgreens

- Walgreens (Rio Rancho): ABDC, Anda, Cardinal, McKesson, Walgreens

- NCS Healthcare (Albuquerque): McKesson

- Walgreens (Espanola): ABDC, Anda, Cardinal, McKesson, Walgreens

- Roden-Smith Pharmacy (Clovis): McKesson, ABDC

- Walgreens (Las Cruces – N. Main St.): ABDC, Anda, Cardinal, Walgreens

- Walgreens (Albuquerque – Menaul Blvd.): ABDC, Anda, Cardinal, McKesson, Walgreens

- Walgreens (Las Cruces – El Paseo Rd.): ABDC, Anda, Cardinal, Walgreens

- Walgreens (Farmington): ABDC, Anda, Cardinal, McKesson, Walgreens

- Walgreens (Roswell): ABDC, Anda, Cardinal, McKesson, Walgreens

- Davis-Fleck Drugs (Truth or Consequences): ABDC, Anda, Cardinal

- Walgreens (Albuquerque – Coors Blvd.): ABDC, Anda, Cardinal, McKesson, Walgreens

- Walgreens (Albuquerque – Wyoming Blvd.): ABDC, Anda, Cardinal, McKesson, Walgreens

221. The Distributor Co-Conspirators distributed eye-popping quantities of opioids across the country. In New Mexico, for example, the Distributor Co-Conspirators distributed the following as measured in milligram morphine equivalents, between 2006 and 2019:

- ABDC – 6,523,360,936 MMEs (21.85% of the market)

- McKesson – 6.281,989,884 MMEs (21.04% of the market)

- Cardinal – 5,976,117,915 MMEs (20.02% of the market)

- Walgreens – 3,339,901,115 MMEs (11.19% of the market)

- Walmart – 1,704,752,742 (5.71% of the market)

- CVS – 585,085,776 (1.96% of the market)

222. The increased supply of opioids engineered by the Opioid Promotion Enterprise caused the extravagant use of opioids that damaged hospitals like Plaintiff. By working to ensure that

far more opioids were available in the community than could ever have been needed for legitimate medical purposes, Distributor Co-Conspirators provided a necessary condition for this increased use.

223.    This course of conduct was deliberate. In a *60 Minutes* interview, former DEA agent Joe Rannazzisi described Distributor Co-Conspirators' industry as "out of control," stating, "What they wanna do, is do what they wanna do, and not worry about what the law is.  And if they don't follow the law in drug supply, people die.  That's just it.  People die." The interview continued:

> JOE RANNAZZISI: The three largest distributors are Cardinal Health, McKesson, and AmerisourceBergen. They control  probably 85 or 90 percent of the drugs going downstream.
>
> [INTERVIEWER]: You know the implication of what you're saying, that these big companies knew that they were pumping  drugs into American communities that were killing people.
>
> JOE RANNAZZISI: That's not an implication, that's a fact. That's exactly what they did.

Another DEA veteran stated that these companies failed to make even a "good faith effort" to "do the right thing." He explained, "I can tell you with 100 percent accuracy that we were in there on multiple occasions trying to get them to change their behavior. And they just flat out ignored us."[93]

**C.    The Nature of the Distributor Co-Conspirators' Wrongful Conduct in the Distribution of Opioids.**

224.    The Distributor Co-Conspirators' failure to secure their opioid supply chains and prevent drug diversion has resulted in years of governmental investigations, which the Distributor Co-Conspirators' have settled for hundreds of millions of dollars. Notwithstanding these settlements and the egregious wrongdoing they uncovered, the Distributor Co-Conspirators' continued to violate their duties.

---

[93] Jennifer Zimpfer Vaughan, *Ex-DEA Agent: Opioid Crisis Fueled by Drug Industry and Congress – By Correspondent Bill Whitaker* (Oct. 17, 2017), https://www.linkedin.com/pulse/ex-dea-agent-opioid-crisis-fueled-drug-industry-jennifer/.

225.    Distributor Co-Conspirators' failed to comply with their CSA (including regulations promulgated thereunder) and state law obligations to identify, report, and halt suspicious orders.

226.    Distributor Co-Conspirators' who are retailers dispensed opioids in violation of the CSA and state law.

227.    Moreover, Distributor Co-Conspirators' actions amounted to predicate acts of Wire Fraud and/or Mail Fraud, as each action (a) involved the use of interstate wires and/or mail, and (b) served to advance the purposes of the Opioid Promotion Enterprise. Some of the Co-Conspirators' actions amount to violations of the CSA and/or New Mexico CSA.

228.    The Marketing and Distributor Co-Conspirators' structured their contracts to give the Distributor Co-Conspirators' strong financial incentives to sell as many opioids as possible. The Distributor Co-Conspirators' benefitted from rebates or "chargebacks" that increased as the sales of pharmaceuticals increased. Joined by this powerful joint incentive to sell as many opioids as possible, the two groups of conspirators cooperated to increase opioid sales.

229.    This cooperation included the Distributor Co-Conspirators' active role in promoting the use of opioids to treat chronic pain. It also included creating the illusion that the Distributor Co-Conspirators' had erected effective controls against the diversion of opioids. The Distributor Co-Conspirators' created this illusion by repeatedly misleading the public and regulators into thinking that they had enacted safeguards, as they were required to do under the CSA.

230.    The National Retail Pharmacies violated the CSA by dispensing extremely large amounts of opioids from their retail pharmacy stores under circumstances in which diversion was highly likely, if not inevitable, while misleading the public that they were working to prevent diversion.

231.    Armed with knowledge of their own sales and shipments and industry-wide data, the Distributor Co-Conspirators knew or should have known that the quantity of opioids being distributed far exceeded any possible medical need—even if the wider market for chronic pain had

been entirely legitimate (which it was not). Distributor Co-Conspirators knew or should have known that a significant number of opioids were being diverted from legitimate medical uses. Opioid shipments continue to be far greater than medically justified.

232.     Sources of information placing Distributor Co-Conspirators on notice that the volume of opioids they were shipping must have been excessive include:

   a.     Detailed transaction-level data on the sale and distribution of opioids, which can be broken down by zip code, prescriber, and pharmacy, and includes the volume of opioids, dose, and the distribution of other controlled and non-controlled substances;

   b.     In-person detailing to promote and provide products and services, which allows them to observe the red flags of diversion.[94]

## VII.     INDICIA OF CONSPIRACY AMONG THE DEFENDANTS AND THEIR CO-CONSPIRATORS.

### A.     The Distributor Co-Conspirators marketed the Manufacturing Co-Conspirators' opioids.

233.     The Distributor Co-Conspirators actively assisted the Manufacturing Co-Conspirators, including Purdue, in marketing their opioid products.

234.     Distributors' efforts date back decades. For example, a 1991 article described efforts by the National Wholesale Druggists Association ("NWDA") to work collaboratively with manufacturers, noting how "wholesalers and manufacturers showed their optimism about the future of wholesale drugs," in light of a "spirit of intercompany teamwork open[ing] up new opportunities for everyone involved . . . ."[95]  Manufacturers such as Purdue were members of the NWDA starting from the early 1990s.

---

[94] Despite the overwhelming evidence of the Distributor Co-Conspirators' actions in furtherance of the objectives of the Enterprise relating to the distribution and dispensing of opioids that constituted acts of mail fraud, wire fraud, and/or state/federal CSA violations, we omit them for purposes of pleading a streamlined complaint that focuses on the conduct of the defendants, and the collaboration (*i.e.,* the conspiracy) among all co-conspirators.

[95] Val Cardinale, *New Spirit of Partnering Rejuvenates Wholesalers*, 135 Drug Topics 23 (Dec. 16, 1991).

235.    The Distributor Co-Conspirators also provided discount cards to induce consumers to purchase the Manufacturing Co-Conspirators' opioids. As a 2017 internal Purdue document explains, "[t]here is evidence associating cash payment with opioid abuse and diversion" and "[d]iscount cards can lower the out-of-pocket cost for a cash prescription without revealing the identity of the card user." Thus, Purdue recognized, as the Distributor Co-Conspirators should have recognized, that discount cards, usable with cash payment for prescriptions, facilitated misuse and diversion.

236.    The Distributor Co-Conspirators invested in overcoming resistance from insurance and health plans to pay for opioids prescribed for chronic, noncancerous conditions. Strategies to overcome insurers' refusal to cover opioids included call centers, to help patients navigate the insurance and insurance appeals process, as well as working with doctors on the same issues.

### 1.    Walgreens

237.    Purdue leveraged its relationship with Walgreens and their mutually beneficial goal of growing the opioid business to ensure that Purdue had input into the "corporate guidelines" that Walgreens's pharmacists were "expected to follow" when it came to dispensing prescription opioids.

238.    Starting in at least 1999, Purdue sponsored Walgreens's continuing education programs designed to encourage stores to "get on the Pro Pain Management Band Wagon." At the beginning of each Purdue-sponsored meeting, a particular Walgreens pharmacist made a presentation on his store and the program implemented. His store actively advertised to area doctors and patients that they were a "full-service" pain management pharmacy. Purdue praised the pharmacist's actions as "fantastic."

239.    Walgreens's Market Director of Pharmacy Operations recommended that Walgreens's District Managers and Pharmacy Supervisors attend a continuing education program titled *The*

*Pharmacists' Role in Pain Management: A Legal Perspective*, which was available online at RxSchool.com.[96] The program was eventually made mandatory.

240.    This program was one in a long line of pharmacist "education" programs that Purdue developed as part of its strategy to disseminate "a new school of thought" about opioids. Through these programs, Purdue and Walgreens disseminated fraudulent information that redefined red flags in an effort to correct pharmacists' supposed "misunderstanding" about pain patients and the practice of pain management. Purdue took what it called an "aggressive role" in educating Walgreens's pharmacists on pain-management issues.

241.    Walgreens's Market Director of Pharmacy Operations also recommended an Endo-sponsored continuing education program, *Navigating the Management of Chronic Pain: A Pharmacist's Guide*, which disseminated manufacturer messaging designed to broaden the market for opioids. For example, it stated, "according to most reports, approximately 30% of the population lives with chronic pain", citing another CE presentation sponsored by APS. It also claimed that "most opioid adverse effects can be managed with careful planning and patient education." It went on to discuss "fears and prejudices" related to addictive behaviors that "unnecessarily limit" opioid use, described as "opiophobia," which the piece claimed was the result of "misunderstandings regarding the concepts of addiction, physical dependence, and tolerance."

242.    One of the presenters for this Endo-sponsored program was Kenneth C. Jackson. Mr. Jackson was also a frequent speaker and KOL for Purdue. In addition, he co-authored a Purdue-sponsored pharmacists' program, *Use of Opioids in Chronic Noncancer Pain*. Released in April 2000, it was designed to eliminate "misconceptions about addiction, tolerance and dependence."

---

[96] *See Walgreen Co. Controlled Substance Anti-Diversion and Compliance Program* (July 17, 2012).

## 2.    CVS

243.    To grow the demand for prescription opioids, CVS participated in the marketing, advertising, and promotion of opioid products with and on behalf of opioid manufacturers.

244.    For example, CVS made at least one pitch to Insys, a company whose senior executives were criminally convicted for their unlawful marketing, to help promote a liquid form of fentanyl. CVS touted the reach of its communications and explained the science behind its marketing, advertising, and promotional services. Through CVS's NEWScript program, CVS claimed to be perfectly poised to assist with new-product launches. CVS even offered Insys the chance at having a literature display in its patient waiting rooms and to help Insys "target patients" using its signature ExtraCare consumer loyalty card database.

245.    CVS also worked with Purdue to ensure that CVS pharmacists were trained by Purdue on many of Purdue's misleading marketing messages. Purdue's and CVS's tactics included distributing what an internal Purdue memo describes as "our . . . Brochure" purporting to teach pharmacists how to identify fraudulent prescriptions; requiring new CVS hires to view what Purdue describes as "our written CE [continuing education] programs"; and planning to co-host additional programs to indoctrinate pharmacists with Purdue's misrepresentations concerning opioids. CVS's ties to PAP and Purdue were so deep that CVS even used PAP's and Purdue's logos on a cover letter when providing the aforementioned guide to CVS pharmacists.

246.    The Purdue memo describing these tactics reveals that they were supported by CVS's leadership, including its directors of quality improvement and regulatory compliance and its Manager of Professional Practices.

247.    CVS worked with Endo to increase patient adherence to continued use of opioids. CVS had a crucial role in carrying out one of the key sales tactics in Endo's 2012 business plan.

248.    Through a company called Catalina Health ("Catalina"), Endo was able to target OxyContin patients in areas where Opana ER had preferred formulary status. Catalina in turn worked to create a brand-loyalty program that kept new patients on their opioids. CVS, through its pharmacy-retention programs, sent letters to the patients' homes to encourage them to stay on Opana.

249.    The agreement between CVS and Endo was formalized in an agreement to promote, market, and advertise Endo's opioid products via its "CVS Carecheck Plus Patient Education Service." CVS not only contractually agreed to promote Opana ER to its customers (i.e., patients) at the point of sale, it even insisted upon reviewing and **approving** the specific messaging used.

250.    CVS helped Actavis promote its opioids by working with Cardinal's Marketing and Business Development team on programs designed to offer rebates and off-invoice discounts on products, with the aim being to "move [] product."

### 3.    Walmart

251.    Walmart teamed up with Purdue to spread misinformation about prescription opioids. As early as 1995, Purdue and Walmart launched presentations utilizing pro-opioid KOLs to pharmacists across the country. As Purdue described: "The Program [on pain management] will originate from Walmart's Studios in Bentonville, AR and sent by satellite to more than 2,000 stores across the country. It is expected that as many as 4,000 pharmacists and district manages will either attend the session or view the video tape."

252.    Between August 1, 2009, and May 31, 2010, Walmart participated in a program in connection with Actavis' Kadian aimed at "improv[ing] patient persistence and increas[ing] the overall length of therapy by providing patients with education on [Kadian], tips to help manage pain, and timely, behavior-triggered refill reminders."

253.    Walmart circulated a Purdue-sponsored continuing education program titled "Should I Dispense This? Recognizing Appropriate Pain Management" and a pamphlet titled "Counseling

Patients & Their Families on the Role of Opioid Analgesics in Pain Management: A Pharmacist's Guide" to its pharmacists. Together, these materials discussed pseudoaddiction, downplayed the addiction risks associated with Purdue's opioid products, and encouraged proactive opioid prescriptions to prevent pain before it even begins.

254.    Walmart participated in a twelve-month collaborative program between Purdue and Adheris beginning October 16, 2013, "designed to improve patient adherence on Butrans."

255.    Walmart distributed promotional materials authored by the American Pharmacists Association, a member of the Pain Care Forum.

### 4.    Kroger

256.    Kroger welcomed Purdue's marketing into its stores. Following an NACDS conference, a Purdue employee described Kroger's Pharmacy Procurement Manager in attendance as "very positive as to what Purdue is doing" and "interested in doing programs . . . at a regional level" and with Purdue's "various brochures included." He also described making another new contact at Kroger, who had agreed to send Purdue's brochure and letter out electronically. An "account contact report" from Purdue further described the results of communication with Purdue's Pharmacy Category Manager, who "was very supportive and understanding" about Purdue's "ongoing OxyContin media battle" in 2001. Not only would Purdue's "[p]harmacy brochure and letter" be sent out to all Kroger Pharmacy Directors in each division and when Kroger's employee's "co-sign the letter" it would have "better impact." Purdue would also send out its continuing education ("CE") programs on pain management.

### 5.    Marketing Participation by Other Distributors

257.    In the late 1990s, ABDC (through its predecessor Bergen Brunswig) assisted Purdue in promoting OxyContin by installing a "glimmer button" in ordering software used by pharmacists.

258.    ABDC was also able to leverage Xcenda, an ABDC subsidiary, to further its goal of distributing and selling more prescription opioids than could possibly have been legitimate. Xcenda worked with Teva to determine which pharmacies purchased the most Fentora and to then target them to encourage the purchase of even more Fentora. Xcenda and Teva researchers published studies funded by Teva misleadingly suggesting that "low-risk" patients could be easily identified, promoting the use of long-acting opioids in chronic noncancer pain patients,[97] and concluding that there was an identifiable group of chronic pain patients predisposed to a higher risk of opioid misuse but failed to identify specific factors that placed patients at greater risk..[98]

259.    Cardinal marketed opioids by direct-to-consumer marketing, direct mail marketing, email marketing, marketing in customer newsletters, telemarketing, advertisements on its ordering platform, and pharmacy rebates. Cardinal's promotional services offered to the Manufacturing Defendants also included programs to train KOLs. Cardinal also offered to provide KOLs to deliver web-based conference programs promoting a drug manufacturer's products. Cardinal offered a proprietary database of providers to whom the Manufacturing Co-Conspirators could send email blasts and presentation material to promote their products. Cardinal provided these services to promote opioids sold by the Manufacturing Co-Conspirators.[99] Cardinal provided marketing assistance to Allergan, Endo, and Janssen.

---

[97] Pamela E. Landsman-Blumberg, et al., *Health Care Resource Use and Cost Differences by Opioid Therapy Type Among Chronic Noncancer Pain Patients*, 10 J. Pain Res. 1713 (2017), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5533567/pdf/jpr-10-1713.pdf.

[98] *Long-term Opioid Users with Chronic Noncancer Pain, supra.*

[99] *See Non-Personal Promotion*, Cardinal Health, https://www.cardinalhealth.com/en/services/manufacturer/biopharmaceutical/commercialization/non-personal-promotion.html (last visited Aug. 25, 2023); *Provider Consulting*, Cardinal Health, https://www.cardinalhealth.com/en/services/manufacturer/biopharmaceutical/commercialization/provider-consulting.html (last visited Aug. 25, 2023); *Provider Engagement*, Cardinal Health, https://www.cardinalhealth.com/en/services/manufacturer/biopharmaceutical/commercialization/provider-engagement.html (last visited Aug. 25, 2023).

260.    McKesson promoted opioids for Allergan Janssen, and Mallinckrodt and administered Purdue's savings card program for OxyContin.

261.    Anda marketed AbbVie's Vicodin following the transition of Vicodin to a branded generic. The banner ad appeared on Anda's ordering system used by Anda's customers to select products.

262.    As a wholly owned subsidiary of opioid manufacturers, including Watson, Actavis, and then Allergan, Anda both acted as a secondary distributor for and specifically promoted, its parent manufacturer's generic and branded products.

263.    H.D. Smith agreed to market AbbVie's Vicodin following the transition of Vicodin to a branded generic. H.D. Smith coordinated and ran promotions on Mallinckrodt's Exalgo.

264.    Albertsons promoted Butrans.

265.    Publix participated in rebate programs with Mylan, Actavis, Par, Endo, and Mallinckrodt.

266.    Giant Eagle participated in rebate programs with Actavis, Par, Endo, Qualitest, and Purdue.

**B.    Collaboration Through Front Groups and Trade Groups**

267.    Defendants, through Purdue, worked with the other Co-Conspirators to achieve their common purpose through trade or other organizations, such as the Pain Care Forum ("PCF"), the Healthcare Distribution Alliance ("HDA") (formerly known as the Healthcare Distribution Management Association ("HDMA")), and the National Association of Chain Drug Stores ("NACDS"). These organizations provided repeated opportunities for members of the Opioid Promotion Enterprise to coordinate their activities and to arrange for the endorsement of their scheme by ostensibly independent or third-party organizations.

### 1.    Pain Care Forum

268.    The PCF was a coalition of drugmakers, trade groups, and dozens of non-profit organizations supported by industry funding, including the Front Groups described in this Complaint. Lobbyists for members of the PCF quietly shaped federal and state policies regarding the use of prescription opioids for more than a decade. PCF members spent over $740 million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including opioid-related measures.[100]

269.    Members included Cephalon, Teva, J&J, Endo, Actavis, Abbott, Purdue, Grünenthal, ABDC (through HDA), Cardinal (through HDA), Hikma (through HDA), McKesson (through HDA), H.D. Smith (through HDA), Schein (through HDA), CVS (through NACDS), Walgreens (through NACDS), Walmart (through NACDS), Kroger (through NACDS), Albertsons (through NACDS), Publix (through NACDS), Giant Eagle (through NACDS).

270.    The PCF allowed the Manufacturing Co-Conspirators and the Distributor Co-Conspirators to engage in coordinated conduct to ensure an oversupply of opioids. The PCF's entire purpose was coordinating industry activities surrounding pain and opioids. The PCF was coordinated by Purdue's Burt Rosen.

271.    Members met monthly in Washington, D.C., but could also participate by phone. The meetings deliberately excluded media and no minutes were taken in order to keep the meetings off the record.

272.    In 2007, APF and Purdue collaborated on talking points for use at a PCF meeting. Some of these talking points included "[o]verly restrictive regulatory policies impeded pain relief"; "doctors and people with pain" who "believe that opioid medications are addictive" constituted "barriers to effective pain care"; and opioid medications "give relief—not a 'high.'"[101]

---

[100] Matthew Perrone, *Pro-Painkiller Echo Chamber Shaped Policy Amid Drug Epidemic*, Ctr. for Pub. Integrity (Sept. 19, 2017), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy-amid-drug-epidemic.

[101] *Treatment Options, supra* at 5.

273.    Members of the PCF worked together in an attempt to delay or halt the rescheduling of hydrocodone combination products such as Norco and Vicodin from Schedule III to Schedule II because the rescheduling, by imposing stricter requirements for prescribing and dispensing, would reduce sales. This effort was ultimately unsuccessful as hydrocodone was rescheduled in 2014.

274.    The Manufacturer Co-Conspirators used the PCF to "coordinate strategy and to address the FDAs REMS proposals." In 2007, Congress gave the FDA authority to require Risk Evaluation and Mitigation Strategies ("REMS") that would increase various safety measures for high-risk drugs, including requiring specialized training for prescribers. Around 2008, the FDA was contemplating a REMS program for long-acting and extended-release (LA/ER) opioids and asked the Manufacturer Co-Conspirators to form an Industry Working Group to coordinate their position. The FDA Industry Working Group meetings, however, were on the record and, because the Manufacturing Co-Conspirators are direct competitors, were attended by antitrust counsel. The FDA did not invite the distributors or Front Groups to participate. The PCF, therefore, created its own REMS Task Force that included these groups.

275.    The PCF's REMS Task Force reviewed a draft letter to the FDA recommending mandatory physician and pharmacist training and certification requirements as a prerequisite to prescribing and dispensing LA/ER opioids. The PCF, working with the HDA, deleted that part, stating "we shouldn't mention a 'certification' requirement for physicians (or anyone else for that matter.)" The final letter to the FDA did not mention the HDA's or the PCF's role in drafting the letter. The PCF also prepared form "recommendations" for its Front Group members to use to submit comments to the FDA on REMS. When one PCF member raised concern that the FDA "may feel it was rather duplicitous of the [industry members] to meet with [the FDA commissioner] and not mention that these were in the works," he was told, "It's the way things work" and there was a "need to keep silent on the congressional and media strategies."

276.    The Manufacturer Co-Conspirators collaborated through the PCF to coordinate opposition to the CDC's opioid prescribing guidelines before they were even issued. The CDC guidelines were "not good news" for the opioid industry and the PCF had formed a "broad work group" that included plans to "criticize the CDC process and expected outcomes" using "media efforts and recruiting patients and provider experts." Indeed, by this time the Manufacturer Co-Conspirators knew that state-implemented prescribing guidelines hurt their opioid sales. And since at least 2012 they and other PCF members, including the HDA, had worked together to convince the CDC that the true epidemic was untreated chronic pain, that it was the "#1 public health problem in the United States," was the true epidemic, and that it was "unclear" why what PCF members euphemistically referred to as "opioid-related problems" were "considered to be of epidemic proportions." Once the CDC released its guidelines, the Manufacturer Co-Conspirators used the PCF to undermine the guidelines because they were concerned that the guidelines were "likely to dampen opioid sales in the US" and "impact[] prescription habits globally."

277.    The Manufacturing Co-Conspirators also used the PCF as a forum to actively coordinate their activities. For instance, Grünenthal USA's Dan Cohen led PCF's Abuse Deterrent Formulations Coalition, which presented to the PCF's Communications Working Group on conference calls and coordinated activities to promote use of prescription opioid ADFs (despite the fact that ADFs do nothing to ameliorate the risk of the most common route of misuse—oral ingestion of pills) along with other Co-Conspirators, including Janssen, Purdue, Endo, and Mallinckrodt.

278.    PCF and the HDA worked together on many issues, including the HDA's Industry Compliance Guidelines, hydrocodone rescheduling, the creation of REMS for prescription opioids, issues related to diversion and SOM, and passage of the Marino bill.[102]

---

[102] This bill was later reintroduced as the Hatch-Whitehouse bill and ultimately enacted as the Ensuring Patient Access and Effective Drug Enforcement Act.

279.    The HDMA and its members actively worked with other PCF members on various issues, including the HDA's Industry Compliance Guidelines, hydrocodone rescheduling, the creation of REMS for prescription opioids, and policies related to diversion and SOM. For instance, in 2008, an ABDC employee emailed Purdue explicitly asking for a meeting between the Purdue employee organizing the PCF and two ADBC's vice presidents to "talk about our issues and how to work with the coalition"—the PCF. Similarly, in March 2008, HDA's Senior Vice President for Government Affairs emailed Burt Rosen and Lisa Robin with FSMB to discuss the interest of some of HDA's members such as Cardinal and McKesson with supporting publishing or distributing Fishman's *Responsible Opioid Prescribing*.

280.    Defendants' collaboration was particularly evident in activities by HDA and NACDS to pass a 2014 bill (the "Marino bill") in Congress weakening DEA's authority to enforce the CSA against distributors. HDA and NACDS coordinated this activity with other members of the PCF. Purdue and its outside lobbyist were the source for the critical language in the bill that accomplished the intended weakening. Non-industry PCF members signed letters in support of the bill. After the bill was passed, a Purdue representative emailed a Cardinal employee to congratulate him on their collective efforts in support of the bill.

281.    Participants in PCF actively communicated with employees of Indivior (then Rickett Benckiser) as evidenced by 2012 emails. These emails concerned interactions with individuals involved in the Researched Abuse Diversion and Addiction Surveillance program ("RADARS"). Purdue had created RADARS in 2001 to satisfy the FDA and the DEA that it was tracking misuse of its products, primarily OxyContin, and cases where healthcare providers were diverting the pills to their own use or to sell for illicit purposes. Purdue sold the RADARS system to Denver Health in 2005, but even after the move to Denver Health, RADARS staffers have continued to argue against stricter limitations on prescription opioids before multiple legislatures, the FDA, and the DEA. They have also supported

Purdue, other Manufacturing Co-Conspirators, and the Front Groups to continue the Opioid Promotion Enterprise, including in authoring and co-authoring articles with Purdue, other opioid manufacturers, and the KOLs.

### 2. Healthcare Distribution Alliance

282. Cardinal, ABDC, McKesson, H.D. Smith, and Schein belong to a trade association known until 2016 as the Healthcare Distribution Management Association and now known as the Healthcare Distribution Alliance.[103] Members have also included Teva, J&J, Endo, Hikma, Indivior, Mallinckrodt, and Purdue.

283. The HDA and its members eagerly sought the active membership and participation of the Manufacturing Co-Conspirators by advocating the many benefits for members, including "strengthen[ing] your alliances."[104] AbbVie, Endo, Hikma, J&J, Mallinckrodt, Par, Purdue, and Teva are or have been members of the HDA.[105]

284. The closed meetings of the HDA's councils, committees, task forces, and working groups provided the Manufacturing Co-Conspirators and the Distributor Co-Conspirators the opportunity to work closely together, confidentially, to develop and further their common purpose.

285. One time this happened was following suspensions of ABDC's, McKesson's, and Cardinal's distribution licenses for certain facilities in 2007 and 2008. These suspensions, which were a direct threat to the entire opioid industry's continued business, lit a fuse within the industry. The very real threat of DEA enforcement prompted a flurry of communication and coordination among all members of the supply chain, including members of the PCF, HDA, and NACDS, to find a solution

---

[103] *Our People*, Healthcare Distrib. All., https://www.hda.org/our-people/ (last visited Aug. 25, 2023).

[104] *Manufacturer Membership Benefits*, Healthcare Distrib. All., https://web.archive.org/web/20220326010637/https://www.hda.org/~/media/pdfs/membership/manufacturer-membership-benefits.ashx (last accessed Aug. 25, 2023 as of Mar. 26, 2022).

[105] *Manufacturer*, Healthcare Distrib. All., https://web.archive.org/web/20221003150121/https://www.hda.org/about/membership/manufacturer (last access Aug. 25, 2023 as of Oct. 3, 2022).

to protect their businesses. As early as November 2007, HDA and NACDS jointly discussed a response to the DEA's initiative. One of HDA's goals, which it shared with NACDS, was to "develop a comprehensive DEA strategy" to avoid enforcement actions against distributors. As part of this strategy, Enterprise members, including through the HDA and NACDS, discussed the CSA's legal requirements, including the fact that distributors were required not to ship suspicious orders, and what their response should be.

286.    The HDA voted as to whether, if "an order is potentially suspicious, should the distributor be able to ship part of the order "consistent with the current practice for many distributors." HDA members also asked, "Should we support DEA's [law enforcement] efforts?" In advance of this vote, HDA requested that each of the Distributor Co-Conspirators provide a representative "authorized to speak on, and agree to, policy and strategy decisions on behalf of their companies."

287.    The Distributor Co-Conspirators met face-to-face at the HDA on March 1, 2011, to discuss DEA regulations and order monitoring.

288.    In 2012, the DEA issued an interim suspension of the license of a Cardinal distribution facility. At issue was an 803% increase in opioid sales to a pharmacy that Cardinal had already been fined for selling opioids to. In response, Cardinal filed a motion for a temporary restraining order. Shortly thereafter, on April 6, 2012, Cardinal, ABDC, and McKesson met under the auspices of the HDA to "plot a course forward."[106] Their plan, which they concocted jointly, was to involve a media campaign, focus groups to explore messaging that would paint the distributors in a positive light, a crisis playbook that included a written plan for responding to various scenarios (including registration suspension and a diversion lawsuit),[107] and a plan to arrange a congressional inquiry designed to paint

---

[106] *See also* Healthcare Mgm't & Distrib. All., *HDMA Political Strategy for DEA Suspicious Orders Matter* (n.d.).

[107] Healthcare Mgm't & Distrib. All., *Crisis Playbook: An Interactive Guide to Crisis Communications* (n.d.), https://wp-stat.s3.amazonaws.com/graphics/opioid-files/pdfs/440.pdf (last visited Aug. 25, 2023).

the DEA as "misdirected." Distributor Co-Conspirators used the crisis playbook to develop talking points based on it; these were thus points that had previously been approved of by all of the co-conspirators participating in the HDA.

289.    Another example occurred in 2013 at an HDA meeting where Cardinal representatives told representatives from other distributors (including ABDC and McKesson) that Cardinal did not report suspicious orders to DEA because there was no advantage to Cardinal in making the required reports.

290.    HDA's Jewelyn Cosgrove emailed all of the members of the PCF to ask them, particularly the Front Group members, to sign onto a "group support letter" to be released with the re-introduction of the Marino Bill. She later acknowledged that it "couldn't have" been passed with the PCF's "help."

291.    The Co-Conspirators also participated, through the HDA, in webinars and other meetings designed to exchange detailed information regarding their prescription opioid sales, including purchase orders, acknowledgements, ship notices, and invoices. For example, on April 27, 2011, the HDA offered a webinar to "accurately and effectively exchange business transactions between distributors and manufacturers . . . ." On information and belief, the Manufacturing Co-Conspirators used this information to gather high-level data regarding overall distribution and to direct the Distributor Co-Conspirators on how to most effectively sell prescription opioids.

292.    Publications and guidelines issued by the HDA confirm that Distributor Co-Conspirators utilized their HDA membership to form agreements. Specifically, in the fall of 2008, the HDA published *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances* (the "Industry Compliance Guidelines") regarding diversion.[108] As the HDA

---

[108] Healthcare Distrib. Mgm't All., *Industry Compliance Guidelines: Reporting Suspicious Orders and Preventing Diversion of Controlled Substances* (n.d.).

explained in an amicus brief, the Industry Compliance Guidelines were the result of "[a] committee of [HDA] members contribut[ing] to the development of this publication" beginning in late 2007.[109] HDA falsely represented to that court that Cardinal did not have any input on the amicus brief and did not participate in the drafting of that brief.

293.    As part of its "roll out" of the Industry Compliance Guidelines, HDA scheduled meetings with NACDS and with the manufacturer trade group PhRMA and specifically recognized NACDS and the PCF as "external stakeholders" in the guidelines.

294.    Nevertheless, HDA knew that some of its largest members, including ABDC and Cardinal, would not implement these guidelines. The HDA even admitted internally that their purpose as to "[h]ead-off further enforcement or regulatory action" not to actually require compliance by the Distributor Co-Conspirators with their CSA obligations.

295.    In an amicus brief filed by the HDA and the NACDS, Distributor Co-Conspirators represented that they were complying with their duties to identify suspicious orders by utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information available to them in the ordering process; taking action when particular orders or series of orders raised red flags because of size, frequency, or departure from patterns; and monitoring for unusual behavior by pharmacies. In this brief, they asserted:

> a.    "HDMA and NACDS members not only have statutory and regulatory responsibilities to guard against diversion of controlled prescription drugs, but undertake such efforts as responsible members of society."
>
> b.    "Distributors take seriously their duty to report suspicious orders, utilizing both computer algorithms and human review to detect suspicious orders based on the generalized information that *is* available to them in the ordering process."[110]

---

[109] *Amicus Curiae* Brief of Healthcare Distribution Management Association in Support of Cardinal Health's Motion for Injunction Pending Appeal 5, *Cardinal Health, Inc. v. Holder*, No. 12-5061 (D.C. Cir. filed Mar. 7, 2012).

[110] Brief for Healthcare Distribution Mgmt. Association and National Ass'n of Chain Drug Stores as Amici Curiae in Support of Neither Party, *Masters Pharm., Inc. v. U.S. Drug Enf't Admin.*, No. 15-1335, 2016 WL 1321983, at *3–4, *25 (D.C. Cir. Apr. 4, 2016).

These statements were designed to give the false impression that Distributor Co-Conspirators were not deliberately turning a blind eye to egregious signs of diversion among their pharmacy customers.

296.    Another example of the Distributor Co-Conspirators' control over the HDA occurred in 2017. Burt Rosen from Purdue emailed employees from ABDC, Cardinal, and McKesson to invite them to a meeting at Purdue's office for "brainstorming to determine if there is anything the Washington Offices may be able to do from a public policy perspective to better educate, or impact Washington policy makers thinking with respect to the litigation brought . . . against the opioid supply chain." Sean Callinicos from Cardinal replied, stating that he had talked with his counterparts at ABDC and McKesson and that "we think it would be preferable for you to have at this meeting Patrick Kelly, copied, and his team from our HDA trade group rather than the individual distributor companies." This clearly shows the Distributor Co-Conspirators using HDA to distance themselves from direct communication with Purdue while nevertheless directing and benefiting from the results of the communication.

297.    The Distributor Co-Conspirators also collaborated with one another and with the Manufacturing Co-Conspirators outside the HDA. For example, in November 11, 2010, H.D. Smith approached Cardinal Health about a "working group meeting to include representatives from the major wholesalers and possibly manufacturers," to discuss "how the major wholesalers could possibly collectively address due diligence efforts."

298.    Similarly, Cardinal, Purdue, Mallinckrodt, and McKesson each discussed ABDC's suspension of a license to distribute controlled substances from one of its distribution centers with ABDC, and Purdue discussed ABDC's suspension with Watson, Cardinal, and McKesson. The common mission of Defendants was voiced clearly by Purdue: "We want no interruption in the supply chain" even if those interruptions were part of the regulatory mechanism designed to prevent diversion of dangerous drugs.

84

299. After the DEA issued an ISO to Cardinal, there were immediate coordination calls between Purdue, Cardinal Health, and McKesson, followed by information sharing with AmerisourceBergen and McKesson. These Co-Conspirators reaffirmed the need for "mutual support": "We look at our work together as 'mutual support' as we are all in this together - manufacturers and wholesalers/distributors - as well as retail customers, of course."

300. In 2012, H.D. Smith scheduled a "meeting with the Big 3 to discuss DEA issues." They discussed customer accounts, some of which had been cut off by one distributor and picked up by other distributors. The group agreed that "this type of meeting and exchange was valuable and should continue quarterly."

301. Representatives from the Big Four (i.e., the Big Three plus H.D. Smith) orchestrated a number of meetings to share information and discuss ongoing DEA issues and suspicious order monitoring between 2012 and 2013.

### 3. National Association of Chain Drug Stores

302. The NACDS is a trade association that represents traditional drug stores, supermarkets, and mass merchants with pharmacies. Its members and affiliate members also include stakeholders such as manufacturers, other distributors, and other trade organizations.

303. Walgreens, Walmart, Rite Aid, Giant Eagle, Publix, Kroger, Albertsons, and CVS are or have been members of NACDS. In addition, ABDC, McKesson, Cardinal, Anda, and H.D. Smith are or have been associate supplier members. HDA and NACDS viewed the strategic "alliance" and overlapping membership between their organizations as important.

304. As controlling members of NACDS, the National Retail Pharmacies have served on and run key governing committees within the organization. Many of them have served on and even chaired NACDS's Board of Directors, which determines the "strategic plan and positions" of NACDS. For example, in 2018, Walgreens, Rite Aid, and Walmart representatives were elected to the

board for 3-year terms. Current board members include representatives of Walmart, Walgreens, Albertsons, Meijer, Kroger, and Publix. In addition, Cardinal and McKesson were elected to the NACDS Board in 2009 and again in 2019.

305.    Distributor Co-Conspirators were also able to serve on key committees alongside the National Retail Pharmacies, providing a forum for collaboration and a venue where the activities of the Opioid Promotion Enterprise could be coordinated. For example, McKesson served on the NACDS Strategic Communications Committee with Walmart, Walgreens, Rite Aid, and CVS and McKesson, and Cardinal received communications from the NACDS policy council along with the National Retail Pharmacies.

306.    In 2008, Cardinal Health prepared talking points for a NACDS conference about its planned retail chain SOM program, making it clear that the program would "minimize the disruption" to retail chains and that they would "work together" with the pharmacies "to ensure that our Suspicious Order Monitoring program for retail chains does not interrupt" business." Cardinal stated that its "objectives" included "working in partnership" with the chain customers to effect "resolution" of a "suspicious order pattern … prior to supply chain disruption," by taking steps established by the Cardinal Health "Sales" department, such as allowing the customer/customer store" to set the thresholds and providing "early warning" communications "prior to a SOM event – for example, at 75% of threshold" for "sales to work with the account."

307.    NACDS delayed effective progress towards establishing effective industry standards regarding red flags for dispensing prescription opioids. The National Retail Pharmacies, working through NACDS, met to discuss developing such standards but ultimately decided not to adopt standards out of a fear that if they did not comply with their own standards, they would be subject to enforcement actions or litigation.

308.    NACDS members coordinated regarding pharmacy diversion "DEA red flags" through a "DEA Compliance Workgroup," seeking to focus on keeping the drugs flowing while promoting optics, noting that "policies that are too prescriptive … should not be included in the code" and citing meeting "pain control needs of patients" as a "Guiding Principle." NACDS members further used an NACDS "Pharmacy Compliance Roundtable" to discuss avoiding criminal and civil liability for issues related to controlled substances, SOM, and diversion.

309.    In 2014, when the HDA discussed a plan involving NACDS and PhRMA to develop a "Red Flags" guidance document for prescription opioids (much like the ICGs), HDA noted that the "subtext strategy . . . [was to] keep the DEA at bay."

310.    NACDS also directly participated in the PCF. Chrissy Kopple of NACDS presented to the PCF's Communications Working Group regarding an early iteration of the Marino bill.

311.    When the DEA attempted to reschedule hydrocodone combination products, which were common targets of misuse and diversion, the co-conspirators banded together to attempt (ultimately unsuccessfully) to prevent their up-scheduling. NACDS reached out to the PCF to create a Task Force and included HDA representatives as well as numerous manufacturers. NACDS collaborated with the PCF "communications working group" and sent statements to media outlets claiming the rescheduling would "negatively impact access to needed medications for those who suffer from chronic pain." The NACDS committee included CVS, Walgreens, McKesson, Rite Aid, and Giant Eagle. NACDS encouraged members to oppose HCP rescheduling, despite admitting the prescription drug abuse is "so bad" in certain states that legislators feel they must "do something." The Co-Conspirators knew rescheduling from Schedule III to Schedule II would "tighten controls" on prescribers and reduce their sales.

312.    In 2016, the NACDS Policy Council discussed ongoing efforts to shape opioid legislation, including their success in removing a requirement that pharmacists have to check their

state drug monitoring program before filling controlled substance prescriptions. Members of this council included Walgreens, CVS, Cardinal, Walmart, McKesson, Rite Aid, and ABDC.

313.    NACDS fought regulatory efforts to require National Retail Pharmacies to use available dispensing related data and red flags to prevent diversion, opposing "recent DEA actions in which the DEA is expecting pharmacists to be enforcement agents with respect to prescriptions for pain medications."

314.    NACDS, Rite Aid, and Walgreens also sought to help their "business partners HDA" "kill" other controlled substance legislation.

315.    Manufacturers were also able to participate in NACDS activities. For instance, in 2012, Endo sent around "NACDS Follow Up" notes regarding meetings with ABDC and a chain pharmacy distributor about SOM practices and the impact of DEA enforcement regarding Schedule II opioids on their business.

316.    NACDS has continued to support the efforts of the National Retail Pharmacies to whitewash their role in creating and sustaining the opioid epidemic. In a recent amicus brief, NACDS asserted: "Although it is a commonly recognized that pharmacists and pharmacies were not responsible for the crisis, NACDS members are doing their part to prevent the diversion of prescription medications, reduce drug abuse, and save lives."[111]

317.    Taken together, the interaction and length of the relationships between and among the Manufacturing Co-Conspirators and the Distributor Co-Conspirators reflect a deep level of interaction and cooperation between two groups in a tightly knit industry. The Co-Conspirators operated as a united entity, working together on multiple fronts, to engage in the unlawful sale of prescription opioids.

---

[111] Brief of the Nat'l Ass'n of Chain Drug Stores as *Amicus Curiae* in Support of Defendants' Motion to Dismiss, *United States v. Walmart Inc.*, No. 20-1744-CFC (D. Del. filed Mar. 3, 2021), https://corporate.walmart.com/media-library/document/2021-03-03-the-national-association-of-chain-drug-stores-nacds-amicus-brief/_proxyDocument?id=00000177-fe2b-def1-a37f-fefb01180000.

318.    Defendants and their Co-Conspirators did not accomplish their goal of driving up demand for and inappropriately increasing the supply of prescription opioids by acting individually. Instead, they collaborated with one another and with other members of the Opioid Promotion Enterprise, including Front Groups, KOLs, trade associations, and pill mills.

319.    Defendants and their Co-Conspirators had a common object to promote the manufacture, sale, distribution, dispensing, and use of prescription opioids. Defendants had a meeting of the minds with their Co-Conspirators and entered into an agreement on this common object. They had a common interest in this purpose, as each profited from the sale of opioids.

320.    Moreover, Defendants turned a blind eye to the misconduct of the other members of the Opioid Promotion Enterprise in order to allow that misconduct to achieve their common purpose.

### 4.    Joint Funding of KOLs and Front Groups

321.    Funding KOLs and Front Groups allowed Defendants and their Co-Conspirators to pool their resources to promote mutually beneficial propaganda about the benefits and risks of prescription opioids to treat chronic, noncancer pain. These KOLs included:

a.    Kathy Foley (Cephalon, Janssen, Purdue)
b.    Lynn Webster (Teva, Cephalon, Endo, Purdue, Mallinckrodt)
c.    Perry Fine (Cephalon, Janssen, Endo, Purdue)
d.    Russell Portenoy (Cephalon, Janssen, Endo, Abbott, Purdue)
e.    Charles Argoff (Teva, Janssen, Endo)
f.    Scott Fishman (Janssen, Endo, Abbott, Mallinckrodt, Purdue)
g.    Steven Stanos (Janssen, Endo, Abbott)
h.    Paul Arnstein (Janssen, Mallinckrodt)
i.    Kenneth Jackson (Endo, Purdue)

322.    Front Groups financially supported, directed, and/or controlled by multiple Co-Conspirators (including Defendants, via Purdue) included:

a.    APF (Cephalon, Teva, Janssen, Endo, Purdue, Abbott)
b.    AAPM (Cephalon, Teva, Janssen, Endo, Allergan, AbbVie, Purdue)
c.    APS (Janssen, J&J, Endo, Purdue, Abbott)
d.    AGS (Janssen, J&J, Endo)
e.    AfPA (Cephalon, Teva, J&J, Endo, AbbVie, Mallinckrodt, Purdue)
f.    ACPA (Cephalon, Teva, Janssen, Endo, AbbVie, Mallinckrodt)

g.    NPC (Teva, J&J, Allergan, Mallinckrodt, Purdue)

323.    Publications, websites, and CMEs developed and supported by multiple Front Groups, Defendants (via Purdue), and their Co-Conspirators included:

a.    *Responsible Opioid Prescribing* (Cephalon, Endo, Purdue, and FSMB)
b.    Treatment Options: A Guide for People Living with Pain (Cephalon, Purdue, APF)
c.    *Exit Wounds* (Endo, Purdue, APF)
d.    Guidelines for the Pharmacological Management of Persistent Pain in Older Persons (Endo, Janssen, Purdue, AGS, APF)
e.    Pain Action Guide (Endo, APF)
f.    Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia (Endo, NIPC)
g.    Special Considerations: Pain in Specific Populations (Janssen, APF)
h.    *Painknowledge.org* (Endo, APF, NIPC)
i.    Finding Relief: Pain Management for Older Adults (Janssen, AAPM, AGS)
j.    *Let's Talk Pain* (Janssen, APF)
k.    Partners Against Pain (Purdue, CVS, APF)
l.    A Policymaker's Guide to Understanding Pain & Its Management (Purdue, APF)
m.    Overview of Management Options (Purdue, Endo)

**C.    Other Collaboration**

324.    In addition, Defendants (via Purdue) and their Co-Conspirators engaged in a variety of collaborative activities to support the excessive use of opioids, which also constituted a nuisance, including:

a.    Abbott and Purdue engaged in the co-promotion of OxyContin to physicians working in hospitals.
b.    Janssen and Purdue agreed not to disparage one another's products or ineffective anti-diversion practices even though they knew that these strategies were driving excessive use and abuse of prescription opioids.
c.    Janssen and Purdue worked together on a joint marketing effort called "Project Pearl," which including marketing for Ultram.
d.    Janssen licensed, sold, and aggressively marketed Grünenthal's opioids: tramadol and tapentadol.
e.    Cephalon, Purdue, Endo, and Mallinckrodt provided funding to FSMB to distribute pro-opioid materials.
f.    Grünenthal provided the technology for ADF versions of Purdue's OxyContin and Endo's Opana and defended the effectiveness of that technology despite evidence to the contrary.
g.    McKinsey worked with Purdue, Janssen, Endo, and Mallinckrodt to devise strategies to increase the sales of their prescription opioids and the market for

prescription opioids generally.

h.    McKinsey worked with ABDC to increase its sales of generic prescription opioids.

i.    ABDC provided marketing assistance to Endo, Janssen, and Purdue to encourage pharmacies to order and dispense larger quantities of prescription opioids.

j.    Teva and ABDC worked together through ABDC's Xcenda subsidiary to publish scientific articles promoting the use of opioids and minimizing their risks.

k.    Cardinal provided marketing assistance to Allergan, Endo, Janssen, and Purdue to promote their prescription opioids.

l.    McKesson provided marketing assistance to Allergan, Janssen, and Purdue to promote their prescription opioids.

m.    Anda and H.D. Smith provided or agreed to provide marketing assistance to AbbVie in marketing Vicodin.

n.    ABDC and Cardinal agreed to give Walgreens favorable treatment in their SOM programs, thereby enabling Walgreens pharmacies to place and have filled suspicious orders that should have been halted, investigated, and not shipped.

o.    Cardinal and McKesson agreed to give CVS favorable treatment in their SOM programs, thereby enabling CVS to place and have filled suspicious orders that should have been halted, investigated, and not shipped.

p.    Walgreens assisted Purdue in marketing OxyContin by allowing Purdue to have input into Walgreens's dispensing policies and by requiring its pharmacists to view "educational" material provided by Endo.

q.    Mallinckrodt assisted Walgreens in shifting its controlled-substance distribution immediately to Cardinal following warnings and subpoenas issued to Walgreens's Perrysburg, Ohio distribution center.

r.    Walgreens worked with Cardinal and ABDC to develop contingency plans to maintain the high supply of opioids to its pharmacies in the event that Walgreens lost its license to distribute Schedule II substances from its Jupiter, Florida DC.

s.    In 2013, Walgreens entered a ten-year agreement with ABDC. [112] ABDC was described as able to gain "purchasing synergies" from Walgreens through the companies' relationship. According to ABDC's most recent 10-K, Walgreens now accounts for 33% of AmerisourceBergen's revenue.[113]

t.    CVS worked with Purdue to disseminate the false message that the risk of addiction and potential for abuse associated with opioid use were very small. CVS allowed Purdue to train CVS's pharmacists with Purdue's promotional materials on OxyContin, which contained misrepresentations about the risks of using opioids.

u.    CVS entered an agreement with Endo to promote, market, and advertise

---

[112] As a part of its distribution agreement, Walgreens gained purchase rights to ABDC equity, allowing it to further participate in the prescription opioid shipment boom in America. Walgreens subsequently exercised these purchase rights, ultimately owning approximately 28% of ABDC. As part of the transaction, Walgreens can nominate up to two members of ABDC's Board of Directors. Currently, Walgreens's Co-Chief Operating Officer sits on the ABDC Board.

[113] AmerisourceBergen Corporation, *Form 10-K* (Nov. 19, 2020), https://d18rn0p25nwr6d.cloudfront.net/CIK-0001140859/44edc41e-d63c-4a49-81ce-619723b2ee77.pdf.

Endo's opioid products to consumers. CVS took on key responsibilities in marketing Endo's opioids to patients, including sending letters to targeted patients' homes, in order to increase patient adherence to continued use of opioids.

v.    CVS worked with Cardinal to create programs that offered rebates and off-invoice discounts on Actavis's opioids in order to promote and increase sales of these opioids.

w.    Walmart and Purdue worked together as early as 1995 to launch pro-opioid presentations featuring KOLs to pharmacists across the country.

x.    Walmart marketed Actavis's Kadian.

y.    Walmart and McKesson formed ClarusOne Sourcing Services LLP in 2016 to source generic pharmaceuticals and provide strategic sourcing services.

z.    Purdue sought to persuade Walgreens that pharmacists who were calling to verify prescriptions five to six times a week were "overzealous" and "calling too much."

aa.    Indivior cooperated with Walmart, Walgreens, and CVS to increase Suboxone film prescription rates through strategically negotiating agreements and pharmacist education programs.

bb.    Albertsons promoted opioid manufacturers' products in its stores and pharmacies, like Butrans.

cc.    Kroger marketed and promoted Purdue's products in its stores, and it circulated Purdue's continuing education programs among its pharmacists.

dd.    Indivior worked with Walmart, Walgreens, and CVS to design systems that would increase the sales of Suboxone.

ee.    Publix participated in rebate programs with Mylan, Actavis, Par, Endo, and Mallinckrodt.

ff.    Giant Eagle participated in rebate programs with Actavis, Par, Endo, Qualitest, and Purdue.

325.    The Distributor Co-Conspirators and the Manufacturing Co-Conspirators collaborated on common approaches to their CSA obligations (which also caused a nuisance). This began with Purdue, who explained that manufacturers could not solve the DEA problem on their own: "The responsibility for making the decision to ship rests with the supplier. . . . That is why we must collaborate." For Defendants and their Co-Conspirators, it was important to "pledge to remain in close contact with each other whenever there may be a questionable order" in order to "protect ourselves and our registrations regarding suspicious order discovery and reporting." Purdue further explained: "We really do have to partner with our own customers to help them in their business with pharmacies catering to 'pain clinics.' Otherwise, [distributors] will cut [the pain clinics] off based on some kind of threshold. We need to convince [distributors that] they should talk to us when our

product is involved and make it a joint decision, etc. just as we need to consult with them from our end." Collaboration was about filling orders, not stopping them: "We are not about to hold [an] order while we take our time deliberating. We want no interruption in the supply chain."

326.    Examples of this collaboration between the Manufacturing Co-Conspirators and the Distributor Co-Conspirators include:

    a.    In 2008, Purdue "arrange[d] a meeting with the Big 3 . . . to talk about DEA's latest plans "to squeeze the wholesalers and distributors on 'pain clinics.'"

    b.    In early 2008, AmerisourceBergen met with Purdue to focus on "Business & Diversion" and "communication and cooperation" between Purdue and ABDC in relation to suspicious order monitoring.

    c.    Purdue and Cardinal Health met to "collaborate with Cardinal on issues about our product(s)," because Purdue felt that it was very important "to collaborate and support [Cardinal] on any accounts we feel might require further assessment, etc."

    d.    Purdue met with McKesson in 2009 about suspicious order monitoring and their systems for doing so. Purdue proposed a "collaborative effort" regarding Suspicious Order Monitoring. McKesson stated, "that [it] was in 100% agreement with Purdue and . . . recognized that this collaborative effort was the right thing to do."

    e.    McKesson and Purdue met again in 2010 for the purpose of "further cooperation between Purdue and McKesson to develop coordinated protocols for communication in the identification of patterns of interest to all of us."

    f.    On August 18, 2009, Purdue's Jack Crowley communicated with both H.D. Smith and Cardinal Health, stating "[w]e should gang up on DEA in Portland, OR," referring to an upcoming DEA diversion conference for the pharmaceutical industry in Portland.

327.    Purdue maintained regular contact with ABDC, Cardinal, and McKesson about prescribers of concern, potentially suspicious accounts, and whether or not to report or stop suspicious orders (or cut off suspicious customers). Purdue and McKesson agreed that the purpose of their communication was not to improve compliance, but to "maximize [their] shared objectives."

328.    Mallinckrodt internally noted that half of the flagged orders in its SOM system were from the Big 3 and that a "significant amount" were from Walgreens, Walmart, and CVS, but decided, in order to protect these sales, not to treat these orders as suspicious.

329.    In 2013, Endo met with CVS and Cardinal to discuss SOM systems.

330.    In July 2013, Purdue met with ABDC, McKesson, Cardinal, and H.D. Smith as well as Walgreens, Walmart, and Rite Aid to discuss SOM issues such as DEA actions and thresholds.

331.    In 2014, McKesson noted that it had met with its "manufacturing partners," including "Mallinckrodt, Purdue, and Actavis," to "share with them our controlled substance monitoring information and identify opportunities for collaboration," and had further met with CVS to review SOM systems.

332.    Hikma agreed to prioritize Cardinal and Schein controlled substance orders in resolving SOM holds, further reducing the one-day turnaround time applicable to all SOM-pended orders at Hikma and virtually ensuring Hikma employees could not perform all necessary due diligence measures.

333.    Publix pressured Teva to overlook red flags in Publix's orders, and Teva in turn pressured its employees to do the same and fulfill and ship suspicious orders to Publix.

334.    The Distributor Co-Conspirators also conspired with the National Retail Pharmacies in order to undermine the goals of the CSA to prevent diversion of dangerous controlled substances.

335.    Cardinal turned a deliberate blind eye to Walgreens's orders, claiming to rely on Walgreens's SOM program. Prior to 2012, however, Walgreens had no SOM program for orders to outside Distributors, and thus did not monitor its pharmacies' orders to Cardinal, even if Walgreens itself had cut that pharmacy off for self-distribution.

336.    Cardinal gave its "proxy" to CVS headquarters to perform due diligence investigations of potentially suspicious orders and individual CVS pharmacies that were ordering excessive amounts of prescription opioids. Cardinal turned a deliberate blind eye to that fact that CVS's "sophisticated internal" SOM program, on which Cardinal claimed to rely, was really a theft report without any SOM capabilities.

337.    In turn, CVS issued internal instructions to not report to the DEA any orders placed to an outside vendor (like Cardinal), even "order[s] deviating from the normal size, frequency, and/or buying pattern and deem the order to not be for legitimate purposes . . . ." In addition to shipping to CVS stores, Cardinal Health also distributed directly to CVS warehouses, which in turn distributed directly to CVS stores. The distributions from Cardinal to CVS warehouses, termed "brokerage sales," were not included in Cardinal's SOMs process and did not have set thresholds as other sales did. These orders were not monitored despite the fact that through these orders CVS was ordering so much hydrocodone that it was "able to strip hydrocodone inventory from Cardinal."

338.    When ABDC identified Walgreens stores or orders that raised a "concern" with regard to oxycodone, ABDC and Walgreens conspired to avoid reporting to the DEA. ABDC stated: "I'm trying to think of everything we can do to prevent having a bunch of orders reported to [the] DEA and held." Despite DEA guidance that "a suspicious order placed by a customer pharmacy is made no less suspicious by application of a system designed to reduce or eliminate such orders prior to shipping," ABDC and Walgreens decided to have Walgreens "police their own orders and block any order to [ABDC] that would exceed AB[D]C's threshold thus triggering a suspicious order being sent to [the] DEA from AB[D]C." Requests to clear orders or raise thresholds, however, were almost always approved, as evidenced by the 95%+ approval rate for FY 2014 and 2015.

339.    When orders "outside the expected usage" made it to ABDC, ABDC and Walgreens set up meetings to discuss adjusting thresholds or using "soft blocking." Contrary to DEA guidance and ABDC's stated policy, ABDC provided Walgreens with the threshold limits set in ABDC's order monitoring program, and also provided Walgreens with weekly SOM statistics. ABDC generally would not take action on Walgreens orders that exceeded its thresholds without talking to the Walgreens integrity team.

340.    CVS conspired with McKesson to keep the drugs flowing and avoid reporting to the DEA. McKesson gave CVS early threshold warnings at 60% of their assigned Schedule II thresholds to provide "plenty of notice" before a SOM event would occur, so that "high volume" purchasers of Schedule II substances could have their thresholds increased accordingly. McKesson routinely increased opioid thresholds for CVS without adequate due diligence.

341.    McKesson provided daily updates to Giant Eagle and Walmart when they were approaching McKesson's controlled substance ordering thresholds. McKesson employees often follow up these automated messages with emails that sometimes solicited requests to increase the approaching thresholds.

342.    As a valued customer, Kroger received a "75% percent report" from Cardinal, ensuring it had the opportunity to avoid orders being flagged and to consider threshold increases. Cardinal employees repeatedly cleared pended orders from Kroger pharmacies following brief justifications, such as that the pharmacy was seeing an influx of new business and needed additional stock to meet demand.

343.    McKesson and Albertsons's SOM partnership had glaring shortcomings. An Albertsons employee reported that "[p]harmacies that have a change in business need (e.g., nearby pharmacy closed, acquisition of another pharmacy, etc.) may request a threshold increase by submitting the following to their DPM: medication needing increase (e.g., Oxycodone); top prescribers that are driving the prescriptions for the specific base code; [and] specific details to build the case to support an increase in threshold (e.g., nearby pharmacy closed, new practice opened, etc.)." Albertsons' pharmacies often requested threshold increases, and McKesson routinely granted them and permitted pended orders to be fulfilled and shipped following brief explanations from Albertsons' pharmacies. In some cases, McKesson employees reported that McKesson's SOM model

automatically increased thresholds on certain controlled substances and permitted pended orders to be fulfilled and shipped without requiring justification from Albertsons' pharmacies.

344.    Giant Eagle and McKesson worked closely together to circumvent limits placed on opioid orders by, in part, omitting those parts of Giant Eagle's orders that would exceed thresholds without notifying the DEA.

345.    Although some members of the Opioid Promotion Enterprise have ceased engaging in some of the conduct alleged in this Complaint (e.g., by discontinuing certain opioid products), the Enterprise is ongoing. No Defendant has tried to leave the Enterprise and indeed, members continue to forward the goals of the enterprise by, among other things, making false statements concerning their historical record and current practices of compliance with their duties to prevent excess use and diversion of prescription opioids.

346.    The Co-Conspirators' conduct was not merely parallel; the Co-Conspirators actively chose to support one another. For instance, when issues began to arise about abuse and diversion of Purdue's OxyContin, an internal Janssen email stated, "It was not [Janssen's] policy to advance language that would attack a competitor's product." [114] The email stressed the "need to have enough foresight to look towards the future of pain management."[115] In other words, what is bad for Purdue is bad for Janssen. This is, of course, in addition to J&J's interest in Purdue as a customer for Noramco APIs.

347.    Not all of the coordinated conduct described in this Complaint was unlawful, but taken together, it establishes that Defendants, by and through Purdue, and their Co-Conspirators reached agreements, had a meeting of the minds, and had ample opportunity to collaborate on the predicate acts described below. This sheer extent and continuity of conduct over a period of many years allows

---

[114] Email from Bruce Colligen to Dennis Fitzgerald (Apr. 20, 2001).
[115] *Id.*

the inference that Defendants, along with their Co-Conspirators, the KOLs, Front Groups, trade

associations, and pill mills were part of the Opioid Promotion Enterprise.

## VIII.  THE OPIOID PROMOTION ENTERPRISE HARMED PLAINTIFF AND OTHER HOSPITALS.

348.    Hospitals—legally and morally—are compelled to treat patients with opioid-related

conditions and, as a result, have been directly and monetarily damaged by the excessive opioid use

caused by the Opioid Promotion Enterprise. Hospitals have incurred and will continue to be

negatively impacted from their treatment of patients with opioid-related conditions.

349.    The actions of the Opioid Promotion Enterprise increased the number of such

patients.

350.    There are different categories of patients whose opioid use impacts hospital

operations. Some patients may meet the diagnostic criteria for OUD. Other patients may have

become physiologically and/or psychologically dependent on opioids without meeting the diagnostic

criteria for OUD. Still others may present for care after a single episode of opioid use (e.g., an

accidental overdose by an opioid-naïve patient). For most of these patients, their opioid use began

with (and often was limited to) opioids that they were prescribed in accordance with Defendants'

false narratives regarding the risks and benefits of opioids.

351.    The care required by opioid-dependent patients may take the form of treatment to

counter the immediate effects of the opioid use (e.g., administration of naloxone to reverse an opioid

overdose), treatment of conditions brought about by the opioid use (e.g., care for infants with

neonatal abstinence syndrome), or medication for OUD (e.g., daily doses of methadone or

buprenorphine provided during a patient's hospital stay to ensure continuity of medication for OUD

treatment).

352.    However, opioid-dependent patients may also present with other sorts of conditions,

the treatment of which may be affected by their opioid dependence. For instance, a patient who has

been on a high regimen of prescription opioids for a long period of time may present for a gallbladder removal. Or, the same patient may present in the emergency room with a traumatic injury following a vehicular accident. Care for these patients will be more complex and will place a greater burden on the hospital's resources than care for an equivalent patient receiving the same treatment but without the history of opioid use.

353.    Studies have shown that, "[c]ompared with opioid-naïve patients, opioid-tolerant patients will typically generate a greater workload for medical and nursing staff . . . . They require more frequent consultations and prescription alterations."[116] "Opioid-dependent patients presenting for surgery will challenge a health care system to provide optimal patient care, requiring close communication among the surgical team, anesthesiologists, referring physicians, and pain specialists."[117] "The proportion of opioid-tolerant patients requiring acute pain management [e.g., in connection with surgery] has increased, often presenting clinicians with greater challenges than those faced when treating the opioid-naïve."[118] These include an "increased risk of awareness" and the concomitant need to take extra precautions to counteract that risk[119] as well as the need to monitor and respond to patients showing symptoms of opioid withdrawal.

354.    Plaintiff must expend more resources to treat opioid-dependent patients, in comparison to patients with similar diagnoses who are not opioid dependent. When comparing the two cohorts, the ratio of payments received—including from private payors—to charges billed is

---

[116] GK Simpson & M Jackson, *Perioperative Management of Opioid-Tolerant Patients*, 17(4) BJA Education 124 (2017), https://www.bjaed.org/action/showPdf?pii=S2058-5349%2817%2930056-2; *see also* Joseph H. Donroe, et al., *Caring for Patients with Opioid Use Disorder in the Hospital*, 188 Can. Med. Ass'n J. 1232 (2016), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5135493/pdf/1881232.pdf ("The inpatient care of patient with opioid use disorder can be medically and psychosocially complex.").
[117] Klaus D. Torp & Robert L. McClain, *Perioperative Pain Control in the Opioid-Dependent Patient: Just Bite the Bullet?*, 10 Current Anesthesiology Reports 473 (2020), https://link.springer.com/article/10.1007/s40140-020-00425-2.
[118] C.A. Huxtable, et al., *Acute Pain Management in Opioid-Tolerant Patients: A Growing Challenge*, 39 Anaesthesia Intensive Care 804 (2011), https://journals.sagepub.com/doi/epdf/10.1177/0310057X1103900505.
[119] *Id.*

lower for the opioid-dependent cohort. This operational impact coincides with the increase of opioids circulating in the community and increases in the population of opioid-dependent patients.

355.    This is not just a matter of some patients not paying their bills. Instead, the financing mechanisms of modern healthcare set rates for types of treatment. If the same treatment for an individual patient becomes more complicated or expensive (as it does in patients with opioid dependency or OUD), then a healthcare provider's rate of realization declines.

356.    For example, it is increasingly common for individuals with OUD to present at a hospital with endocarditis, treatment for which may involve surgery followed by intravenous antibiotic treatment. This treatment requires the installation of an IV port in the patient; typically, a patient with such a port will be released and will receive their intravenous antibiotics on an outpatient basis. However, because IV ports provide a ready route for intravenous drug use, the standard of care for patients with IV ports who have a concurrent OUD is to conduct the entire course of treatment on an inpatient basis, with an associated additional burden on the hospital's operations.

357.    The structures by which medical care in hospitals is funded (generally by fixed fees for particular treatments) means that the operational impact of treating opioid-dependent patients cannot be passed along to patients or other payors. For example, if a floor nurse must visit an opioid-dependent patient staying in the hospital for some treatment eight times over the course of a shift to manage complications related to the patient's opioid use but would only have to visit an otherwise equivalent non-opioid-dependent patient four times over the course of the same shift, there is an impact on the hospital's operations. However, no funding mechanism for hospitals provides additional funding to account for the opioid-dependent patient's greater use of staff resources.[120]

---

[120] *Cf.* Paul A. Taheri, et al., *Paying a Premium: How Patient Complexity Affects Costs and Profit Margins*, 229 Annals of Surgery 807 (1999), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1420827/pdf/19990600s00007p807.pdf (suggesting ways, in the trauma context, in which "it is the more medically complex cases that potentially compromise the economic position of the . . . institution").

358.    During admission, hospital professionals routinely consult with patients to assess which medications the patients are taking at home. Due to Defendants' conduct, hospitals can no longer trust patients to self-report their prescriptions and must take additional steps to independently verify their patients' purchases (such as by examining the PDMP).

359.    Additionally, individuals with OUD have presented and continue to present themselves to Plaintiff claiming to have illnesses and medical problems in order to obtain opioids. Plaintiff has incurred and continues to incur operational impacts related to the time and expense of identifying, diagnosing, testing, or otherwise attempting to treat these individuals.

360.    Hospitals must also treat opioid users who present in need of emergency care, a fact of which Defendants were aware. This obligation arises under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, which requires hospital emergency departments that accept payments from Medicare to provide care to anyone seeking treatment for a medical condition, regardless of citizenship, legal status, or ability to pay. Under EMTALA, participating hospitals may not transfer or discharge patients needing emergency treatment except with the informed consent or stabilization of the patient or when their condition requires transfer to a hospital better equipped to administer the treatment. Similarly, if a pregnant opioid-dependent person presents for treatment, under EMTALA, the hospital must provide care for both the opioid-dependent parent and the opioid-dependent baby.

361.    This is no small burden. In 2017, an estimate 1.5 million emergency room visits were related to OUD.[121] Moreover, as with other patients, emergency care for opioid-dependent patients for any condition can be more complex than for similarly situated patients who are not opioid dependent.

---

[121] Utsha G. Khatri, et al., *Variation in Emergency Department Visit Rates for Opioid Use Disorder: Implications for Quality Improvement Initiatives*, 51 Am. J. Emergency Med. 331 (2022).

362.    Plaintiff has purchased and continues to purchase and administer opioids marketed and sold by Purdue. Purdue has marketed and continues to market their opioid products directly to Plaintiff and other hospitals. Plaintiff is a direct customer and victim of Defendants' (via Purdue) fraudulent and unlawful marketing. Plaintiff and other hospitals have purchased opioids from Purdue, have used them as deceptively marketed by Defendants (via Purdue), and have suffered damages as a direct and proximate result. Plaintiff would not have purchased the quantity of opioids it purchased had Plaintiff known the truth about Defendants' false marketing scheme, *i.e.* that Defendants' claims regarding the risks, benefits, and superiority of opioids for long-term use were untrue and unfounded.

363.    The financial impact on hospitals, including Plaintiff, includes, but is not limited to, the following:

a.    operational losses suffered in connection with providing treatment to patients suffering from opioid-related conditions as the reason for presentation for care and/or as a comorbidity;

b.    operational losses associated with patient counseling with respect to pain management, necessitated by overprescription to the general population and dissemination of false and misleading information to prospective patients and others; as hospitals and other providers question their patients' self-reporting, it necessitates that further steps be taken in all phases of diagnosis, treatment, and counseling;

c.    the loss of revenue incurred by hospitals as a consequence of their obligation to provide care to patients suffering from opioid-related conditions;

d.    costs of opioids purchased by hospitals themselves, which were direct targets of Defendants' marketing campaigns;

e.    costs of training personnel in the proper treatment of drug overdoses;

f.    costs associated with training staff in the application of naloxone;

g.    operational losses suffered in relation to infants born with opioid-related medical conditions or born dependent on opioids due to drug use by mothers during pregnancy, including the costs of creating and maintaining special facilities and costs associated with increased staffing to observe infant behavior and adjust doses of medication used to manage withdrawal symptoms;

h.    costs associated with staff burnout, particularly in neonatal intensive care units, where staff suffer from PSTD, compassion fatigue, anger, addiction, and suicide;

i.    costs of providing additional personnel to respond to security concerns created by patients and others suffering from OUD and other forms of opioid dependency;

j.    costs of purchasing and maintaining additional equipment necessitated by the increased demands placed on hospitals as a result of the increased population of opioid-dependent patients and the expanded services hospitals provided in response; and

k.    costs of providing special programs over and above ordinary hospital services.

364.    Defendants and the Opioid Promotion Enterprise has caused a repeated and continuous injury (including but not limited to that of a nuisance). The damages have not occurred all at once but have continued to occur and have increased as time progresses.

365.    The harms suffered by Plaintiff and other hospitals were a direct and foreseeable result of the actions of the Opioid Promotion Enterprise and Defendants' actions. Defendants, as sophisticated participants in the pharmaceutical industry, knew that treatment provided to opioid-dependent patients would be provided by hospitals such as Plaintiff and that those hospitals' operations would be negatively impacted thereby.

## IX.    **TOLLING**

366.    Purdue filed for Chapter 11 bankruptcy in September 2019 in the Southern District of New York. Accordingly, all litigation against Purdue and the Defendants was effectively stayed until July 2025.

## X.    **CLASS ALLEGATIONS**

367.    Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on its own behalf and on behalf of all others similarly situated, as representative of the following Proposed Class:

All acute care hospitals in the United States that treated patients with opioid use order for four years preceding the commencement of this action. Excluded from the Class are any hospitals directly or indirectly owned or operated by Purdue or Purdue's affiliated entities.

368.    Available datasets identify acute care hospitals in the United States, rendering the members of the Proposed Class readily identifiable.

369.    According to CMS records, there are thousands of acute care hospitals in the United States, rendering the class so numerous that individual joinder of the members is impracticable. The members of the Proposed Class are geographically dispersed throughout the United States.

370.    There are questions of law and of fact common to all members of the Proposed Class as described below.

371.    Plaintiff's claims are typical of those of the Proposed Class as all members of the Proposed Class have suffered an operational impact on their hospitals from the increased population of opioid-dependent patients created by the Opioid Promotion Enterprise. Plaintiffs' claims and those of the Proposed Class are based on identical legal theories concerning Defendants' conduct, which was common as to all members of the Proposed Class Plaintiffs and the members of the Proposed Class seek damages for the same sort of injuries to their operations caused by Defendants' conduct.

372.    Plaintiff and its counsel will fairly and adequately represent the interests of the members of the Proposed Class. Plaintiff has no interest antagonistic to, or in conflict with, the interests of the members of the Proposed Class. Plaintiff's counsel are highly experienced in the prosecution of class actions and complex litigation, including opioids litigation on behalf of numerous hospitals in various states throughout the country. Plaintiff's counsel have the financial resources necessary to adequately and vigorously litigate this class action.

373.    A class action is superior to all other available methods for fairly and efficiently adjudicating the claims of Plaintiff and the members of the Proposed Class. Plaintiff and the members of the Proposed Class have been harmed in identical ways by Defendants' conduct. Although the members of the Proposed Class have each suffered extensive damages, these damages are still likely smaller than the expense and complexity of litigating on an individual basis against the Defendants. Therefore, it is unlikely than any individual hospital would be able to obtain effective redress for the wrongs committed against that hospital by these Defendants.

374.    Common questions of law and fact predominate over individual questions. These questions include:

a.    Did Defendants, by and through Purdue, and the Manufacturing Co-Conspirators manufacture prescription opioids?

b.    Did Defendants, both individually and by and through Purdue, make misleading statements regarding the risks and benefits of prescription opioids?

c.    Did the Distributor Co-Conspirators distribute prescription opioids?

d.    Did the Distributor Co-Conspirators distribute prescription opioids without conducting adequate due diligence?

e.    What is the scope of the Co-Conspirators' duties under the Controlled Substances Act?

f.    Did the Distributor Co-Conspirators receive suspicious orders for prescription opioids?

g.    Did the Distributor Co-Conspirators fill suspicious orders of prescription opioids?

h.    Did the Distributor Co-Conspirators report suspicious orders of prescription opioids to DEA and other regulators?

i.    Did the National Retail Pharmacies enact policies that pharmacists at individual stores were required to follow?

j.    Did the National Retail Pharmacies receive prescriptions for opioids?

k.    Did prescriptions received by National Retail Pharmacies for opioids contain red flags?

l.    Did the National Retail Pharmacies investigate prescriptions for opioids to resolve the presence of red flags?

m.    Did the policies and procedures in place at the National Retail Pharmacies cause pharmacists to fill prescriptions that should not have been filled due to the presence of red flags that were not investigated?

n.    Was the Opioid Promotion Enterprise an association-in-fact that existed?

o.    Were Defendants members of the Opioid Promotion Enterprise?

p.    Did the Opioid Promotion Enterprise engage in activities beginning in the 1990s?

q.    Were Front Groups, KOLs, and pill mills members of the Opioid Promotion Enterprise?

r.    Did the Opioid Promotion Enterprise have an unlawful purpose to propagate falsehoods about the safety and benefits of opioids and the way they are or should be distributed and dispensed and to distribute and dispense opioids in violation of the Controlled Substances Act?

s.    Did members of the Opioid Promotion Enterprise engage in wire fraud?

t.    Did members of the Opioid Promotion Enterprise engage in mail fraud?

u.    Did members of the Opioid Promotion Enterprise corrupt an official proceeding?

v.    Did the Distributor Co-Conspirators violate the CSA in the way they distributed prescription opioids, including by failing to identify, report, and not ship suspicious orders?

w.    Did the National Retail pharmacies violate the CSA in the way they dispensed prescription opioids, including by filling red flag prescriptions?

x.      Did Defendants conspire to support the conduct of the Opioid Promotion Enterprise?

y.      Did Defendants benefit financially from their membership in the Opioid Promotion Enterprise?

z.      Did the conduct of the Opioid Promotion Enterprise increase the number of opioid-dependent individuals?

375.    In the alternative, this Court should certify an issues class under Rule 23(c)(4). Factual and legal questions regarding Defendants' conduct, including whether the Opioid Promotion Enterprise existed and whether Defendants were members of it, whether Defendants committed predicate acts constituting a pattern of racketeering activity, and whether Defendants engaged in a conspiracy are common questions that can be efficiently and appropriate answered on a class-wide basis as to every member of the Proposed Class.

## XI.    CAUSE OF ACTION

### Violation of Racketeering Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1961–1968)

376.    Plaintiff repeats, realleges, and incorporates by reference the preceding paragraphs of this Complaint, as if fully set forth herein.

377.    This claim alleges violations of 18 U.S.C. §§ 1962(c)–(d).

378.    At all relevant times, Plaintiff and the members of the Proposed Class were capable of holding legal or beneficial interest in property and so were each a "person" within the meaning of 18 U.S.C. §§ 1961(3), 1962(c).

### 1.    Structure of the Opioid Promotion Enterprise

379.    **Name:** At all relevant times, there existed an "enterprise," within the meaning of 18 U.S.C. §§ 1961(4), 1962(c) – to wit, an association-in-fact comprised of each Defendant as well as other members – referred to herein as "The Opioid Promotion Enterprise."

380.    **Continuity**: The activities of the Opioid Promotion Enterprise were continuous, beginning in the 1990s and continuing until at least within four years prior to the filing of this Complaint.

381.    **Effect on Commerce**: The Opioid Promotion Enterprise was engaged in, and its activities affected, interstate or foreign commerce.

382.    **Membership**: The Opioid Promotion Enterprise reflected several types of participants, not all of whom were complicit, most of whom are named as Defendants:

    i.    **The Sacklers.** Defendants Richard Sackler, Beverly Sackler, David Sackler, Ilene Sackler Lefcourt, Jonathan Sackler, Kathe Sackler, Mortimer Sackler, Theresa Sackler, and Raymond Sackler controlled Purdue's misconduct. Defendants conceptualized and set in motion the falsehoods about opioids that created billions of dollars of artificial demand for these highly addictive and dangerous products. Together, the Defendants directed and otherwise participated in Purdue's deceptive sales and marketing practices, sending hundreds of orders to executives and other employees. From the money that Purdue collected as a result of its wrongful conduct, they paid themselves and their family billions of dollars.

    ii.    **The Manufacturing Co-Conspirators and Associates**. The Manufacturing Co-Conspirators) engaged in unlawful conduct to promote greater use of prescription opioids, engaged in unlawful conduct related to the distribution of opioids, and conspired with other members of the Opioid Promotion Enterprise.

    iii.    **Front Groups and KOLs**. The Manufacturing Co-Conspirators used the Front Groups and KOLs to stoke demand for opioids by falsely creating the impression of independent, third-party, authoritative validation of the Manufacturing Co-Conspirators' false claims.

    iv.    **Trade Associations.** Defendants participated in and used various trade associations, including the Pain Care Forum, the Healthcare Distribution Alliance, and the National Association of Chain Drug Stores as fora to develop and coordinate the unlawful activities of the Opioid Promotion Enterprise and to promote various aspects of the scheme.

    v.    **Distributor Co-Conspirators.** The Distributor Co-Conspirators joined the Opioid Promotion Enterprise with full awareness and complicity and acted in concert with the Manufacturing Co-Conspirators. The Distributor Co-Conspirators engaged in unlawful conduct to promote greater use of prescription opioids, engaged in unlawful conduct related to the distribution of opioids, and conspired with other members of the Opioid Promotion Enterprise.

    vi.    **National Retail Pharmacies.** In addition to their conduct as Distributor Co-Conspirators, the National Retail Pharmacies engaged in unlawful conduct related to dispensing of prescription opioids and conspired with other members of the Opioid Promotion Enterprise.

    vii.    **Noramco.** Noramco engaged in unlawful conduct related to the production and importation of active pharmaceutical ingredients for prescription opioids and conspired with other members of the Opioid Promotion Enterprise to increase the sale of prescription opioids.

    viii.    **McKinsey.** McKinsey engaged in unlawful conduct related to the marketing

and distribution of prescription opioids and conspired with other members of the Opioid Promotion Enterprise to increase the sale of prescription opioids.

ix.    **Corrupt Physicians and Pharmacies, a/k/a Pill Mills.** These participants unlawfully prescribed and dispensed prescription opioids.

2.    **The Common Purpose and Scheme of the Opioid Promotion Enterprise**

383.    The purpose of the Opioid Promotion Enterprise was to increase the sale of prescription opioids, thereby increasing Defendants' and their Co-Conspirators' revenues and profits. The members of the enterprise agreed to work towards this purpose by propagating falsehoods about the safety, risks, and benefits of opioids and about the way they are or should be distributed and dispensed, by unlawfully distributing and dispensing opioids, and by conspiring to do these things.

384.    Knowing that prescription opioids were highly addictive as well as ineffective and unsafe for the treatment of chronic pain, Defendants and their Co-Conspirators formed the Opioid Promotion Enterprise and engaged in a scheme to increase their profits and sales through (1) repeated and systematic misrepresentations about the safety and efficacy of opioids for treating chronic pain and (2) ongoing disregard of their duties to identify, investigate, halt, and report diversion of prescription opioids.

385.    At all relevant times, Defendants conducted (managed) or participated, directly or indirectly, in the conduct (management) of the Opioid Promotion Enterprise, through a pattern of unlawful or otherwise prohibited activity. Defendants, with full knowledge and purpose, also conspired with members of the Opioid Promotion Enterprise, in violation of 18 U.S.C. § 1962(d), to violate § 1962(c).

386.    There was regular communication between Defendants, their Co-Conspirators, the Front Groups, the KOLs, and the Trade Associations in which information was shared, misrepresentations coordinated, and payments exchanged. This coordination, communication, and payment often required the use of the wires and mail given the geographic dispersal of the members of the Opioid Promotion Enterprise.

387.    As public scrutiny and media coverage revealed how opioids ravaged communities throughout the United States, the Front Groups and KOLs did not challenge the Manufacturing Co-Conspirators' misrepresentations, seek to correct their own previous misrepresentations, terminate their role in the Opioid Promotion Enterprise, or disclose publicly that the risks of using opioids for chronic pain outweighed their benefits and were not supported by medically acceptable evidence.

388.    Defendants could not have accomplished the purpose of the Opioid Promotion Enterprise without the assistance of their Co-Conspirators, Front Groups and the KOLs, who were perceived as "neutral" even while spreading misrepresentations about opioids.

389.    The impact of the Opioid Promotion Enterprise is still in place, i.e., opioids continue to be prescribed and used for chronic pain, and the wave of opioid-dependent patients continues to consume Plaintiff's resources.

390.     Defendants, their Co-Conspirators, Front Groups, KOLs, and Trade Associations were all willing participants in the Opioid Promotion Enterprise, had a common purpose and interest in the object of the scheme, and functioned within a structure designed to effectuate the enterprise's purpose.

### 3.    Pattern of Racketeering Activity

391.    Defendants and the Members of the Opioid Promotion Enterprise engaged in multiple, repeated, and continuous criminal acts, including but not limited to:

    a.    **Wire Fraud, 18 U.S.C. § 1343.** Defendants and Members of the Opioid Promotion Enterprise, in violation of § 1343, transmitted communications electronically to designated persons to assert and/or coordinate false claims regarding the benefits, risks, sale, distribution, and dispensing of prescription opioids with the overall aim of increasing sales of prescription opioids and collecting the resulting profits.

    b.    **Mail Fraud, 18 U.S.C. § 1341.** Defendants and Members of the Opioid Promotion Enterprise, in violation of § 1341, transmitted communications by the mail to designated persons to assert and/or coordinate false claims regarding the benefits, risks, sale, distribution, and dispensing of prescription opioids with the overall aim of increasing sales of prescription opioids and

collecting the resulting profits.

c.    **Obstruction of Official Proceedings, 18 U.S.C. § 1512(c).** Members of the Opioid Promotion Enterprise, in violation of § 1512(c), corruptly obstructed, influenced, and/or impeded one or more official proceedings and/or attempted to do so. These proceedings included hearings before congressional committees, administrative proceedings before the FDA and the DEA, and proceedings before United States courts.

d.    **Violations of the Controlled Substances Act, 21 U.S.C. § 801, *et seq.*** Members of the Opioid Promotion Enterprise, in violation of § 843(a)(4)(A), knowingly or intentionally failed to report suspicious orders of prescription opioids that they were required to report. Members of the Opioid Promotion Enterprise, in violation of §§ 821, 822(b), 841(a), and 21 C.F.R. § 1301.74, distributed prescription opioids without authorization by knowingly failing to design and operate a system to detect suspicious orders of prescription opioids. Members of the Opioid Promotion Enterprise, in violation of §§ 821, 822(b), 841(a), and 21 C.F.R. § 1301.71(a), distributed prescription opioids without authorization by knowingly failing to maintain effective controls against diversion of prescription opioids into other than legitimate medical, scientific, and industrial channels by, among other things, shipping suspicious orders of prescription opioids without dispelling the suspicion. The National Retail Pharmacies, in violation of §§ 821, 822(b), and 841(a), knowingly dispensed prescription opioids without authorization by, among other things, failing to comply with the procedures mandated by 21 C.F.R. Part 1306. Members of the Opioid Promotion Enterprise, in violation of § 843(b), knowingly or intentionally used a communication facility (including the mail and wires) to facilitate the commission of the above violations of the CSA. Each Defendant, in violation of § 846, willingly agreed with at least one other person to a plan to knowingly commit one or more of the above violations of the CSA.

e.    **Violations of State Controlled Substances Laws.** Members of the Opioid Promotion Enterprise violated state-controlled substances laws that prohibit unauthorized dealing in controlled substances that are defined in section 102 of the Controlled Substances Act, including hydrocodone, oxycodone, and fentanyl.

392.    Each of the Defendants conducted and participated in the conduct of the Opioid Promotion Enterprise by: (1) creating and directly contributing to the false narrative that prescription opioids are safe for general use, including the misrepresentations discussed above; (2) personally directing the sales strategies of Purdue to increase sales of prescription opioids despite repeated warnings of the dangers and addiction risks; (3) developing and implementing a sales strategy that incentivized growing the entire market for prescription opioids, including generic brands; (4)

developing and implementing suspicious order monitoring systems for Purdue but then systematically ignoring those systems and refusing to report suspicious orders of controlled substances; (5) directing the regular payment of Purdue's profits, each payment consisting of hundreds of millions of dollars, directly to the Sackler family; and (6) actively concealing the acts of the Enterprise, especially concealing the involvement of the Sackler family in the false marketing and creation of the opioid epidemic.

393.     Moreover, each Defendant and Opioid Promotion Enterprise Member used the mail and wires to participate in the operation or management of the affairs of the Opioid Promotion Enterprise, directly or indirectly, in one or more of the following ways:

a.     Creating and providing a body of deceptive, misleading and unsupported medical and popular literature about the risks and benefits of opioids, electronic and print advertisements about opioids, sales and promotional training materials about opioids, and CMEs and speaker presentations about opioids that understated the risks and overstated the benefits of long-term use; in this respect all communications identified in Section IV are alleged to be predicate acts;

b.     Making inaccurate assertions that their promotion of prescription opioids had always been done in a manner that was safe and nonmisleading;

c.     Selecting, cultivating, promoting, and paying KOLs, Front Groups, and Trade Associations;

a.     Paying KOLs to serve as consultants or on the Manufacturing Co-Conspirators' advisory boards, to serve on the advisory boards and in leadership positions of Front Groups, and to give talks or present CMEs;

b.     Paying significant amounts of money to leaders and individuals associated with Front Groups;

c.     Donating to Front Groups to support talks or CMEs;

d.     Paying membership fees or registering with Front Groups and trade groups, such as the HDA, PCF and NACDS;

e.     Disseminating many of their false, misleading, imbalanced, and unsupported statements through unbranded materials that appeared to be independent publications from Front Groups;

f.     Sponsoring CME programs put on by Front Groups that focused exclusively on the use of opioids for chronic pain;

g.     Developing and disseminating pro-opioid treatment guidelines with the help of the KOLs as authors and promoters and the help of the Front Groups as publishers and supporters;

h.     Encouraging Front Groups to disseminate their pro-opioid messages to groups targeted by the Manufacturing Co-Conspirators, such as the elderly, and then funding that distribution;

i.   Concealing their relationship to and control of Front Groups and KOLs;

j.   Fraudulently claiming that they were complying with their duties to maintain effective controls against diversion, including duties to identify, investigate, halt shipment of, and report suspicious orders of opioids;

k.   Fraudulently claiming that they were complying with their obligation to design and operate a system to disclose to the registrant suspicious orders of their prescription opioids;

l.   Fraudulently claiming that they did not have the capability to identify suspicious orders of controlled substances;

m.   Applying political and other pressure to halt prosecutions for failure to report suspicious orders of prescription opioids;

n.   Lobbying for less stringent regulation of their marketing and distribution of pharmaceutical products.

o.   Communicating with one another and with other members of the Opioid Promotion Enterprise via e-mail, telephone, and written communications regarding the management, operation, and/or participation in the enterprise and in the unlawful statement regarding the risks and benefits of prescription opioids; all collaborations among members of the Enterprise described in Section VI are alleged to be predicate acts.

p.   Communicating with state agencies, federal and state courts, and private insurers regarding their misrepresentations regarding risks and benefits of using opioids for chronic pain;

q.   Receiving monies through the mails and wires, including payments for prescription opioids;

r.   Sending the prescription opioids themselves through the mails as well as the associated bills of lading, invoices, shipping records, reports, and correspondence; and

s.   Sending documents intended to facilitate or control the dispensing of prescription opioids, including the National Retail Pharmacies' nationwide policies and procedures that controlled the conduct of individual retail pharmacies.

394.    For the Opioid Promotion Enterprise to work, each member had to agree to implement similar tactics regarding fraudulent promotion of the use and sale of prescription opioids. This conclusion is supported by the fact that the Members of the Opioid Promotion Enterprise each financed, supported, and worked through the same KOLs, Front Groups, and Trade Associations and often collaborated on and mutually supported the same publications, CMEs, presentations, and prescription guidelines. This conclusion is further supported by the fact that many of the Manufacturing Co-Conspirators received the same advice from McKinsey regarding how to "turbocharge" their opioid sales.

395. The Front Groups, KOLs, and Trade Associations also conducted and participated in the conduct of the Opioid Promotion Enterprise, directly or indirectly, by means of the mail and wires in one or more of the following ways:

a. Making misrepresentations regarding opioids;

b. Distributing promotional and other materials that claimed that opioids could be safely used for chronic pain without risk (or with minimal risk) of OUD and dependency and that misrepresented the risk-benefit balance of using opioids for chronic pain;

c. Amplifying messages favorable to increased opioid use—and ultimately, the Defendants' financial interests;

d. Drafting and issuing guidelines and policies that minimized the risk of OUD, promoted opioids for chronic pain, and promoted policies and procedures for the distribution and dispensing of prescription opioids that were deliberately ineffective at preventing diversion; and

e. Concealing the connections among themselves and to Defendants.

396. Opioid Promotion Enterprise Members who participated in official proceedings corruptly obstructed, impeded, or influenced those proceedings in one or more of the following ways:

a. Making misrepresentations regarding the safety or efficacy of prescription opioids;

b. Making misrepresentations regarding their own actions to comply with controlled substances laws and otherwise prevent opioid diversion and misuse; and

c. Soliciting the support of supposedly "neutral" witnesses or groups—that Opioid Promotion Enterprise Members actually financed and/or controlled—to testify and/or submit comments in support of increased opioid use and looser regulations of opioid sales.

d. Such proceedings included, but are not limited to:

e. Congressional testimony, lobbying, and submission of materials to members of Congress in association with the Ensuring Patient Access and Effective Drug Enforcement Act, the Military Pain Act, the National Pain Policy Act;

f. Congressional testimony seeking to modify the "80/20" that limited Noramco's access to the U.S. market;

g. Congressional testimony by ADBC, McKesson, Cardinal, and H.D. Smith minimizing and/or denying their role in creating the opioid crisis;

h. Submission of an amicus brief in *Cardinal Health v. Holder*;

i. Testimony and submissions in connection with FDA administrative actions, including those surrounding the creation of the ER/LA opioid REMS; and

j. Testimony and submissions in connection with DEA investigations and enforcement actions.

397.     Opioid Promotion Enterprise Members conspired to and did violate their obligations under the CSA and its state equivalents. Under laws regulating controlled substances, Opioid Promotion Enterprise Members are duty bound to identify, report, and not ship suspicious orders of controlled substances. The Opioid Promotion Enterprise Members jointly agreed to and did, in fact, disregard their duties to identify, investigate, halt and report suspicious orders of opioids and diversion of their drugs in one or more of the following ways:

      a.      Unlawfully distributing and/or dispensing prescription opioids;

      b.      Furnishing false or fraudulent information in their reports about suspicious orders, and/or omitting material information from reports, records, and other documents required to be filed, including suspicious orders of prescription opioids;

      c.      Refusing to comply with their obligations under the law to prevent diversion by, among other things, failing to halt and report suspicious orders of prescription opioids and creating policies and procedures that allowed suspicious prescriptions to be filled without adequate due diligence;

      d.      Failing to report and halt CSA violations by other members of the Opioid Promotion Enterprise and, in some cases, actively facilitating other members' violations;

      e.      Deceiving regulators, the public, and Plaintiff that Opioid Promotion Enterprise Members were complying with their legal obligations to identify and report suspicious orders of prescription opioids all while they were knowingly allowing millions of doses of prescription opioids to divert into the illicit drug market.

398.     By designing and deploying defective systems for identifying suspicious orders and/or prescriptions that could not lawfully be filled under the CSA and other drug control laws, Opioid Promotion Enterprise Members deliberately closed their eyes to what would otherwise have been obvious—namely, that their customers were placing suspicious orders and/or presenting prescriptions that should not have been filled. The volume of prescription opioids that they distributed and/or dispensed implies that failure to notice that some of the orders and/or prescriptions were ones that could not lawfully have been shipped and/or dispensed was deliberate.

399.     Because Opioid Promotion Enterprise Members often communicated verbally when discussing their plans to all adopt similar models for reporting suspicious orders (i.e., models that

resulted in the commission of violations of controlled substance laws), the similarities allow an inference of tacit agreement regarding Opioid Promotion Enterprise Members' compliance with controlled substance laws.

400.    The Pill Mills conducted and participated in the conduct of the Opioid Promotion Enterprise, directly or indirectly, by unlawfully prescribing and/or dispensing prescription opioids. The Manufacturing Co-Conspirators conspired with the Pill Mills to whom they directly promoted opioids. Schein conspired with the Pill Mills to which it distributed.

401.    The scheme devised and implemented by the members of the Opioid Promotion Enterprise amounted to a common course of conduct intended to increase sales of prescription opioids by encouraging the prescribing and use of opioids for chronic pain. The scheme was a continuing course of conduct, and many aspects of it continue through to the present.

402.    Each member of the Opioid Promotion Enterprise agreed, with knowledge and intent, to the overall objective of the enterprise and participated in the common course of conduct to commit unlawful acts for the purpose of increasing the sales of prescription opioids.

403.    The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of obtaining significant monies and revenues from the sale of highly addictive and dangerous drugs. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

404.    Defendants' and their Co-Conspirators' conduct was not merely parallel. While certain Opioid Promotion Enterprise Members engaged in similar conduct (e.g., various Manufacturing Co-Conspirators made similar misrepresentations regarding the safety and efficacy of prescription opioids), they engaged in that conduct while communicating and coordinating with one another.

405.    The elements of these predicate acts occurred within the United States and/or the predicate acts violated U.S. statutes with extraterritorial reach.

### 4. Conspiracy

406.    Even if a Defendant did not personally commit a predicate act, each Defendant conspired with other members of the Opioid Promotion Enterprise in violation of 18 U.S.C. § 1962(d).

407.    Each Defendant, whether or not it personally committed a predicate act, agreed to participated in the Opioid Promotion Enterprise, with knowledge that at least one member of the enterprise intended to (and did) commit at least two predicate acts.

408.    For instance, each Defendant knew and intended that the National Retail Pharmacies would dispense prescription opioids in violation of the CSA. This knowledge and intent can be inferred because Defendants could not profit from prescription opioids unless they were actually dispensed by the National Retail Pharmacies.

### 5. Consequences

409.    By reason of the above-referenced violations of 18 U.S.C. § 1962(c)–(d), Plaintiff was injured in its business or property within the meaning of 18 U.S.C. § 1964(c) and is entitled to assert this claim and to recover threefold the damages they sustained and the cost of the suit, including reasonable attorneys' fees, as well as such other appropriate relief as the Court may provide.

## XII.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff asks that the Court:

A.    Certify the Proposed Class or the alternative issues class and appoint Plaintiff as the class representative;

B.    Enter judgment against Defendants, jointly and severally, and in favor of Plaintiff and the class;

C.    Award compensatory damages in an amount sufficient to fairly and completely compensate Plaintiff and the members of the class for all damages; treble damages; pre-judgment and post-judgment interest as provided by law and at the highest legal rate;

D.    Award such equitable relief against Defendants as the Court should find appropriate;

E.      Award Plaintiff its cost of suit, including reasonable attorneys' fees as provided by law; and

F.      Award such further and additional relief as the Court may deem just and proper under the circumstances.

## XIII.   <u>JURY DEMAND</u>

Plaintiff demands a trial by jury on all issues so triable.

Dated: October 14, 2025                    Respectfully Submitted,

                                           Christopher A. Dodd
                                           FAYERBERG DODD, LLC
                                           500 Marquette Avenue NW, Suite 1330
                                           Albuquerque, New Mexico 87102
                                           Tel: (505) 475-2742
                                           chris@fayerbergdodd.com

Additional Counsel for Plaintiff Who Will Seek Admission *Pro Hac Vice*

                                           Warren Burns
                                           Darren Nicholson
                                           Ryan Gaddis
                                           Connor Weldon
                                           **BURNS CHAREST, LLP**
                                           900 Jackson St., Suite 500
                                           Dallas, Texas 75202
                                           Telephone: (469) 904-4550
                                           Facsimile: (469) 444-5002
                                           wburns@burnscharest.com
                                           dnicholson@burnscharest.com
                                           rgaddis@burnscharest.com
                                           cweldon@burnscharest.com

                                           Korey A. Nelson
                                           **BURNS CHAREST, LLP**
                                           365 Canal Street, Suite 1170
                                           New Orleans, LA 70130
                                           Telephone: (504) 799-2845
                                           Facsimile: (504) 881-1765
                                           knelson@burnscharest.com

                                           John W. (Don) Barrett
                                           David McMullan, Jr.
                                           Richard Barrett
                                           Sterling Aldridge
                                           **BARRETT LAW GROUP, P.A.**
                                           P.O. Box 927
                                           404 Court Square North
                                           Lexington, Mississippi 39095
                                           Tel: (662) 834-2488
                                           Fax: (662) 834-2628
                                           dbarrett@barrettlawgroup.com
                                           dmcmullan@barrettlawgroup.com
                                           rrb@rrblawfirm.net

saldridge@barrettlawgroup.com

Charles J. LaDuca
David L. Black
Monica Miller
Jennifer E. Kelly
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Telephone: (202)789-3960
charles@cuneolaw.com
dblack@cuneolaw.com
monicam@cuneolaw.com
jkelly@cuneolaw.com

Steve Martino
**TAYLOR MARTINO, P.C.**
51 St. Joseph St.
Mobile, AL 36602
Telephone: (251) 433-3131
SteveMartino@taylormartino.com

*Attorneys for Plaintiff*

119